Jose Klein, OSB No. 083845
jose@kleinmunsinger.com
Damien Munsinger, OSB No. 124022
damien@kleinmunsinger.com
KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F
Portland, OR 97214-3497
(503) 568-1078
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| Melissa Canning,<br><br>Plaintiff,<br><br>v.<br><br>Washington County<br><br>Defendants. | Case No. 3:23-cv-00210<br><br>**FIRST AMENDED COMPLAINT**<br><br>Whistleblower Retaliation, Or. Rev. Stat. § 659A.199; Prohibited Conduct by a Public Employer - Or. Rev. Stat. § 659A.203; OFLA Interference - Or. Rev. Stat. § 659A.171; FMLA Interference - 29 U.S.C. § 2611(2); Protected Class Discrimination - Or. Rev. Stat. § 659A.030, 42 U.S.C. §2000e Title VII; Disability Discrimination, Or. Rev. Stat. §659A.112, .118, 42 U.S.C. § 12112<br><br>PRAYER: $4,486,000.00<br><br>DEMAND FOR JURY TRIAL |

1.      Washington County Sheriff's Office Deputy Melissa Canning's career abruptly changed on March 6, 2021. Prior to that evening, Deputy Canning was recognized as a talented law enforcement officer. Her supervisors consistently told her that she was a great candidate for advancement. On March 6, 2021, Deputy Canning alerted her supervisors that a colleague had disregarded a suicidal male citizen's report of being sodomized at gunpoint, and then lied about it. Immediately thereafter the Washington County Sheriff's Office unleashed a campaign of harassment and retaliation that culminated in Deputy Canning's pretextual termination on January 31, 2023.

2.      Deputy Canning seeks judicial redress for Washington County's unlawful treatment and retaliation.

## I.      JURISDICTION

3.      This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. Pursuant to 42 U.S.C. § 1367, this Court should also exercise supplemental jurisdiction over Plaintiff's claims that arise under state law, as those state law claims arise from the same nucleus of operative facts as Plaintiff's federal claims.

4.      Venue is proper within the District of Oregon, Portland Division, pursuant to 28 U.S.C. § 1391(b) because all or substantially all of Plaintiff's claims arose in this judicial district.

5.    Plaintiff submitted timely notice of her intent to sue in accordance with Or. Rev. Stat. § 30.275.

6.    Plaintiff also timely filed claims with Oregon's Bureau of Labor and Industries ("BOLI") raising issues alleged herein. Plaintiff's administrative cases have been closed and Plaintiff has received a notice of right to sue from BOLI. Plaintiff has timely filed this matter within the time limits set forth in the right to sue notices issued by BOLI.

## II.    PARTIES

7.    Plaintiff Melissa Canning ("Plaintiff" or "Deputy Canning") is an individual resident of Washington County, State of Oregon. Plaintiff is a female woman of color, who identifies as Filipina/Native American. Plaintiff is a member of a protected class under Or. Rev. Stat. § 659A.030 and Title VII. From approximately April 2018 through her unlawful termination on January 31, 2023, Plaintiff worked as a sheriff's deputy for Defendant Washington County.

8.    Defendant Washington County ("Defendant" or "the County") is a public body, as defined by Or. Rev. Stat. § 30.260(4). The County is an employer as defined by Or. Rev. Stat. § 659A.030(4)(a). Defendant operates the Washington County Sheriff's Office ("WCSO") where Deputy Canning was employed as a sworn peace officer.

## III.    FACTS

9.    Deputy Canning grew up in a law enforcement family. Her father, William Canning, retired in 2012 as a Lieutenant of Police, Northern Station platoon

commander with the San Francisco Police Department following a 32-year career; her older brother has been with San Francisco Police Department for about 16 years and has served as a commanding officer. He was previously employed as an officer with a Police Department in Utah for about three years. Her younger brother has been with the San Francisco Police Department for about 10 years including as an Investigator in the Special Victims Unit.

10.     Following a divorce in 2015, Plaintiff needed to independently provide for her family, and she chose to follow what had become a familial passion by pursuing a career in law enforcement.

11.     In April 2018, WCSO hired Plaintiff as a patrol deputy on a probationary recruit status. In October 2018, Deputy Canning successfully graduated with her Basic Police Certificate from the Department of Public Safety and Standards Training in Salem, Oregon. The 20-week training academy was a grueling process that presented significant challenges for a single mother with children not yet old enough to be left home alone.

12.     After successfully completing WCSO's 18-month probationary process, Deputy Canning advanced to a position as a regular patrol deputy. At that time, in October 2019, WCSO Sergeant Jason Yazzolino commended Deputy Canning for her superior work ethic and enthusiasm for police work, stating that he had "no hesitation in recommending Deputy Canning for the promotion to the rank of Deputy."

13.    Deputy Canning's trainers noted her particular passion and aptitude for working to support the anti-human trafficking and anti-sex trafficking missions of the sheriff's office. By 2020, her superiors had noticed her strong work ethic and her talents for investigating more complicated, higher-level matters, including investigations into sex crimes. In September 2020, Sergeant Josh Wilson noted in a quarterly review, "I have very much enjoyed supervising Melissa [Canning]. Her work ethic, relationship with co-workers and the public, and her willingness to both learn and do whatever is necessary to complete a task are all qualities that I appreciate."

14.    By 2021, Deputy Canning was expressing interest in, and receiving encouragement from supervisors about, seeking a promotion to a detective position. Sergeant Josh Snyder noted that Deputy Canning "completes complex and thorough investigations, and has several compliments from other Sgts. on her reports and investigations."

A.    <u>The events of March 6, 2021 and the ensuing investigation.</u>

15.    On the evening of March 6, 2021, Deputy Canning was partnered with another deputy, Brett Winders. Upon information and belief, Winders is a white male.

16.    At approximately 8:55 PM, a call came in that "MALE AT THE LOCATION IS HAVING SUICIDAL THOUGHTS … NO PLAN. SAYING, 'I MIGHT NOT SEE YOU TOMORROW.'" At 8:59 PM, Deputy Winders radioed

that he was with the subject and the subject's manager. Deputy Canning arrived at
the scene several minutes later.

17.    When Deputy Canning arrived, she observed Deputy Winders
walking with the subject. It appeared that Winders was placing the subject into a
Peace Officer Hold ("POH"), an involuntary hold on an individual based on a
finding of probable cause that the individual posed an immediate threat to himself or
others and was in need of immediate care, custody, or treatment for mental illness.
Upon arrival, Deputy Canning asked Winders if he needed any assistance.

18.    Deputy Winders asked Deputy Canning if she could give the subject a
ride to the hospital. Deputy Canning asked if this was a POH. Winders responded
that the subject was not being placed on a hold, and that he just needed a courtesy
transport to the hospital. Deputy Canning agreed to take the subject to the hospital.

19.    En route to the hospital, it was evident that the subject was upset.
The subject thanked Deputy Canning repeatedly for assisting him and believing he
needed help. When Deputy Canning inquired about what upset the individual, the
subject reported that he had been kidnapped and raped at gunpoint two days prior.
He did not, however, make any suicidal statements to her.

20.    Once the subject was safely checked into the hospital, Deputy
Canning immediately radioed into dispatch, which aired to all on-duty deputies, to
change the call type from Suicidal Threat to a Sex Crime Adult. Within
approximately one minute of radioing in the information of a crime, Deputy

Winders sent Deputy Canning a direct message, expressing surprise.

"WHAAAAAAT?!" Winders wrote, seemingly shocked about the change in the call.

21.     Deputy Canning investigated the sex crime for the remainder of her shift. At approximately 3:00 AM on March 7, she returned to the precinct to submit evidence related to the rape. While there, she encountered Deputy Winders again. She explained to Winders that the subject he asked her to transport to the hospital had been raped at gunpoint two days prior. Winders responded with apparent shock. "Nooo. *What?*" This interaction occurred in the presence of several other deputies.

22.     One of the deputies present at the time, Deputy Bryan Payton, joked that he would sooner be killed than perform oral sex on a man, and Deputy Winders laughed at the comment.

23.     Deputy Canning continued to investigate the rape case during her March 7 shift. She called the subject's two managers who were present with the subject at the time that the call came in as a potential suicide threat. During her conversation with one of the managers, Deputy Canning asked why law enforcement had not been told about the sexual assault, but only about the risk of suicide.

24.     The manager responded to Deputy Canning. "We did [inform law enforcement about the sexual assault]! We told your partner!" Deputy Canning confirmed with him that the subject had explained to Deputy Winders the facts and circumstances of the sexual assault. Deputy Canning then verified with the subject himself that he also had told Winders about the assault. The subject told Deputy

Canning that he did not remember for certain if he had mentioned that it was at gunpoint, but he definitely told Winders that he had been sexually assaulted.

25.    Deputy Canning reached out to Sergeant Robert Rookhuyzen who had provided her with mentorship on sex crime investigations. She explained to Sgt. Rookhuyzen how Deputy Winders spoke falsey to her about what he had known about the report of sexual assault.

26.    On March 11, 2021, Sgt. Rookhuyzen submitted a performance observation memo on behalf of Deputy Canning for her "stellar" incident report and "for representing our profession and agency so well" in her investigation into the March 6 call.[1]

27.    On March 7 or 8, 2021, Deputy Canning reached out to Deputy Winders and asked him to write a supplemental report covering the conversation that he had with the subject prior to Deputy Canning's arrival to the scene.

28.    In his supplemental report, Deputy Winders once again failed to include any reference to a report of sexual assault.[2]

29.    Outside of his report, in a direct message to Deputy Canning, Deputy Winders wrote that he had thought that the subject had been "12–34," a code that WCSO uses to denote "behavioral problems / mentally unbalanced." Winders also

---

[1] A copy of Sgt. Rookhuyzen's March 11, 2021, Observation Report is attached as exhibit 1 to this Complaint.

[2] A true and accurate copy of the narrative contents of Deputy Winders's supplemental report from March 8, 2021, is attached as exhibit 2 to this Complaint.

stated, "I'm sorry the SUT turned into a mouth–rape case." Winders further elaborated that he was "so concerned with getting him to the hospital that I took his ramblings as utterances."

30.     Several weeks later, Deputy Canning discovered that on or about March 22, Deputy Winders wrote a second supplemental report, in which, for the first time, he reported that the subject had told him that "a traumatic thing happen[ned] to him recently. He said someone pointed a gun at him and told him to, 'suck his dick'." The facts introduced in the revised supplemental report conclusively established that Deputy Winders had been expressly informed about the occurrence of a sex crime when he arrived at the call. Therefore, he lied by omitting critical facts in his direct communication with Deputy Canning on the evening of March 6, 2021, and in his original and in his first supplemental report. In addition, Deputy Winders perpetuated these lies multiple times by expressing surprise about the call changing from a suicide threat to a sex crime.[3]

31.     In fact, what had been disclosed to Deputy Winders constituted the serious crime of sodomy in the first degree, a class A felony punishable in Oregon by up to 20 years in prison.

**B.  Deputy Canning's initial reports of Deputy Winders's dishonesty**

32.     On March 7, 2021, Deputy Canning told the Officer in Charge of the shift, Sergeant Chris Bowman, that Deputy Winders had lied about his knowledge of

---

[3] A true and accurate copy of the narrative contents of Winders's March 22, 2021 supplemental report, is attached as exhibit 3 to this Complaint.

the subject's report of a class A felony sex crime accomplished through the use of a deadly weapon. Sgt. Bowman advised Deputy Canning to report the matter to Sergeant Josh Snyder, who supervised both Winders and Deputy Canning.

33.    Deputy Canning reported the matter to Sgt. Snyder, who, in conjunction with Lieutenant Kelly Degman, commenced a Supervisor Investigation into the conduct of Deputy Winders.

34.    Despite Deputy Canning's disclosure to Sgts. Bowman and Snyder that Deputy Winders had lied to her in an effort to cover up his failure to open a sex crime investigation when one was reported, the supervisory investigation did not look into the question of Deputy Winders's honesty.

35.    In or around May 2021, Deputy Canning learned that Sgt. Snyder and Lt. Degman had concluded their investigation. Upon information and belief, Deputy Winders justified ignoring a report of a serious sex crime by dismissing the victim as "crazy." Further, upon information and belief, Lt. Degman in turn relied on that characterization as a justification to avoid a finding of misconduct by Deputy Winders, and passed on to Chief Deputy Al Roque that the victim was "crazy." Chief Deputy Roque would later refer to the victim as "that crazy guy."

36.    Neither Lt. Degman nor Sgt. Snyder interviewed Deputy Canning or asked any additional questions to follow up on what she had reported to Sgt. Bowman. Nor did Defendant WCSO provide Deputy Canning with any status update on the investigation or county actions to address Deputy Winders's dishonest conduct.

37.     In or about the middle of May 2021, after careful consideration, Deputy Canning reported her concerns to WCSO's Professional Standards Unit ("PSU"). Deputy Canning relayed her belief that the supervisory investigation into Deputy Winders was incomplete. Shortly after Deputy Canning made that report, PSU Sgt. Tony Bass contacted Deputy Canning. Sgt. Bass informed Deputy Canning that the supervisory investigation into Winders was being elevated to an Internal Affairs ("IA") investigation into Deputy Winders's untruthfulness.

38.     As part of that IA investigation, Sgt. Bass interviewed Deputy Canning. During the interview Deputy Canning provided the names of several personnel who had relevant information regarding Deputy Winders's untruthfulness. Despite providing assurances that he would be in touch with those witnesses, the witnesses were not contacted during the investigation.

39.     During the IA investigation, Deputy Winders was not put on administrative leave. Instead, he continued his regular duties working out of the same precinct as Deputy Canning.

40.     As soon as the supervisory investigation elevated into an IA investigation into Deputy Winders's untruthfulness, Deputy Canning began to experience retaliation from her supervisors. In March 2021, Deputy Canning submitted a training request for an offered course on human trafficking. Sgt. Snyder immediately approved the request and forwarded it to Lt. Degman. Lt. Degman sat on Deputy Canning's request for several weeks. Then, around the time that the supervisory investigation escalated to IA, Lt. Degman informed Deputy Canning

that the course was full and no longer open for enrollment. As described below, this was but a small indication of the pattern of unlawful retaliation that was to come.

41.    Beginning in May 2021, Deputy Canning began to experience significant anxiety related to her treatment at work. Her symptoms included tension headaches, fatigue and insomnia. Medical providers attributed these symptoms to the stress related to being a whistleblower at work. She utilized protected leave to avoid having to work the same shift with Deputy Winders more than what was absolutely necessary.

42.    Deputy Canning disclosed to several supervisors, including Sgts. Rookhuyzen, Bowman, and Snyder, the significant anxiety and adverse mental health effects that she was experiencing during this time. On multiple occasions, Deputy Canning explained to each of them that the symptoms she was experiencing imposed substantial limits on daily life and her experiences in the workplace.

43.    Despite making the County aware that she was dealing with a medical condition that was substantially limiting major life activities, the County did not engage with Deputy Canning in an interactive process to see if there were reasonable accommodations that would allow her to once again thrive in the workplace. Nor did the County engage in meaningful discussions about protected family medical leave that could be available to her during this challenging period. Without any meaningful protections extended to her, Deputy Canning followed other procedures, repeatedly using her paid time off banks to manage the effects of her conditions. Despite being aware of the negative impact of working closely with Deputy Winders

during the investigation, the County failed to take any steps to provide Deputy
Canning with a safe work environment.

44.     In early August 2021, Deputy Canning learned that Winders's IA
investigation for untruthfulness came back as unfounded. Consistent with WCSO
practice, the undersheriff signed off on the IA finding. Deputy Canning requested to
meet with Undersheriff John Koch to discuss the matter.

45.     On or about August 16, 2021, Deputy Canning met Undersheriff
Koch in his office. During the meeting, Undersheriff Koch indicated a limited
awareness of the particular facts involved in the Deputy Winders investigation. "We
get a lot of these binders," he told her. Deputy Canning requested an opportunity to
go over the specific facts of the investigation. He agreed, and Deputy Canning
walked him through the events.

46.     Throughout the recitation of events, Undersheriff Koch took notes.
He asked Deputy Canning about coworkers and supervisors who were aware of the
incident. Deputy Canning told him that the WCSO employees who knew relevant
facts were Lt. Kelly Degman, Sgt. Tony Bass, Sgt. Josh Snyder, Sgt. Chris Bowman,
Sgt. Robert Rookhuyzen, Deputy Scott Cutler, Deputy Brian Payton, and *possibly*
Deputy Kevin Howell and Deputy Mike Mitchell.

47.     Undersheriff Koch thanked Deputy Canning for coming forward. He
promised to take a "second look" at the investigation. He acknowledged that
sometimes the sheriff's office "get[s] it wrong" and affirmed that "this one needs a
second look."

48.    Towards the end of the conversation, Undersheriff Koch asked if supervisors had moved Winders out of Deputy Canning's district to avoid conflict. She responded that no one had ever told her that was possible; instead, she had taken off nearly half the rotation to avoid having to work with someone who had lied about the report of a sodomy at gunpoint, a class A felony.

49.    Undersheriff Koch asked if she was still sharing work days with Winders. Deputy Canning informed the undersheriff that in the rotation that was set to begin in a few weeks, the two would be sharing a district but only working one day together.  Undersheriff Koch stated that if Deputy Canning so requested, a supervisor would likely move Deputy Winders to a different district.  Deputy Canning affirmed that that would be helpful as Winders's dishonesty had caused her enormous stress and anxiety.

50.    Undersheriff Koch advised that supervisors "should have been on top of that."  He also noted that the administration should have contacted Deputy Canning to review the findings of the IA investigation.  Undersheriff Koch further agreed that the sheriff's office erred by not interviewing Deputy Canning regarding the original misconduct report.  When Deputy Canning asked why Deputy Winders was never put on Administrative Leave, Undersheriff Koch stated that he did not know.

51.    In the weeks that followed, Deputy Canning took Undersheriff Koch at his word that he would be taking a second look at the Deputy Winders investigation.

52.     Around that time, Deputy Canning applied for an open position on the Crisis Negotiation Unit ("CNU"), a special teams assignment that would come with additional compensation. The specialized work of the CNU requires superior communication skills, including the ability to develop rapport and trust with individuals in extremely volatile environments.

53.     Deputy Canning learned that Winders was eligible and had applied for a position on the CNU. However, given that Undersheriff Koch had told her that he was taking a second look at the investigation of Deputy Winders, and given that Winders had disregarded a report of sodomy in the first degree by a victim in crisis, which would have a direct bearing on the work he would do in CNU, Deputy Canning felt an obligation to inform the CNU selectors about Winders's March 2021 misconduct.

54.     On or about September 2, 2021, Deputy Canning met with Sgt. Cliff Lascink, who was conducting the CNU recruitment. Deputy Canning explained to Sgt. Lascink the Deputy Winders matter, and the fact that the undersheriff had decided to take a second look at the investigation. Deputy Canning expressed concern that given the sensitive nature of the CNU's work, it was important that it not be staffed with someone like Deputy Winders, who had not only been dishonest but also ignored a credible report from the victim of a sex crime.

55.     Sgt. Lascink told Deputy Canning that he would confer with PSU about the status of the Winders IA investigation. Deputy Canning responded that he

should likely check with the undersheriff as he was the person looking into the matter, and PSU may not be aware of the status.

56.     On September 9, 2021, Deputy Canning wrote to Sgt. Jason Yazzolino, letting him know that Undersheriff Koch had indicated to her that the WCSO might be able to move Deputy Winders out of her district on the day that they were scheduled to work together. Sgt. Yazzolino responded the same day, stating, "Thank you for bringing this to my attention. You don't need to tell me any details. I will make sure we move Winders to another district."

57.     Still concerned about the risk that Deputy Winders presented on patrol, and the likelihood that his dishonesty could be used to undermine his testimony on any criminal prosecution in which Winders played a role in the arrest or investigation, Deputy Canning reached out to the Washington County District Attorney's Office. She wrote to Senior Deputy District Attorney Bracken McKey, stating, "I believe I am in possession of information that could be seen as exculpatory during a criminal prosecution according to the *Brady vs. Maryland* case. The information involves a deputy at WCSO and his honesty. The attached narrative explains this incident to the best of my ability." Deputy Canning attached a summary of the events involving Deputy Winders.[4]

58.     The next day Sr. DDA McKey responded, stating that the district attorney's Brady Committee would review the information.

_____

    [4] Deputy Canning's narrative provided to Sr. DDA McKey is attached as exhibit 4 to this Complaint.

FIRST AMENDED COMPLAINT
Page 16

59.     The Brady Committee of the Washington County District Attorney's office reviews issues relating to the conduct of law enforcement personnel that may be considered exculpatory in a criminal case. Those issues generally relate to matters of incidents of untruthfulness, criminal convictions, candor issues or some other type of issue placing the credibility of the law enforcement personnel into question. Law enforcement personnel subject to the County's Brady list, fall into one of two categories. Those who are designated as "Alert" on the Brady list will not be used by the County to testify in a criminal prosecution. The second category of the Brady list is for those designated as "Additional Discovery." Law enforcement personnel placed on the "Additional Discovery" category of the County's Brady list have been found to have engaged in conduct which could be considered exculpetory in a criminal case, but the conduct is not so egregious as to to cause an "Alert." For those law enforcement personnel subject to the "Additional Discovery" category of the County's Brady list, potentially exculpatory evidence is disclosed to defense counsel in advance of the law enforcement personnel testifying in a criminal trial.

**C.  Deputy Canning reported an instance of a deputy using excessive force**

60.     In or around July 2021, Deputy Canning was having a conversation with Sgt. Rookhuyzen, who had served as an informal mentor to her. The two were discussing WCSO's Field Training and Evaluation Program ("FTEP"). During the conversation, Deputy Canning disclosed that she had been on a call with two deputies and observed what she believed to have been an incident of excessive force used by one of her colleagues: Deputy Corey Neileah, a probationary deputy, while

assisting another probationary deputy, had slammed a male domestic violence suspect unnecessarily against a vehicle.

61.     Sgt. Rookhuyzen told Deputy Canning that because he was a supervisor, he would have to report up the chain of command what Deputy Canning had told him. Deputy Canning responded that this was fine and that she would cooperate fully with whatever steps were needed moving forward.

62.     WCSO ultimately conducted a superficial investigation into Deputy Neileah's conduct. Deputy Neileah, who is a white male, was never put on administrative leave during the investigation. He remains a WCSO deputy. As of January 2023, he was promoted to a full-time position as a K9 officer, after barely one year of patrol experience.  This position comes with a pay raise and requires extensive knowledge on search/seizure and use-of-force.  Following the investigation,  Deputy Neileah routinely complained to coworkers about Deputy Canning reporting him.

      **D.  <u>WCSO's early acts of retaliation against Deputy Canning</u>**

63.     In the weeks and months following Deputy Canning's disclosures about Deputy Winders's dishonesty and the excessive force used by Deputy Neileah, WCSO began to treat her differently. Whereas prior to blowing the whistle about Winders's lies and misconduct, Deputy Canning received consistently positive feedback and encouragement to take on more challenging assignments and greater responsibilities, now she was marked as someone unwilling to work cooperatively with others.

64.     Deputy Canning heard from several sources that she was derisively being referred to as a "whistleblower" for her involvement in "the Winders thing" and "the Neileah thing." Colleagues seemed to go out of their way to avoid her.

65.     Deputy Canning's application for the CNU was rejected. Instead, Sgt. Lascink selected Deputy Winders, a white male who had just been subject to a dishonesty investigation, for the position. Sgt Lascink informed Deputy Canning that the primary reason she was not selected was because she could not work well with others and because she had told him that she could not work alongside Winders. Upon information and belief, under existing WCSO policy and practice, Winders should not have been eligible for CNU due to the low-level discipline he received for deficiencies in his report writing.

66.     In most special team assignments, an applicant will be deemed ineligible for the position if there is any discipline on their file within a period of time, typically one year. That practice was ignored in this case. Undersheriff Koch later acknowledged to Deputy Canning that WCSO has failed to maintain a consistent practice regarding the impact of a disciplinary history on special teams assignments.

67.     Deputy Canning's request to have Deputy Winders moved to a different district was also rejected.

68.     At the end of September 2021, Undersheriff Koch and Commander David Marzilli summoned Deputy Canning to a meeting. At the meeting,

Undersheriff Koch acknowledged that he did not have authority to ensure that Deputy Canning and Deputy Winders did not share a district.

69.    The undersheriff further denied stating that the Deputy Winders case needed a second look and claimed only to have said that he would give it a second look. During the conversation, the undersheriff went out of his way to make sure Deputy Canning knew he was aware she had gone to the district attorney's office with her concerns about Winders's dishonesty.

70.    During the conversation, Commander Marzilli stated that he wanted to make sure that "everything is fair" for Deputy Winders and for Deputy Canning. Deputy Canning responded by explaining the harm that she had already experienced as a consequence of doing the right thing with respect to the misconduct of Winders. She specifically reported:

   a.    the retaliation she had been suffering, including that coworkers and sergeants were making negative comments about her being a whistleblower, alienating her from the shift, and accusing her of responsibility for "the Winders thing";

   b.    the outcome of her CNU application was retaliation for her lodging a complaint against Deputy Winders;

   c.    the negative impact on her health that she had to take her own PTO to manage, causing her lost income;

   d.    the fact that Deputy Winders should not have been eligible for a special team assignment because of his conduct; and

FIRST AMENDED COMPLAINT
Page 20

e. that she would be further retaliated against in her upcoming Detective application process, particularly because Sgt. Lascink was on the interview panel.

71.    During the conversation, Deputy Canning requested that her PTO banks be restored. Undersheriff Koch and Commander Marzilli laughed at her for making this request. Defendant WCSO failed to investigate these complaints by Deputy Canning.

72.    The following month, in October 2021, WCSO opened a recruitment for a Detective position. Deputy Canning was one of eight candidates. Despite performing at or near the top of the list of candidates on all objective measures during the application process, Deputy Canning was ranked seventh out of the eight candidates. Personal input from the panel interviewers, including Sgt. Lascink, improperly lowered Deputy Canning's standing in the candidate pool.

73.    The following month Deputy Canning learned the position of Field Training Officer ("FTO") would soon be open for recruitment.  In or around late January 2022, Deputy Canning submitted her application for FTO.

74.    Prior to reporting Deputy Winders's dishonesty in March 2021, she had been told by several supervisors that she would make an excellent FTO. Now, her application was rejected. Deputy Canning learned from Sgt. Rookhuyzen that Lt. Ed Rawlinson, who was involved in the appointment, harbored animus towards Deputy Canning because of her use of medical leave. According to Sgt. Rookhuyzen, Lt. Rawlinson had said to him about Deputy Canning's candidacy, words to the

effect of, "she will have to show up to work more than two days a week" before she would be a viable candidate for FTO.

75.     On Christmas Eve 2021, Deputy Canning experienced discrimination and retaliation by WCSO inappropriately denying her the day off, despite that she had requested the day off in July 2021. Similarly situated white male employees and employees who had not engaged in whistleblowing activities were given requested days off under similar circumstances. In fact, a white male coworker was given the day off at the last minute, although he had just submitted his request days prior.

76.     In February 2022, Deputy Canning was again discriminated against, this time wrongfully excluded from a training specific to activities of the Criminal Apprehension Team ("CAT"), which utilizes highly trained deputies to track and arrest offenders wanted for serious felony crimes and verifies sex offender compliance.

77.     On or about January 3, 2022, the County placed Deputy Winders on the Brady list, with the "Additional Discovery" designation. In the case of Deputy Winders, his placement on the *Brady* list was the result of Deputy Canning's report to Senior Deputy District Attorney McKey in September 2021.

78.     Sgt. Rookhuyzen had told Deputy Canning that the news of Deputy Winders's placement on the *Brady* list was circulated in a sergeants' meeting. In the meeting, sergeants were told that Winders's placement on the list was a result of Deputy Canning reporting Winders's dishonesty to the district attorney's office.

79.     Immediately thereafter, Deputy Canning became the target of rumor and untruth. WCSO personnel gossiped that Deputy Winders had done nothing

wrong and that Deputy Canning had sabotaged him because she was disgruntled that his IA had come back unfounded. As a result, Deputy Canning was regarded as a disgruntled employee and Winders as a victim unfairly tarnished.

### E. Salsa-gate

80.    On February 22, 2022, Sgt. Rookhuyzen and his domestic partner, Tony Bracamonte, who also worked at WCSO as a Jail Services Technician (JST), went out to dinner with Deputy Canning. Sgt. Rookhuyzen had suggested the dinner as an opportunity for her to blow off steam relating to the significant mental strain that Deputy Canning was experiencing.

81.    Sgt. Rookhuyzen drove for the three of them. They went to Si Señor restaurant in Washington County. As they were off-duty and had much to discuss, they stayed at the restaurant for approximately three hours. During the meal, the three of them discussed the stress Deputy Canning was experiencing as a result of the retaliation she was experiencing at WCSO. They also discussed the status of Deputy Canning's investigation into the March 2021 sex crime.

82.    At the end of the meal, Deputy Canning packed a to-go box of her leftovers. On the table was a small plastic serving bowl containing beans that came with Deputy Canning's meal. In order to keep the beans separate from her chicken, Deputy Canning put the small plastic bowl inside the to-go box. She did this in the presence of Sgt. Rookhuyzen and JST Bracamonte. JST Bracamonte made a joke about Deputy Canning putting the small plastic container in her to-go box, but

neither he nor Sgt. Rookhuyzen expressed any belief or concern that her conduct amounted to theft of a small plastic container.

83.    Deputy Canning had done this before at this particular restaurant chain. Her practice had been to use the small plastic container to take leftovers, then wash the container and return it clean to the restaurant. Never had the restaurant complained to her or expressed any concern about this practice of hers. Deputy Canning also cleaned and returned this container to the restaurant.

84.    After Deputy Canning packed up her leftovers and they settled the bill, Deputy Canning, Sgt. Rookhuyzen and JST Bracamonte left the restaurant and went to another restaurant for a drink and to continue their conversation. Other than a request by Sgt. Rookhuyzen that Deputy Canning place the to-go box on the floor of his car rather than the back seat, and a reminder at the end of the evening not to forget her leftovers, the subject of Deputy Canning's leftovers did not come up again.

85.    On February 23, 2022, the victim of the March 2021 sodomy case came to the precinct to review a photo array that included the suspect. The victim correctly picked out the suspect from the array. Deputy Canning relayed that news to Sgt. Rookhuyzen. She then communicated the information to Detective Sgt. Brad Davis, who instructed her to forward the information to the district attorney's office for grand jury consideration and potential prosecution. Deputy Canning complied with that directive.

86.     Had the prosecution gone forward, Deputy Winders would have been required to testify. This would have been a challenge for the district attorney's office as it would have been required to make *Brady* disclosures about Winders.

87.     The next day, just before midnight on February 24, 2022, Sgt. Rookhuyzen sent an email to Lt. Degman, stating that he believed he had an obligation to report Deputy Canning for stealing the small plastic container, which he described as a "mortar salsa container." This presumably gave rise to the use of the term "salsa-gate" in gossip at the County about Deputy Canning.

88.     In dramatic contrast to its investigations into Deputy Winders's dishonesty and Deputy Neileah's excessive use of force, the County immediately commenced an aggressive investigation into Deputy Canning. On February 25, 2022, WCSO referred the matter to the Beaverton Police Department for a criminal investigation of theft and official misconduct. Deputy Canning was off-duty at the time that she visited Si Señor.

89.     That day, Deputy Canning was escorted into an interview room. Present for the meeting were Sgt. Todd Baker, Sgt. Eamon O'Reilly, Sgt. Holly Greener, and a union representative. Deputy Canning was advised that she was being placed on immediate administrative leave. Sgt. Greener then took her to the female locker room, and remained present while Deputy Canning dressed down and locked her gear away.  Deputy Canning was then escorted off the property, during a shift change when many coworkers were present.

90.     As part of the paperwork required at the meeting, Deputy Canning received a letter from Chief Deputy Roque formally notifying her that she was being placed on administrative leave. Going forward, her shift would be Monday – Friday, 8:00 AM to 4:00 PM; on each day, she would need to contact Sgt. Chris Plewick at 8:30 and 1:30, wherein Sgt. Plewick "may have instructions for you regarding meetings and interviews to be conducted." She was further required to carry, at all times during her shift, a cell phone issued by the PSU and was further required to respond within one hour to any request of the WCSO.

91.     Chief Deputy Roque ordered Deputy Canning not to discuss the matter with "anyone except the Executive Command staff (Chief Deputy, Undersheriff, or Sheriff), the assigned investigators, a Human Resources representative, legal counsel, Chaplain Paul Lyda, a WCPOA representative, or an EAP representative."

92.     Four days later, on March 1, 2022, Washington County Sheriff Pat Garrett emailed Washington County District Attorney Kevin Barton to notify the district attorney's office that it had "initiated a criminal investigation involving a credible allegation of theft involving Deputy Melissa Canning." Sheriff Garrett did not mention that the object allegedly stolen was a plastic container valued at $1.91. This email was sent prior to any subject or witness interview regarding the incident. The first interviews were conducted on March 2.

93.     With Deputy Canning on administrative leave, the March 2021 sex crime case was put on hold. Rather than proceed to the grand jury, the case was

suspended, which it has remained through the time of this filing. With the case suspended, WCSO has avoided the embarrassment of Deputy Winders's *Brady* status becoming an issue in a sex crime prosecution.

94. Despite Defendant's orders that the matter not be discussed, and despite Deputy Canning's strict compliance with that order, in her absence gossip that Deputy Canning was on administrative leave because "she stole a salsa bowl from a restaurant" spread throughout the WCSO within the first week of her leave.

95. Deputy Canning alerted her union, the Washington County Police Officers Association ("WCPOA"), about the gossip that was spreading about her, as perpetuating gossip can be a policy violation. The union traced the information leak, assumed to be from a supervisor, back to Deputy Gary Upton, who claimed that he "couldn't remember" where or who he heard the gossip from. Deputy Upton averred that he heard the information at the training center where there was a steady traffic of people coming and going. Deputy Upton recalled he heard the gossip in passing on or about March 1, 2022, during a time period when Sgt. Rookhuyzen was present at the training center.

96. Throughout the process, Deputy Canning cooperated fully with the County's investigation into the allegedly stolen salsa container. Among other things, she provided information and a declaration from a server at a restaurant affirming that Deputy Canning had a practice of borrowing a small service bowl and returning it to the restaurant after washing it. However, the investigators never called the

individual, whose contact information was included, for interviews or follow-up questions.

97.    In or around the end of March 2022, the district attorney's office informed WCSO that it would not be moving forward with charges against Deputy Canning. However, WCSO never informed Deputy Canning that she was no longer under threat of prosecution. Instead, she learned this detail from WCPOA, who, in late April 2022 had requested an update on where the investigation stood.

98.    WCSO's investigation into the small plastic container was conducted by Sgts. Brad King and Jessica Hennessey, both of whom had a record of bias towards Deputy Canning. Sgt King had served as Deputy Winders's union representative throughout Winders's IA investigation and has on multiple occasions made statements that "Winders is only on the *Brady* list because of Canning." Sgt. Hennessey participated in the investigation into Deputy Neileah's use of excessive force.

99.    The investigation carried on for an additional three months. Throughout that time, Deputy Canning's health deteriorated. In or around 2014, she was diagnosed with Chronic Lyme Disease. Like many who suffer from auto-immune diseases, Deputy Canning's Chronic Lyme can flare up during periods of significant stress. During her time on administrative leave, her Chronic Lyme symptoms spiked dramatically, making it difficult to do much beyond basic chores and necessities. According to Deputy Canning's primary medical provider, she saw him approximately two-to-three times from 2019 to March 2021. In the

approximately fifteen months after the Deputy Winders incident in March 2021, she visited the doctor approximately ten times. During this period, Deputy Canning was diagnosed with and received medication for depression, anxiety and insomnia.

100.    On or about June 30, 2022, WCSO completed its investigation. The investigative finding was that Deputy Canning had violated the County's Professional Conduct, Mission and Service Vision, and Prohibited Conduct policies. However, the County provided no information as to exactly how her conduct violated those policies but instead issued a documented oral reprimand, the lowest level of discipline available to the County. In a brief meeting, Chief Deputy Roque informed Deputy Canning of the oral reprimand, and explained the violations were sustained, "because of the discredit and because of the appearance of it."

101.    On June 30, 2022, Sheriff Garrett wrote to District Attorney Kevin Barton confirming that the County's "personnel investigation regarding Deputy Canning concluded with no findings of misconduct reflecting a lack of truthfulnesss, candor or bias."

102.    Despite as early as March 2022, the district attorney's office had determined that it would not be pursuing charges against Deputy Canning; on May 19, 2022, a deputy district attorney ("DDA") who was prosecuting a sexual assault case in which Deputy Canning was a witness, wrote to opposing counsel stating, "This email is to alert you that Dep. Melissa Canning, a potential witness in this case, is currently the subject of an investigation for an allegation of theft. She is currently

on administrative leave by the Washington County Sheriff Office, and the investigation is ongoing."

103.   On June 6, 2022, the DDA emailed the defense counsel again to state, "This email is to update and correct an email relating to Dep. Canning that I previously sent on May 19th. The statement below is more accurate: The State is not calling Dep. Canning as a witness at trial. Dep. Canning is currently on administrative leave related to an investigation into dishonesty. This IA is ongoing."

104.   The County confirmed on or around August 16, 2022 that there were "no allegations of …untruthfulness" in Deputy Canning's investigation. Nonetheless, the DDA's statement about alleged dishonesty was then placed in a public filing in the case, further causing damage to Deputy Canning's reputation. The defendant in the case issued a subpoena to Deputy Canning with the apparent purpose of impeaching her credibility. The County released Deputy Canning back to work on the very day that she had been subpoenaed to testify for the defendant, which meant she could show up to Court in uniform, and the defense did not call her to the stand.

105.   Multiple white male WCSO personnel who had not engaged in protected whistleblowing activity, and who were the subjects of more serious criminal investigations than an allegation of theft of a $1.91 plastic salsa bowl, were not subject to the same reputationally damaging conduct as Deputy Canning.

   a.   Sergeant Brandon Yon was investigated for a possible violation of driving under the influence of intoxicants related to allegations that he was driving a golf cart while drunk. During the investigation Sergeant Yon was not

placed on administrative leave; nor was he walked off the WCSO property or the subject of emails to other public agencies labeling him as a "suspect."

b.  Former WCSO deputy Jeremiah Oswald was initially placed on leave for "mishandling of evidence" after an inmate accused him of stealing $150 cash.  He was not listed as a suspect or investigated at a criminal level. In fact, Deputy Oswald was allowed to return to work. Subsequently, Deputy Oswald was found to have been dishonest in the initial investigation. He was placed back on administrative leave and allowed to resign a few weeks later.

c.  In or around July 2022, Sergeant Mark Trost was placed on administrative leave after an alleged "Reckless Burning" or "Illegal Fireworks" report came in, which included a video of his involvement. Upon information and belief, Sergeant Trost was never investigated criminally, nor did the sheriff send a pre-*Brady* email to the District Attorney.

d.  Former Deputy Tyler Whitely arrived at work and exhibited signs of impairment around November 2022. Sgt. Trost requested a voluntary breath sample from Deputy Whitely, who complied. The result of the BAC was about .069, below the legal limit but still an arrestable offense if investigated properly. Deputy Whitely was instead driven home and placed on Administrative Leave with no criminal investigation ever opened. (He resigned about 6-8 weeks later.)

106.    After the district attorney's office informed WCSO that it would not be moving forward with criminal charges, WCSO investigators looked for some other excuse to go after Deputy Canning. WCSO accessed her work phone looking for evidence of wrongdoing. On or about July 1, 2022, Deputy Canning was told by Sgt. Jason Yazzolino that while Deputy Canning was on administrative leave, he had been instructed to find something wrong with a search and seizure that Deputy Canning had executed several months prior. Again, WCSO found no evidence of wrongdoing.

### F.    Deputy Canning's report of misconduct by Sgt. Rookhuyzen

107.    While on administrative leave for the alleged theft of a small plastic container, Deputy Canning repeatedly met with her union representatives. During one such meeting, she expressed dismay about Sgt. Rookhuyzen having manufactured this basis to undermine her status in the WCSO. During the conversation, she shared that she had endured various forms of inappropriate conduct by Sgt. Rookhuyzen and had not made an issue out of them.

108.    One example of inappropriate conduct that Deputy Canning included occurred on or about June 1, 2021. After going out for happy-hour drinks, and upon Sgt. Rookhuyzen's urging, she, JST Bracamonte, and Sgt. Rookhuyzen came back to the precinct so that Sgt. Rookhuyzen could administer blood alcohol tests on the breathalyzer. Deputy Canning asked Sgt. Rookhuyzen if they were allowed to do that. Sgt. Rookhuyzen responded that he would code it as "training" which would

obviate the need to enter identifying information for Deputy Canning and JST Bracamonte.

109.   Another example of inappropriate conduct by Sgt. Rookhuyzen was sharing confidential information about discipline imposed on other deputies. Sgt. Rookhuyzen had told Deputy Canning that one colleague of hers had been written up for writing terrible reports, and another for incompetence using the police radio.

110.   More troubling inappropriate behavior by Sgt. Rookhuyzen was the superior officer's repeated acts of sexual harassment toward Deputy Canning. Over and over again, Sgt. Rookhuyzen would ask inappropriate questions about Deputy Canning's personal life. He would solicit her opinions about which WCSO personnel she found attractive, offer speculation about colleagues' penis sizes, and also confide in her about individuals he was attracted to. Sgt. Rookhuyzen made repeated comments about someone Deputy Canning's brother worked with at a different law enforcement agency. Sgt. Rookhuyzen asked more than once if Deputy Canning could have her brother provide a picture of the attractive colleague with his shirt off. Sgt. Rookhuyzen also sent Deputy Canning photographs of colleagues whom Sgt. Rookhuyzen found "sexy."

111.   For Deputy Canning, Sgt. Rookhuyzen's insistence on discussing sexual topics with her was unwanted and unpleasant. When these topics arose, because Sgt. Rookhuyzen was her superior, she would attempt delicately to steer the conversation away from sex.

112.    Deputy Canning shared this information in a meeting with her union representative. Her union representative advised her that she had an obligation to report this information. If she did not report Sgt. Rookhuyzen for this misconduct, Deputy Canning herself could be disciplined. Accordingly, and despite reasonable fear that reporting Sgt. Rookhuyzen for all of this misconduct would likely result in an escalation of the retaliation and ostracism that she had been experiencing at the workplace, Deputy Canning duly submitted a written complaint detailing Sgt. Rookhuyzen's misconduct as directed by her union.

G.  **The County's further discrimination and retaliation against Deputy Canning**

113.    Upon her return from administrative leave, Deputy Canning was forced to work with both Sgt. Rookhuyzen and Deputy Winders. When Sergeant Jason Yazzolino brought up in a sergeant's meeting that he thought it would be counter-productive to have Deputy Canning working alongside these individuals, it gave rise to a reasonable fear of additional retaliation and the potential that she would not receive adequate backup on a call for service.

114.    July 7, 2022 was Deputy Canning's first full shift after being placed on administrative leave. Sgt. Rookhuyzen was also working that shift. During the shift, Deputy Canning submitted a report for a hit-and-run. Within several minutes of submitting the report, Sgt. Rookhuyzen pulled it from the queue for review. The action from Sgt. Rookhuyzen was unusual as the report that she had written was of a routine nature and not something typically subject to immediate review by a supervisor.

115.    Sgt. Rookhuyzen messaged Deputy Canning, stating, "I just read your report. Excellent investigation into the alleged bus hit and run." Immediately following this message Deputy Canning began to experience a panic attack. She had difficulty driving home from work and took leave for the following day. On or around July 14, 2022, the County rejected Deputy Canning's application for the Field Training Officer ("FTO") program. In rejecting her application, the WCSO described her as having a "curt" and "short" nature. Never before had WCSO given Deputy Canning such feedback. To the contrary, for years, supervisors had commended Deputy Canning for her professionalism and superior communication skills. The performance reviews she has received from the WCSO make no reference to her being "curt" or "short" or demonstrating any concerning communication style. Deputy Canning was the only female candidate for the FTO position. At the time WCSO had only one female FTO in the County and that FTO was contracted out to a city police department. Upon information and belief, Deputy Canning was one of only two deputies denied FTO out of fourteen candidates.

116.    In July 2022, Deputy Canning sought protected medical leave under the Family Medical Leave Act ("FMLA"). On July 29, 2022, the County rejected her request stating that she had not met the annual hours requirement for FMLA leave. When Deputy Canning asked for an explanation as to how that was possible, the County asserted that it would not include the hours during the pendency of the County's investigation into salsa-gate, during which she was required to call in twice daily and be available to respond to any sheriff's office directive within one hour.

117.    White male WCSO personnel who had not engaged in any protected whistleblowing activities have not been subject to the same treatment or been denied FMLA on the basis that the County used to deny Deputy Canning's request for FMLA protected leave. But for Deputy Canning's race and gender, and/or Deputy Canning's complaints about Deputy Winders, Deputy Neileah, and Sgt. Rookhuyzen, the County would have approved her FMLA request.

118.    Following the rejection of her FMLA leave request, Deputy Canning sought protected leave under the Oregon Family Leave Act ("OFLA"). In August 2022, once again, the County rejected her request for protected medical leave under the theory that hours in which Deputy Canning was required to be available for any request from the sheriff's office would not count towards OFLA eligibility.

119.    The County did allow her to take an unpaid leave of absence for medical reasons. That leave of absence came with no legal protections and no assurances that it would be continued for any period beyond the discretion and whims of her employer.

120.    Based on this escalating pattern of retaliation and the aggravation of Deputy Canning's medical symptoms that the retaliation caused, on or about August 23, 2022, Deputy Canning's doctor advised her that she would be better off medically if she could work from home. Her medical provider advised that she needed at least 90 continuous days away from the individuals whose discrimination and retaliation was aggravating her medical conditions. However, with the accommodation of

working from home, he released Deputy Canning to resume work on that modified basis.

121.    During the COVID emergency in 2020 and 2021, patrol deputies on a medical/light duty status were routinely assigned to work shifts from home where they fielded calls, wrote reports, provided follow-up phone interviews and investigations for deputies needing assistance, followed up on requests by Detectives, assisted with writing and/or reviewing search warrants, and other tasks. WCSO had ample work available that Deputy Canning could have performed remotely. Indeed, other WCSO personnel who were white and male, and had not engaged in protected whistleblower activity, were granted an accommodation of working from home when such an accommodation was medically necessary.

122.    On or about August 23, 2022, Deputy Canning submitted paperwork requesting a modified duty assignment of working from home. After several days of hearing nothing back, Deputy Canning forwarded her request to Sgt. Plewik and Lt. Joe Noffsinger, who were in charge of modified duty assignments. As of September 1, 2022, Deputy Canning still had not received any response from WCSO about her request for modified duty.

123.    On September 1, 2022, Holli Bridgens from Washington County human resources finally responded to Deputy Canning's request. Ms. Bridgens informed Deputy Canning that she had to seek an accommodation through the Americans with Disability Act ("ADA"). The County required Deputy Canning to go back to her doctor and seek additional information about "the specific details that

relate to your limitations." This same information had already been provided to the County in her multiple requests for protected family medical leave.

124.    On or about September 6, 2022, Deputy Canning submitted the ADA paperwork to the County.

125.    The following day, September 7, 2022, Deputy Canning spoke with County human resources representative Dale Yee. Mr. Yee explained to Deputy Canning that because her request for modified duty (to be stationed from home) was a request for more than a few days, it had to be treated as a permanent disability, and required the ADA paperwork that had been given to Deputy Canning. Upon information and belief, other WCSO personnel who were white and male, who had not engaged in protected whistleblower activity, were provided with modified duty assignments to work from home without having to complete ADA paperwork.

126.    Meanwhile, Deputy Canning's medical status continued to worsen. In September 2022, Deputy Canning's primary care provider diagnosed her with Post Traumatic Stress Disorder and Panic Disorder, both of which were the consequence of retaliation she suffered from WCSO and the County.

127.    On September 15, 2022, Deputy Canning provided Ms. Bridgens with additional information from her doctor about her medical condition. On September 20, Ms. Bridgens responded, stating that Deputy Canning's doctor provided "insufficient info." However, Ms. Bridgens did not tell Deputy Canning how or why the information provided was insufficient.

128.     On September 27, 2022, Deputy Canning provided additional medical information to Ms. Bridgens.

129.     On October 6, having heard nothing back and experiencing significant financial hardship based on her unpaid status, Deputy Canning again wrote to Ms. Bridgens, stating, "It has now been 8 days since I submitted my doctor's updated ADA accommodation forms. I continue to remain unpaid while waiting for, what seems, an unreasonable amount of time to fulfill the ADA accommodation request. Please advise when I can expect a response with next steps."

130.     On October 12, 2022, the County finally met with Deputy Canning to discuss her accommodation request. Mr. Yee ran the meeting. During the meeting, Mr. Yee stated expressed concerns about the request for 90 days of modified duty. Commander John Bennett, who was also present at the meeting had to acknowledge that it was common for WCSO personnel to be on light duty for periods exceeding 90 days. Mr. Yee also expressed concern about time in between service calls when Deputy Canning ostensibly would not be doing anything. Deputy Canning responded that that too was very common for other personnel on modified duty. Further, Deputy Canning agreed that she would be available and eager to perform assignments as they came in. She stated that it was her preference to stay busy throughout her shifts.

131.     Throughout Deputy Canning's period of medical leave, she received emails sent to her work email. This included communications regarding donations of leave time, medical forms that the County demanded Deputy Canning's doctors

complete, compensation information and other documents. Consistent with her doctor's medical release, which provided that Deputy Canning was medically able to perform work remotely, including writing reports, taking phone calls, and engaging in email communications, Deputy Canning made a periodic practice of checking her email while on leave.

132.    On or about November 23, 2022, Deputy Canning checked her WCSO email at a time when an armed bank robbery was in progress. Deputy Canning recognized the suspect as someone she had had prior police contact with. Deputy Canning provided material assistance with the identification of the suspect.

133.    After helping out, Deputy Canning contacted her supervisor, Sgt. Yazzolino, and asked if she should put in for the time that she worked on the assignment. Sgt. Yazzolino commended her on the work and approved and encouraged her submitting the time.

134.    On November 25, 2022, Deputy Canning received an email from Deputy District Attorney Nadya Martin, who was prosecuting a sexual battery case in which Deputy Canning had been the lead investigator. DDA Martin had asked Deputy Canning to conduct a follow-up interview with the victim. Deputy Canning reached out again to her supervisor, Sgt. Yazzolino. Sgt. Yazzolino told Deputy Canning that she could do the interview if she wanted or he would send out an officer to perform it. Deputy Canning elected to do the interview and submitted to DDA Martin a report of the phone interview that she conducted. Deputy Canning then submitted her time for the work she performed.

135.    The work that Deputy Canning performed on both matters was of value to the County and did not contravene the medical guidance that she received from her doctor. Nonetheless, on November 29, Deputy Canning received a letter from Chief Deputy Roque informing her that her behavior in doing work approved by her supervisor "is contrary to the expectation of someone who is on leave status. To avoid this occurring again we have temporarily revoked your e-mail access. I am also notifying you that you are not authorized to perform or undertake any further work on behalf of WCSO unless and until you are no longer on leave or otherwise released to work." Chief Deputy Roque concluded by stating that should she perform additional service to the County while on leave she may be disciplined.

136.    By revoking her access to email while she was on a medical leave, Deputy Canning was deprived of access to important communications, including communications about her work status and leave-sharing opportunities.

137.    Upon information and belief, similarly situated white male WCSO personnel who had not engaged in whistleblowing activities did not have their access to email revoked while on medical leave.

138.    On or about January 10, 2023, approximately four months after Deputy Canning submitted a request for a disability accommodation, WCSO finally responded, summarily rejecting her request for modified duty work. Rather than engage in any interactive process to determine whether there was some other accommodation that would allow Deputy Canning to perform the duties of her job,

the County notified her that she would be designated a medical layoff effective January 31, 2023.

139.     Similarly situated white male personnel who did not engage in whistleblower activity, who had a medical need for analogous accommodations or modifications to their duties, were accommodated and not subject to termination.

140.     On January 31, 2023, the County terminated Deputy Canning's employment.

141.     Despite that as of June 30, 2022, the Washington County District Attorney's office had known that the investigation into Deputy Canning's purported theft of a salsa container "concluded with no findings of misconduct reflecting a lack of truthfulness, candor or bias," in the months following the conclusion of that investigation, the County made repeated false allegations regarding Deputy Canning's disciplinary status.

142.     In September 2022, a Deputy District Attorney falsely told a defense attorney in a criminal matter that Deputy Canning was on administrative leave related to an allegation of dishonesty. (In September 2022, she was on a medical leave; she had never been on administrative leave for an allegation of dishonesty.) In October 2022, the a different Deputy District Attorney informed another defense attorney that "new Brady material had come to light regarding [Deputy] Canning." Deputy Canning has never been told what that "new Brady material" was or been given an opportunity to clear her name from any lingering allegations of dishonesty.

143.    In October and November 2023, a deputy district attorney notified multiple defense attorneys about Deputy Canning's status as a witness for the County. The deputy district attorney falsely stated that Deputy Canning was "involved in an internal investigation that involved dishonesty." The deputy district attorney went on to state that Deputy Canning's status as a witness had not been updated since she had been put on administrative leave for the alleged theft of a $1.91 salsa bowl. In those communications, the deputy district attorney did not provide any additional information about any alleged misconduct by Deputy Canning, but did provide a link to a news article about Deputy Canning filing this currently pending lawsuit against the County.

144.    As of February 2024, more than a year after Deputy Canning's employment had been terminated by the County, it listed her *Brady* status as pending.

145.    In April 2024, the Washington County District attorney's office confirmed that Deputy Canning was placed on the Brady list, with the designation of "additional discovery." Upon information and belief, the only additional evidence that the Washington County District Attorney's Office considered following Sheriff Garrett's June 2022, email stating that it had completed its investigation "with no findings of misconduct reflecting a lack of truthfulness, candor or bias," were the facts that Deputy Canning had filed this lawsuit and that a news article about the lawsuit had been published.

## IV.    CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## <u>Whistleblower Retaliation, Or. Rev. Stat. § 659A.199</u>

146.    Deputy Canning  realleges and incorporates by reference all previous allegations set forth in this complaint.

147.    Washington County is an employer subject to Or. Rev. Stat. § 659A.199.

148.    Deputy Canning engaged in various activities protected by Or. Rev. Stat. § 659A.199, including, but not limited to, the making of good faith complaints to WCSO supervisors regarding unlawful actions, and including but not limited to violations of laws regarding the reporting of crimes, officer truthfulness, use of force, sexual harassment, and official misconduct.

149.    The County discriminated against Deputy Canning in the terms and conditions of their employment by treating Deputy Canning differently than similarly situated personnel on the basis of her whistleblowing; by harassing Deputy Canning; and by creating a hostile work environment by intimidating Deputy Canning in retaliation for her complaints and opposition to unlawful directives and practices. The County further discriminated against Deputy Canning by denying requests for protected leave and medical accommodation and, ultimately, by terminating her employment.

150.    After terminating Deputy Canning's employment, the County continued to retaliate against her by falsely stating that she had "involved in an

internal investigation that involved dishonesty," and by placing her in the "Additional Discovery" category of its Brady List. These actions by the County jeopardize her ability to find future employment in law enforcement.

151.    As a direct and proximate result of the County's conduct, Deputy Canning has suffered and will continue to suffer mental stress, emotional distress, humiliation, inconvenience and loss of enjoyment of life fair compensation for which to be determined at trial, but estimated to be not less than $3,200,000.

152.    As a direct and proximate result of the County's conduct, Deputy Canning suffered economic losses in an amount to be proven at trial, but estimated to be not less than $1,286,000.

153.    The County's conduct was wanton and willful. Deputy Canning requests an award of punitive damages.

154.    Deputy Canning is entitled to recover her reasonable attorneys' fees, expert fees, costs and disbursements from the County.

**SECOND CLAIM FOR RELIEF**

**<u>Prohibited Conduct by a Public Employer – Or. Rev. Stat. § 659A.203</u>**

155.    Deputy Canning  realleges and incorporates by reference all previous allegations set forth in this complaint.

156.    Washington County is an employer subject to Or. Rev. Stat. § 659A.203.

157.    Or. Rev. Stat. § 659A.203 provides that it is an unlawful employment practice for a public employer to prohibit any employee from disclosing, or take or

threaten to take disciplinary action against an employee for the disclosure of any
information that the employee reasonably believes is evidence of a violation of any
federal or state law, rule or regulation by the state, agency or political subdivision, or
mismanagement, gross waste of funds or abuse of authority or substantial and specific
danger to public health and safety resulting from action of the state, agency or
political subdivision.

158.    The County violated Or. Rev. Stat. § 659A.203(1) by denying creating
or intentionally maintaining a hostile work environment in retaliation for Deputy
Canning's disclosures of conduct she reasonably believed to be unlawful, gross
mismanagement, and/or abuse of authority, including but not limited to violations of
laws and County policies regarding the reporting of crimes, officer truthfulness, use
of force, sexual harassment, and official misconduct.

159.    The County discriminated against Deputy Canning in the terms and
conditions of their employment by treating Deputy Canning differently than
similarly situated personnel on the basis of her whistleblowing; by harassing Deputy
Canning; by creating a hostile work environment by intimidating Deputy Canning
in retaliation for her complaints and opposition to unlawful directives and practices.
The County further discriminated against Deputy Canning by denying requests for
protected leave and medical accommodation and, ultimately, by terminating her
employment.

160.    After terminating Deputy Canning's employment, the County
continued to retaliate against her by falsely stating that she had "involved in an

internal investigation that involved dishonesty," and by placing her in the "Additional Discovery" category of its Brady List. These actions by the County jeopardize her ability to find future employment in law enforcement.

161.    As a direct and proximate result of the County's conduct, Deputy Canning has suffered and will continue to suffer mental stress, emotional distress, humiliation, inconvenience and loss of enjoyment of life fair compensation for which to be determined at trial, but estimated to be not less than $3,200,000.

162.    As a direct and proximate result of the County's conduct, Deputy Canning suffered economic losses in an amount to be proven at trial, but estimated to be not less than $1,286,000.

163.    The County's conduct was wanton and willful. Deputy Canning requests an award of punitive damages.

164.    Deputy Canning is entitled by statute to recover her reasonable attorneys' fees, expert fees, costs and disbursements from the County.

## THIRD CLAIM FOR RELIEF

### OFLA Interference – Or. Rev. Stat. § 659A.171

165.    Deputy Canning  realleges and incorporates by reference the previous allegations set forth in this complaint.

166.    Washington County is an employer subject to the Oregon Family Leave Act ("OFLA") and  the Family and Medical Leave Act ("FMLA").

167.    Deputy Canning was employed by the County for at least 180 days and worked on average of at least 25 hours a week during the 180 days before her

leave time was to begin. Deputy Canning was eligible for and entitled to protected leave under Or. Rev. Stat. § 659A.171 (OFLA).

168.   The County interfered with Deputy Canning's protected leave by refusing to credit her for shifts worked during the approximately four months in which she was on administrative leave and engaged to call in twice each scheduled shift and to be available to come into WCSO facilities within one hour of being notified by her employer.

169.   The County further interfered with Deputy Canning's protected leave through its discriminatory decision to place Deputy Canning on administrative leave while it investigated the alleged theft of a $1.91 salsa bowl, and to keep her on administrative leave for approximately two months after the County had confirmed that no criminal charges would be issued relating to the alleged theft of a $1.91 salsa bowl, Deputy Canning would have been eligible for leave under the Oregon Family Leave Act.

170.   The County had notice of Deputy Canning's need for use of her OFLA protected leave and unreasonably denied her that protected leave.

171.   As a direct and proximate result of the County's conduct, Deputy Canning suffered economic losses in an amount to be proven at trial, but estimated to be not less than $25,000.

172.   The County's conduct was wanton and willful. Deputy Canning requests an award of punitive damages.

173.    Deputy Canning is entitled by statute to recover her reasonable attorneys' fees, expert fees, costs and disbursements from the County.

### FOURTH CLAIM FOR RELIEF

### FMLA Interference – 29 U.S.C. § 2611(2)

174.    Deputy Canning realleges and incorporates by reference all previous allegations set forth in this complaint.

175.    Washington County is an employer subject to the Oregon Family Leave Act ("OFLA") and  the Family and Medical Leave Act ("FMLA").

176.    Deputy Canning was employed by the County for at least 12 months and provided more than 1,250 hours of service to the County during the previous 12-month period. Deputy Canning was eligible for and entitled to protected leave under 29 U.S.C. §2611(2) (FMLA).

177.    The County interfered with Deputy Canning's protected leave by refusing to credit her for shifts worked during the approximately four months in which she was on administrative leave and engaged to call in twice each scheduled shift and to be available to come into WCSO facilities within one hour of being notified by her employer.

178.    The County further interfered with Deputy Canning's protected leave through its discriminatory decision to place Deputy Canning on administrative leave while it investigated the alleged theft of a $1.91 salsa bowl, and to keep her on administrative leave for approximately two months after the County had confirmed that no criminal charges would be issued relating to the alleged theft of a $1.91 salsa

bowl, Deputy Canning would have been eligible for leave under the Oregon Family Leave Act.

179.    The County had notice of Deputy Canning's need for use of her FMLA protected leave and unreasonably denied her that protected leave.

180.    As a direct and proximate result of the County's conduct, Deputy Canning suffered economic losses in an amount to be proven at trial, but estimated to be not less than $25,000.

181.    The County's conduct was wanton and willful. Deputy Canning requests an award of punitive damages.

182.    Deputy Canning is entitled by statute to recover her reasonable attorneys' fees, expert fees, costs and disbursements from the County.

## FIFTH CLAIM FOR RELIEF

### Protected Class Discrimination – Or. Rev. Stat. § 659A.030

183.     Deputy Canning  realleges and incorporates by reference all previous allegations set forth in this complaint.

184.    Washington County is an employer subject to Or. Rev. Stat. § 659A.030.

185.    Or. Rev. Stat. § 659A.030 provides that an employer engages in an unlawful employment practice when it discriminates on the basis of gender.

186.    Deputy Canning is a woman of mixed race (*to wit* Fillipina and Native American).

187.     The County discriminated against Deputy Canning by treating her differently than similarly situated white and male personnel. The County held Deputy Canning to different terms and conditions of employment, including but not limited to conditions relating to discipline, protected leave, promotion and selection for special teams assignments. The County further discriminated against Deputy Canning by harassing her and subjecting her to a hostile work environment on the basis of her membership in statutorily protected classifications.

188.     Deputy Canning's race and gender were substantial factors in the County's adverse conduct towards her including the County's decision to terminate her employment.

189.     As a direct and proximate result of the County's conduct, Deputy Canning has suffered and will continue to suffer mental stress, emotional distress, humiliation, inconvenience and loss of enjoyment of life fair compensation for which to be determined at trial, but estimated to be not less than $3,200,000.

190.     As a direct and proximate result of the County's conduct, Deputy Canning suffered economic losses in an amount to be proven at trial, but estimated to be not less than $1,286,000.

191.     The County's conduct was wanton and willful. Deputy Canning requests an award of punitive damages.

192.     Deputy Canning is entitled by statute to recover her reasonable attorneys' fees, expert fees, costs and disbursements from the County.

## SIXTH CLAIM FOR RELIEF

### Protected Class Discrimination – 42 U.S.C. §2000e Title VII

193.    Deputy Canning  realleges and incorporates by reference all previous allegations set forth in this complaint.

194.    Washington County is an employer as defined by 42 U.S.C. §2000e(b).

195.    Deputy Canning is a woman of mixed race (*to wit* Fillipina, and Native American).

196.    The County discriminated against Deputy Canning by treating her differently than similarly situated white and male personnel. The County held Deputy Canning to different terms and conditions of employment, including but not limited to conditions relating to discipline, protected leave, promotion and selection for special teams assignments. The County further discriminated against Deputy Canning by harassing her and subjecting her to a hostile work environment on the basis of her membership in statutorily protected classifications.

197.    Deputy Canning's race and gender were substantial factors in the County's adverse conduct towards her including the County's decision to terminate her employment.

198.    The County's discriminatory actions as alleged herein were in violation of 42 U.S.C. § 2000e-2(a).

199.    As a direct and proximate result of the County's conduct, Deputy Canning has suffered and will continue to suffer mental stress, emotional distress,

humiliation, inconvenience and loss of enjoyment of life fair compensation for which

to be determined at trial, but estimated to be not less than $3,200,000.

200.    As a direct and proximate result of the County's conduct, Deputy

Canning suffered economic losses in an amount to be proven at trial, but estimated to

be not less than $1,286,000.

201.    The County's conduct was wanton and willful. Deputy Canning

requests an award of punitive damages.

202.    Pursuant to 42 U.S.C. § 1988, Deputy Canning is entitled to recover

her reasonable attorneys' fees, expert fees, costs and disbursements from the County.

## SEVENTH CLAIM FOR RELIEF

### Disability Discrimination, Or. Rev. Stat. §659A.112, .118

203.    Deputy Canning  realleges and incorporates by reference all previous

allegations set forth in this complaint.

204.    Washington County is an employer as defined by Oregon

discrimination laws.

205.    Deputy Canning is a qualified individual that suffers from a physical or

mental impairment that affects major life activities.

206.    Deputy Canning informed the County about her disability.

207.    The County discriminated against Deputy Canning on the basis of her

disability by, among other things, denying her protected leave to receive treatment

for her disability, refusing to engage in a meaningful interactive process to determine

whether there was an accommodation that would allow her to perform her duties, and terminating her employment.

208.    As a direct and proximate result of the County's conduct, Deputy Canning has suffered and will continue to suffer mental stress, emotional distress, humiliation, inconvenience and loss of enjoyment of life fair compensation for which to be determined at trial, but estimated to be not less than $3,200,000.

209.    As a direct and proximate result of the County's conduct, Deputy Canning suffered economic losses in an amount to be proven at trial, but estimated to be not less than $1,286,000.

210.    The County's conduct was wanton and willful. Deputy Canning requests an award of punitive damages.

211.    Deputy Canning is entitled by statute to recover her reasonable attorneys' fees, expert fees, costs and disbursements from the County.

## EIGHTH CLAIM FOR RELIEF

### Disability Discrimination, 42 U.S.C. § 12112

212.    Deputy Canning  realleges and incorporates by reference the previous allegations set forth in this complaint.

213.    Washington County is an employer as defined by 42 U.S.C § 12111(5)(A) and therefore a covered entity, under 42 U.S.C § 12111(2), subject to federal prohibition of discrimination in employment.

214.    Deputy Canning is a qualified individual that suffers from a physical or mental impairment that affects major life activities.

215.    Deputy Canning informed the County about her disability.

216.    The County discriminated against Deputy Canning on the basis of her disability by, among other things, denying her protected leave to receive treatment for her disability, refusing to engage in a meaningful interactive process to determine whether there was an accommodation that would allow her to perform her duties, and terminating her employment, and refusing to engage in an interactive process to determine whether her disability could be accommodated by a job restructuring.

217.    As a direct and proximate result of the County's conduct, Deputy Canning has suffered and will continue to suffer mental stress, emotional distress, humiliation, inconvenience and loss of enjoyment of life fair compensation for which to be determined at trial, but estimated to be not less than $3,200,000.

218.    As a direct and proximate result of the County's conduct, Deputy Canning suffered economic losses in an amount to be proven at trial, but estimated to be not less than $1,286,000.

219.    The County's conduct was wanton and willful. Deputy Canning requests an award of punitive damages.

220.    Deputy Canning is entitled by statute to recover her reasonable attorneys' fees, expert fees, costs and disbursements from the County.

### V.    JURY TRIAL DEMAND

221.    Deputy Canning demands a jury trial on all claims and issues triable to a jury.

## VI.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully request the following relief:

1.     Economic damages of not less than $1,286,000.00 for plaintiff Deputy Canning;

2.     Non-economic damages of not less than $3,200,000 for plaintiff Deputy Canning;

3.     Punitive damages in the amount of $825,000 for plaintiff Deputy Canning;

4.     Plaintiffs' reasonable costs and attorneys' fees incurred in prosecuting this action;

5.     Equitable relief including a prospective injunction prohibiting the County from retaliating against whistleblowers and discriminating on the basis of protected classifications including sex, race, disability and leave status;

6.     Pre-judgment and post-judgment interest on all amounts awarded as consistent with applicable law;

///

///

///

///

///

7.     All such other relief for plaintiffs as this Court may deem just and

proper.


DATED this 3rd day of July, 2024.


KLEIN MUNSINGER LLC

By *s/Jose Klein*
    Jose Klein, OSB No. 083845
    jose@kleinmusinger.com
    Damien Munsinger, OSB No. 124022
    damien@kleinmunsinger.com
Of Attorneys for Plaintiff