SUMMARY:

Brett Winders deliberately ignored a sexual assault victim's report of being kidnapped and sexually assaulted at gunpoint, then pawned the victim off to me with the only instruction being to give them a courtesy ride to the hospital. Fortunately, the victim reported the same sexual assault incident to me and I was able to conduct a full investigation. Winders intentionally omitted the facts from his initial report and only included it in a supplemental he wrote weeks later in an attempt to further cover up his initial dishonesty. He lied to me directly on more than one occasion about his knowledge of the reported crimes. WCSO command investigated the incident twice: once for his failure to act (SRIM- no investigation into dishonesty) and once for his dishonesty (Full Internal Affairs investigation). I do not know the full details of the investigation as I was not privy to the results.

WCSO Case Number: 50-21-3172

NARRATIVE:

On March 6, 2021 (2055 HRS) I was dispatched with my district partner, Brett Winders, to a call of a suicidal threat. The original call stated: "MALE AT THE LOCATION IS HAVING SUICIDAL THOUGHTS…NO PLAN. SAYING, 'I MIGHT NOT SEE YOU TOMORROW.'"

Winders radioed at 2059 hours that he was out with the subject, ▓▓▓ , and ▓▓▓ 's manager, ▓▓▓ . I arrived at about 2108 hours. As I drove toward Winders' patrol vehicle, I saw that he was walking with ▓▓▓ . I rolled down the window and asked if he needed anything, since it *appeared* Winders would be placing ▓▓▓ on a Police Officer Hold.

Winders asked me if I would be able to give ▓▓▓ a ride to the hospital. I asked Winders, "Is this a POH?" (police officer hold) and he stated no, that ▓▓▓ would just like a courtesy transport to get some resources from the hospital. I was initially confused, since Winders had just spent 10 minutes talking with ▓▓▓ . Winders provided me zero information from his conversation with ▓▓▓ I asked two additional times if ▓▓▓ was a "POH", and Winders stated both times that ▓▓▓ , "just wanted a ride".

While driving ▓▓▓ to St. Vincent, I could tell something was bothering him. He kept thanking me for helping him and thanked me for believing that he needed help. As I began to speak with ▓▓▓ about what was troubling him, I learned he had been kidnapped and raped at gunpoint two days prior.

Melissa Canning v. Washington County
Exhibit 4, page 1 of 7.

I asked ▇ if he had reported this and he told me he did, tonight. I assumed that meant our present conversation. I later found out that he had reported the exact same facts to Deputy Winders prior to my arrival. Once at St. Vincent, I gathered all the details from the incident and called Detectives to report the call.

I radioed for dispatch to change the call type from a Suicidal Threat to a Sex Crime Adult.

Within a minute or so of radioing this information, which was audible to all county deputies, Winders sent me an MDT message, "WHAAAAAAAAT?!", or something similar, seemingly shocked about the change in my call. This was the first lie to me from Winders directly about this incident.

I continued investigating the rape for the remainder of the shift. At about 0300 hours when my shift was over, I was at East precinct in the evidence room to submit items related to the rape.

Winders came in and made a comment about a separate call from the evening. In the background, and at the doorway, three of my shift mates had gathered to see what I was doing. (Deputy Michael Mitchell, Deputy Kevin Howell, Deputy Bryan Payton). I pointed at Winders and stated, "Hey. YOUR guy….". Winders interrupted and said, "Not MY guy!" I continued, "…your guy from the ▇ that I took to St V's? He was raped at gunpoint two days ago."

Winders jaw dropped, seemingly shocked, and he stated, "Noooo. What??" This was the second lie to me from Winders directly about this incident.

One of the three deputies in the background asked what happened. I gave a very brief overview of the call. I remember Bryan Payton making a joking comment that if another man had him at gunpoint and told him to perform oral sex or be killed, he would not do it. Winders laughed at this and the group of them walked down the hall to change out for the evening.

The following day (3/7/21), I had follow-up interviews for my investigation. I called two of ▇'s managers (▇ and ▇), whom ▇ had disclosed suicidal thoughts to. I first spoke with ▇, who told me ▇ had been acting "off" that night. ▇ said ▇ will normally joke and laugh with his coworkers but seemed quiet and sad about something. ▇ confronted him to see if he was ok and ▇ then stated that he was sexually assaulted at gunpoint the other day. ▇ asked if it would be ok to

Melissa Canning v. Washington County
Exhibit 4, page 2 of 7.

share this information with the other manager, ▇, and ▇ agreed. ▇ stayed with ▇ while police were called, and ▇ went home.

I then called ▇ to talk to him about what happened. ▇ told me that ▇ had disclosed to him and ▇ that he ▇) was sexually assaulted at gunpoint the other night. After I gathered all the details, I asked ▇ if he could help me understand how police were not told about the sexual assault.

I told ▇ that we were only made aware that ▇ was possibly having suicidal thoughts. ▇'s response was, "We did!" I asked him whom he provided these details to, and ▇ said, "We told your partner!"

I asked ▇ what he heard ▇ tell Deputy Winders, and ▇ said, "He told him he was sexually assaulted at gunpoint", and that it had happened the other night. I asked ▇ what my partner's reaction to this was, and he said something like, "His jaw dropped, and he looked just as surprised as I was when I found out." This is how I confirmed the first two reactions from Deputy Winders to me were untruthful in nature. He wanted to cover up the fact that he purposefully and intentionally did not investigate a kidnapping or sexual assault.

After my call with ▇, I had plans to meet with ▇ to obtain consent signatures for DNA. I asked ▇ if he could remember telling my partner about what happened. ▇ told me he couldn't remember exactly how he worded it, but that he did tell Deputy Winders what happened. I asked ▇ if he could elaborate on "what happened", and ▇ told me he told Deputy Winders he was sexually assaulted the other night. ▇ said he couldn't remember if he mentioned it was at gunpoint, but definitely told Deputy Winders about the sexual assault.

After I met with ▇, I called the OIC for the shift, SGT Chris Bowman. I was furious that Deputy Winders lied to me about ▇. I told SGT Bowman everything that had happened, and he told me I would need to include all of it in my report. SGT Bowman then advised that I reach out to SGT Josh Snyder (direct supervisor for Winders at the time) to let him know what happened.

Later that day, (3/7/21) at about 2100 hours, I met with SGT Snyder and provided all the information. SGT Snyder told me my part was done and he would handle the issue from there.

Melissa Canning v. Washington County
Exhibit 4, page 3 of 7.

I also spoke with SGT Robert Rookhuyzen about my call, as he has been a mentor over the years for my sex crime investigations. I remember venting to SGT Rookhuyzen about Winders lying to me and pretending to be surprised in the evidence room when I confronted him.

On either 3/7/21 or 3/8/21, I messaged Winders via MDT and asked if he could write me a supplemental report to cover his portion of the conversation he had with ▬, prior to my arrival. I asked him to send a copy of his report when he finished.

I sat with Deputy Scott Cutler, the only other deputy aware of the call and Winders' lying, when I sent Winders that MDT message. Deputy Cutler and I had conversation about other calls we have each been on with Winders. In one instance, Deputy Cutler had to call the DA for a grand jury case because Winders mentioned things in his report that were false. (50-21-2516).

Winders messaged that his report had been submitted. In front of Deputy Cutler, I submitted my completed report first, prior to reading Winders'.

Winders' report:

This is a supplemental report. On 03/06/2021 at approximately 2055 hours DEP Canning was dispatched to a suicide threat at ▬ in unincorporated Washington County. I was closer to the target address than she was, so I joined the call and arrived first. Manager ▬ reported an employee named ▬ (she did not know his last name) was having suicidal thoughts. ▬ said ▬ was with another manager, named ▬ was not on site, but told the call taker ▬ and ▬ were located near the pool's kitchen.

I arrived at the ▬ at approximately 2108 hours, and was approached by two males. One male said his name was ▬, while the other male identified himself as ▬ when he presented his ODL to me. ▬ had mucus on his moustache, as if he had been crying recently. He told me he had, "a rough forty eight hours," however he said he'd been having personal issues for several months.

I asked ▬ if he was having suicidal thoughts, and he said yes. ▬ said he'd been dealing with these thoughts for some time, and I encouraged him to be taken to the hospital. ▬ agreed, and we walked from the pool to the front of the ▬ where my vehicle was parked.

▬ said he did not want to be seen with law enforcement at his place of employment. At this time DEP Canning arrived and drove up to ▬ and I. I suggested to ▬ we could walk to the far end of the parking lot, away from the ▬ near ▬, so that he could get in a patrol vehicle more discreetly. ▬ agreed, and he went with DEP Canning to Providence, St. Vincent's on a voluntary transport. This concluded my interaction with ▬.

I read Winders' report with Deputy Cutler and was furious that he omitted the crimes that ▮ reported to him. I advised SGT Snyder about this.

On March 9, 2021, I received a personal cell phone text message from Winders:

"Well, I was gonna wait til Thai food to say it, but you deserve an apology sooner than that. I'm sorry the SUT (Suicide Threat) turned into a mouth-rape case. I thought he was 12-34 and was so concerned with getting him to the hospital that I took his ramblings as utterances. I'm sorry that caused you so much overtime (although I'm happy you got an opportunity to get paid)."

I felt this text was additional cover-up to the lies Winders already told. Winders was not able to articulate, either in his text or in his original report, why he thought ▮ was 12-34 (code for "crazy"). Winders was not "so concerned" about getting ▮ to the hospital or he would have placed him on a police officer hold and taken him to the hospital himself.

Several weeks after the initial call, I pulled up the case to print for my own records. I noted a second report was added to the file by Winders, dated March 22, 2021. I will highlight the blatant omissions from his original report to this one:

This is a supplemental report. On 03/06/2021 deputies were dispatched to a suicide threat at the ▮ ▮, in unincorporated Washington County. I arrived before the primary deputy, and learned the subject of the suicidal threat, ▮, was a chef at the pool's kitchen. The reporting party did not know ▮'s full name, but said he would be wearing a chef coat and chef pants.

When I arrived at the pool area, I was approached by two males, ▮, and his manager ▮. ▮ had mucus on his moustache, as if he had been crying recently, and he was wearing a white chef's coat and stripped pants. He told me he had, "a rough forty eight hours," but looked to ▮ laughed, and said he been having issues for several months.

I asked ▮ if he had suicidal thoughts, and he said yes. ▮ said he'd been dealing with these thoughts for some time, and I encouraged him seek professional treatment at the hospital. ▮ agreed, and the three of us walked from the pool to the front of the club house where my patrol vehicle was parked.

On the way to the front of the building, ▮ said he was worried about his employment at the golf course, and ▮ told ▮ to not worry about his employment. ▮ then told me he had a traumatic thing happen to him recently. He said someone pointed a gun at him and told him to, "suck his dick." ▮ said he did not know who the male was, but he feared for his life, so he did what the male told him to do.

I recalled how ▮ said he had been feeling suicidal thoughts for several months, but he had also said an unknown male had pointed a gun at him approximately two days prior. I did not know if ▮'s suicidal ideations were from recent or past events. Due to the nature of the call for service, my primary concern was ▮'s safety, and to get him to the hospital. I encouraged him to follow me to my patrol vehicle so that I could take him to the hospital. As soon as we entered the parking lot, ▮ told me ▮e did not want to be

Melissa Canning v. Washington County
Exhibit 4, page 5 of 7.

seen with law enforcement at his place of employment. ▮▮▮ stopped walking with me and appeared to be surveying the parking lot. I was unsure if ▮▮▮ was going to willingly follow me to my patrol vehicle.

At this time DEP Canning arrived in the golf course parking lot and drove up to ▮▮▮ and I. She asked if she could assist, and I suggested to ▮▮▮ that he and I could walk together to the far end of the parking lot, away from ▮▮▮ so that he could get in a patrol vehicle more discreetly. ▮▮▮ agreed, and he walked to the end of the parking lot with me, where DEP Canning parked her vehicle and let him in the back seat. DEP Canning took ▮▮▮ to Providence, St. Vincent's hospital on a voluntary transport. This concluded my interaction with ▮▮▮.

On May 10, 2021, I was contacted by WCSO PSU SGT Tony Bass. SGT Bass asked if I could meet with him and stated I was not in trouble but may have witnessed something that he needed more information about. At this meeting, I learned SGT Bass was investigating Deputy Winders for untruthfulness, after Winders' SRIM's came across his desk.

After providing my full interview, SGT Bass specifically asked me for names of any other coworkers who may have additional information to provide. I told SGT Bass that SGT Rookhuyzen and Deputy Scott Cutler were the only two whom I had spoken to about the call. I had already mentioned SGT Bowman and SGT Snyder in my recorded interview. SGT Bass advised that I could tell both SGT Rookhuyzen and Deputy Cutler that he would be reaching out to them. SGT Bass asked if I was ever interviewed in regard to Deputy Winders' SRIMs and I told him I was not

After our meeting ended, I called SGT Rookhuyzen and let him know. I saw Deputy Cutler at East Precinct later that day and told him the same. (As of recent, I know Deputy Cutler and SGT Rookhuyzen were never contacted for an interview).

In about June 2021, I had a Compass Check with SGT Snyder. He asked how everything was going and I mentioned work had been difficult due to the Winders ordeal. He told me he didn't want me to think it got, "swept under the rug", and that it was getting taken care of.

In about June or July 2021, I was contacted by my union rep who informed me Winders' investigation was complete and unfounded.

I was not able to comprehend how this could be possible and learned Undersheriff Koch had signed the investigation as Unfounded. I requested a meeting with US Koch, which was scheduled for August 16, 2021.

Melissa Canning v. Washington County
Exhibit 4, page 6 of 7.

When meeting with Undersheriff Koch, I explained that I was having a difficult time understanding how Winders' lying could be unfounded. I asked Undersheriff Koch if I could walk through the call with him, which I did. Undersheriff Koch asked if I had ever been given the option to have Winders moved outside of my district, and I told him it was never presented as an option to me. I told Undersheriff Koch that I could not work with a liar and pointed out each instance that Winders lied to me, as well as the blatant lies of omission from his first and second reports. I told Undersheriff Koch the ordeal had caused so much stress and anxiety that I burned nearly all my accruals to not have to come in and work with Winders. I also pointed out Winders had never been placed on Admin Leave. Instead, he continued to take reports over the phone while on, "light duty", while being investigated for untruthfulness.

Undersheriff Koch took notes during our meeting and told me he would be taking a second look at the investigation. He told me, "Sometimes we get it wrong", and insisted this specific investigation would need to be reviewed.

Undersheriff Koch also thanked me for meeting with him and said he understood how difficult it can be to have to report coworkers for misconduct. I explained to Undersheriff Koch that this incident was especially difficult because I considered Brett Winders to be a friend. This added insult to injury to learn that my friend and coworker had blatantly lied to me to avoid doing his job.

I explained to Undersheriff Koch that I have great pride in my job as a police officer. I expect, at a minimum, that my coworkers be truthful and honest. I stated that I can work with anyone, regardless of personality or difference of opinion, but I cannot and will not work with a liar.

I would be doing a disservice to the citizens of Washington County by ignoring the fact that Brett Winders was allowed to ignore a serious criminal report, and then allowed to lie multiple times to cover it up. I feel it is my moral obligation to protect my coworkers from this liability. I also feel it is my moral obligation to protect future victims of serious crimes from being blatantly ignored.

Melissa Canning v. Washington County
Exhibit 4, page 7 of 7.