The Honorable Adrienne C. Nelson

Jose Klein, OSB No. 083845
jose@kleinmunsinger.com
Damien Munsinger, OSB No. 124022
damien@kleinmunsinger.com
KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F
Portland, OR 97214-3497
(503) 568-1078
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| Melissa Canning, | Case No. 3:23-cv-00210-ACN |
| Plaintiff, | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| Washington County | |
| Defendants. | |

## I.    INTRODUCTION

Plaintiff Melissa Canning opposes Defendant Washington County's Motion for Partial Summary Judgment (the "Motion," ECF 41). First, Defendant seeks to dismiss Plaintiff's claims for retaliation under the Federal Family Medical Leave Act

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 1

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

(FMLA) and the Oregon Family Leave Act (OFLA). Second, Defendant seeks to enjoin Plaintiff "from arguing that [Plaintiff] Canning's discipline relating to her theft of a salsa bowl was retaliatory." This case presents genuine questions of material fact on both issues that a jury must decide. Defendant's Motion should be denied.

## II.    FACTS

### 1.    *Plaintiff's disfavored status within the Sheriff's Office.*

Defendant hired Plaintiff as a sheriff's deputy in 2018. Canning Decl. Complaint, ECF 1, ¶11; admitted in Amended Answer and Affirmative Defenses ("Answer"), ECF 14, ¶11. She attended the state police academy in Salem. *Id.* While other cadets resided at the academy during training, Plaintiff commuted every day because she has sole custody of her two children. Declaration of Jose Klein ("Klein Decl."), Ex. 1 (Canning deposition excerpts ("Canning Dep.")), 36:19–37:12.

Washington County Sheriff's Office ("WCSO") Lieutenant Kelly Degman was one of her academy instructors. Klein Decl., Ex. 2 (Degman deposition excerpts ("Degman Dep.")), 33:1-7. During Plaintiff's time at the academy, Degman singled Plaintiff out for ridicule. Canning Decl. ¶7. Degman regularly called Plaintiff a "problem child." Degman Dep. 33:14-20. Throughout Plaintiff's employment with Defendant, she experienced hostility from Degman. Canning Decl. ¶8.

Despite Degman's abusive treatment, Plaintiff successfully graduated from the academy and transitioned to a probationary position as a Patrol Deputy. ECF1, ¶11,

admitted, Answer ECF 14, ¶11. In October 2019, Plaintiff became a full time patrol deputy. ECF 1, ¶12; admitted, Answer, ECF 14, ¶12.

By 2021, Plaintiff was receiving encouragement from supervisors to seek a promotion to detective. ECF 1, ¶14, admitted, Answer ECF 14, ¶14.

A. <u>Plaintiff blew the whistle on Deputy Brett Winders for dishonesty;</u>
   <u>WCSO ignored its policies and practices to protect Winders.</u>

In March, 2021, Plaintiff reported that then–Deputy Brett Winders had been dishonest about a botched sexual assault investigation. Winders failed to document a victim's report of rape-at-gunpoint, and had repeatedly feigned surprise when Plaintiff accurately documented the victim's report. *See* ECF 1-4 (Plaintiff's submission to the Washington County District Attorney's Office ("WCDA") describing Winders' dishonesty). Plaintiff reported Winders' conduct to the officer in charge of the shift and to her Sergeant, Joshua Snyder. *See* Complaint, ECF 1, ¶¶32-33, admitted, Answer, ECF 14, ¶¶32-33.

Defendant's policies require "all complaints" be investigated. Klein Decl. Ex. 14, p. 1. That policy distinguishes more serious "Class I Allegations," from other, less serious "Class II Allegations." Class I Allegations include "[a]llegations of misconduct regarding … workplace harassment, discrimination, dishonesty, … or violation of criminal statutes." *Id.* Those serious allegations require an internal affairs ("IA") investigation, to be performed by members of Defendant's Professional Standards

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 3

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

Unit ("PSU"). Klein Decl., Ex. 3 (King deposition excerpts ("King Dep.")), 14:21-24; Klein Decl. Ex. 13, p. 1.

Rarely, when Defendant is investigating a Class I Allegation, Defendant places the employee on modified duty, duty-stationed at home pending the outcome of the investigation or a change in circumstances. That decision rests with supervisors. Ex. 14, p. 2. The Department considers "factors" including "the risk to the organization, the risk to the community, [and] the risk to the County by having that employee in the workplace." Klein Decl., Ex. 4 (Koch deposition excerpts ("Koch Dep.")), 26:11-20. Other factors include Defendant's own pre-judgment of the evidence-- "the level of confidence in the validity of each allegation" *Id.* 119:17-21; and the severity of the allegation, Klein Decl., Ex. 5 (Roque deposition excerpts ("Roque Dep."), 61:20-62:6. According to Chief Deputy Roque, allegations of "truthfulness" are "amongst the highest level of allegations we have in our field," and should bear heavily on Defendant's decision to impose modified duty. *Id.*

When Plaintiff alleged dishonesty concerning Winders-- a Class I Allegation-- Defendant did not place Winders on modified duty or even initiate an IA Investigation. Instead, Degman ordered the matter be treated as a mere non-disciplinary "performance observation" ("PO"). Klein Decl., Ex. 6 (Snyder deposition excerpts ("Snyder Dep."), 23:23-24:9; Degman Dep. 42:22-43:23.

Only after the non-disciplinary PO was issued did a Commander intervene to overrule Degman's directive to treat the matter as non-disciplinary coaching. *See* Ex. 15 (email from Snyder to PSU Sergeant Bass regarding handling of Winders matter); Degman Dep. 43:21-23.

Despite knowing there were "allegations that Winders had lied," (ECF 14 ¶32; Degman Dep. 47:23-48:3), Defendant, through Degman, ignored the dishonesty allegation. Instead, Defendant classified the matter as Class II Allegations of failures to conduct a thorough investigation and to know applicable criminal laws. Klein Decl Ex. 16, p. 1-2. In derogation of departmental best practices, Defendant never interviewed Plaintiff. Canning Decl., ¶12; Klein Decl. Ex. 17, p.3; Degman Dep. 44:18-45:6 ("all parties involved" -- including the complainant -- should have been interviewed). On April 15, Defendant issued Winders an oral reprimand, its lowest level of discipline. Ex. 16, p. 1; Ex 17, p.3.

Only after the low-level oral discipline issued did PSU "receive[] information of a possible truthfulness issue with Winders" related to Plaintiff's complaint. *Id*. PSU "started an investigation into the truthfulness allegation by first meeting with Canning. Canning told PSU Sergeant Bass she believed Winders lied to her on three separate occasions and wanted this to be investigated." *Id*.[1]

---

[1] Defendant's policies require IA investigations to be complete within "30 days from the date the complaint is received," unless an extension request is made in writing

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 5

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

Even after Defendant reluctantly acknowledged that Plaintiff had raised a Class I Allegation, Defendant never put Winders on modified duty. Klein Decl Ex. 18, p. 2 (chart noting each instance of modified duty, duty-stationed at home imposed in truthfulness cases between 2019 and 2022. Winders IA2021-0006 indicates "no leave".) The Sheriff's Office completed its investigation without issuing discipline to Winders. Ex. 19.

For Plaintiff, having to continue working alongside a deputy whom she knew to be dishonest caused significant anxiety. Canning Dep. 176:18-23; 178:3-11.

B. Undersheriff Koch promised to take a "second look" into the Winders investigation; Defendant began to retaliate against Plaintiff.

While the Winders IA was pending, Plaintiff began to experience retaliation including being denied training opportunities. Canning Dep. 172:11-174:17.

In August 2021, Plaintiff learned Defendant had deemed the Winders IA unfounded. Canning Dep. 208:17-20. Plaintiff requested and received a meeting with Undersheriff Koch. At the meeting, Plaintiff provided "specifics of her concerns about Deputy Winders' truthfulness during that investigation." Koch Dep. 71:1-17. Koch acknowledged "sometimes we get it wrong," and offered to take a "second look" at the investigation. Canning Decl., Ex 53; Koch Dep., 72:12-17.

---

and approved. Ex.13. With respect to the Winders investigation, Defendant *began* its IA investigation more than 60 days after Plaintiff made her complaint.

During the meeting, Plaintiff "express[ed] concerns about working the same district as [Winders]" and shared that the anxiety she felt had led her to call out multiple times to avoid Winders. Koch Dep., 73:1–11. Plaintiff's contemporaneous notes confirm that Koch told her that steps should have been taken to ensure she and Winders were not on the same shift.

> US Koch asked if supervisors had moved Winders out of my district to avoid conflict.  I mentioned that it was never brought up as an option.  Instead, I took off nearly half the rotation to avoid having to work with someone who had blatantly lied about a serious sexual assault investigation.  Asked if Winders and I were still sharing work days.  I mentioned next rotation (which would start in a few weeks) we only shared one day together but did not know if we would be sharing a district.  US Koch said if that were the case to mention it to a supervisor to have Winders move districts.  I mentioned the enormous stress and anxiety this caused.  US Koch advised supervisors "should have" been on top of that.  US Koch had also pointed out I should have been contacted by an Admin to review the findings of the IA.  This also did not happen.  US Koch was aware I was never interviewed regarding the original misconduct report, which was yet another error.  US Koch did not know why Winders was never put on Admin Leave.

Ex. 53. *See also*, Koch Dep. 73:8–74:17.

On September 9, Plaintiff emailed her sergeant, copying Koch, and requesting that Winders be moved from their overlapping shift. Klein Decl., Ex. 20, pp 5–6. The email was forwarded to Degman and other lieutenants who responded with hostility towards Plaintiff. *See Id.* pp. 2–3 (Rawlinson: "Canning is twisting or misunderstanding the [Undersheriff's ] direction and assuming she should be directing a sergeant." Degman: "Canning is moving to another shift … therefore it shouldn't be an issue."). Sergeant King opined that changing one day of Winders' schedule could give rise to a "hostile work environment complaint from Deputy Winders." Klein Decl. Ex. 21. King, Winders's supervisor, noted that "Deputy

Winders and I discussed the workplace harassment policy and I encouraged him to be candid with me if he ever felt he was being subjected to workplace harassment or hostile working conditions." Klein Decl., Ex. 22, p. 3. Supervisors did not offer Plaintiff resources if she felt she was subject to a hostile working environment. Canning Decl., ¶18.

When Plaintiff spoke to Koch about Winders' dishonesty, she and Winders were both applying for a special assignment on the Crisis Negotiation Unit ("CNU"). Plaintiff informed a CNU sergeant about Koch's "second look," which could affect Winders' eligibility for the assignment. Klein Decl., Ex. 7 (Lascink deposition excerpts ("Lascink Dep."), 29:14-30:16. Plaintiff advised the sergeant that "he would likely need to check in with US Koch, since PSU may not [be] aware" of the second look. Ex. 53. The sergeant did not contact Koch. Lascink Dep. 30:17-19.

Instead, the sergeant turned his focus on Plaintiff. Because Plaintiff voiced concerns about Winders, the sergeant treated her report as a "red flag." Suddenly, there were "concerns" Plaintiff lacked "ability to work in a small team environment." *Id.* 34:5-17. The sergeant told his supervisor that he "didn't believe that [Plaintiff] was actually making minimum qualifications" for CNU, because she opposed working with Winders. *Id.* 47:10-48:25.

Plaintiff and Winders both tested for the position. The test, consisting of subjective evaluations in several categories, was scored on a one-hundred point basis,

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 8

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

from which an eligibility list was created. "Typically," scores of 60 and above made

the eligibility list. *Id.* 42:1–43:14.

The CNU test results:

| APPLICANT | PRESENTATION | LISTENING | NEGOTIATION | INTEL | TOTAL |
|---|---|---|---|---|---|
| Linn | 20 | 22 | 20 | 11 | 73 |
| Lawson | 13 | 22 | 18 | 11.5 | 64.5 |
| Winders | 12 | 16 | 21 | 12.25 | 61.25 |
| Canning | 19 | 15 | 18 | 9 | 61 |
| Carney | 16 | 21 | 10 | 11.25 | 58.25 |
| Cornejo | 11 | 10 | 12 | 8.75 | 41.75 |
| Guzman | NA | NA | NA | NA | 0 |

Eligibility List

Ex 23, p. 11. Defendant made sure Winders scored higher. Despite that scores above

60 "typically" qualify for eligibility, this time, for reasons not articulated, Defendant

cut off eligibility at 61.25.

> C. <u>Plaintiff escalated her concerns about Winders' dishonesty to the
> Washington County District Attorney's Office ("WCDA"); the DA
> placed Winders on its Brady list; and Plaintiff became further
> disfavored within the Sheriff's Office.</u>

On September 19, Plaintiff emailed the WCDA, providing specific

information about Winders' dishonesty. Klein Decl. Ex 24. In January 2022, based on

information provided by Plaintiff, the WCDA placed Winders on its Tier 2-

Additional Discovery *Brady* status. Klein Decl. Ex. 25.

Plaintiff's supervisor Sergeant Robert Rookhuyzen was familiar with Plaintiff's

complaint about Winders. Rookhuyzen told Plaintiff her whistleblowing had made

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 9

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

her a target.[2] In a timeline of events Plaintiff created while on modified duty, Plaintiff

recalled:

> In about November 2021, I was made aware of a conversation between SGT Rookhuyzen and LT Rawlinson regarding the upcoming FTO openings.  SGT Rook stated to LT Rawlinson that I would make a good FTO.  Rawlinson's response to this was negative, stating something like, "Well she'll have to show up for work more than two days a week, first".
>
> I have never had a conversation with LT Rawlinson about work, my work load or my cases.  I was shocked that he would make such a negative comment about my work ethic.  I was also worried about further retaliation in NOT getting the position as FTO based on Rawlinson's personal opinion about me.

Canning Decl. Ex. 57, p. 10.

After Winders was placed on the *Brady* list, Rookhuyzen informed Plaintiff

about negative comments being made by sergeants about her:

---

[2] Between March 2021 and February 2022, Plaintiff was friends with Sergeant Rookhuyzen and his domestic partner, Jail Services Technician Anthony Bracamonte. Klein Decl., Ex. 8 (Bracamonte deposition excerpts ("Bracamonte Dep."), 13:25-14:19; Klein Decl., Ex. 9 (Rookhuyzen deposition excerpts ("Rookhuyzen Dep.") 73:5-7 (Plaintiff and Rookhuyzen "used to talk a lot.").

---

**SGT MEETING**

On February 2, 2022, Rook told me about a SGT meeting that occurred earlier that day. In this meeting, SGTs were told of the DA's decision to place Winders on the Brady list as a result of his untruthfulness in my sexual assault investigation. This was mentioned as an aside, with a note similar to, "this should only be an issue for his first couple trials after this announcement. It will fizzle out from there." **My name was also mentioned in a negative manner, specifically, that Winders, "is only on the Brady list because Canning turned him in to the DA."**

Rook told me he absolutely has my back and supported me. Rook commented either during this phone call or a recent past conversation that he would be entertained by the drama if the media were to get a hold of this. He mentioned the name Maxine Bernstein, whose name I was unfamiliar with. He told me she has written several pieces for The Oregonian regarding police corruption because she hates cops.

I mentioned I would not (and could not, per policy) act on this idea but mentioned, hypothetically, if the story got out, it would likely be the only way WCSO Admin and coworkers would finally know what happened with the Winders incident. I also mentioned in previous conversations with Rook the frustration of Winders never being placed on Admin Leave for such a serious allegation. This created a huge stigma around the office that he did nothing wrong and was never in trouble. When it later came out that his IA was, "Unfounded", this further perpetuated the idea that Winders literally did nothing wrong and I was the disgruntled co-worker who had a benign complaint that didn't merit any attention, let alone discipline.

---

*Id.*, p. 11.

Unbeknownst to Plaintiff, Rookhuyzen was being pressured by Degman not to socialize with Plaintiff. Degman and another lieutenant talked to Rookhuyzen about his friendship with Plaintiff. Rookhuyzen was warned about "supervisor and deputy relationships and how, as a supervisor, you can't -- if you're too close to any one individual you lose perspective." Degman Dep. 68:16–69:10.

### 2. The Events Leading to Plaintiff's Modified Duty Assignment.

On February 22, 2022, Plaintiff went to dinner with Rookhuyzen and Bracamonte. Canning Decl. Ex. 54.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

After the meal, Plaintiff placed her leftovers in a styrofoam container. On the table there was a small plastic bowl of beans that came with her meal. To keep the beans from mixing with her other leftovers, Plaintiff placed the bowl into the to-go container. *Id.*

Bracamonte and Rookhuyzen were both present at the table when Plaintiff packed up her leftovers.

> Neither Rook nor Tony asked me what my intentions were in taking the cup after they watched me place it in the Styrofoam container. Neither made a serious comment, admonishment or directive regarding my action or intentions. Neither suggested removing it prior to leaving the restaurant. Neither suggested I would be reported if I left with the cup. Neither suggested ending our evening if I left with the cup. Neither took the cup out when I left the To Go tray when I ran to the bathroom prior to leaving the restaurant. Neither advised we would not continue on to the next restaurant if I left with the cup.

*Id.*

They drove to another establishment, where they socialized for several more hours. *Id.* The following day, Rookhuyzen texted Plaintiff but did not ask about the plastic bowl. Canning Decl., Ex. 56.

Rookhuyzen testified that at the time that he exchanged texts with Plaintiff he did not "have a suspicion that" Plaintiff had stolen a bowl. Rookhuyzen Dep. 90:14–24. Rookhuyzen claims his suspicion formed the night of February 24, when he and Bracamonte talked about the bowl. Rookhuyzen Dep. 90:25-91:12. The two met in the lobby but talked elsewhere after Rookhuyzen asked if "the lobby is

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 12

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

recorded." Bracamonte Dep. 46:2–12. According to Bracamonte, Rookhuyzen "wanted to make sure he heard what he thought he heard and he asked me if Melissa took the salsa bowl that evening." Bracamonte Dep. 45:2–5.

Bracamonte "didn't think it was a big deal." He said, "[Rookhuyzen] should talk to Melissa.' * * * So he could complete the circle of investigation." Bracamonte Dep. 47:12–24.

Had Rookhuyzen bothered to speak to Plaintiff, he would have learned that when Plaintiff was a regular at a restaurant, she would occasionally borrow, wash, and return containers. *See* Ex. 54, p. 5. (Statement of Heather Milligan, manager of Rock Creek Corner restaurant, describing Plaintiff's practice and noting that Plaintiff "always returned [the containers], and cleaned them, which is more than others have done."). Indeed, Plaintiff would have been able to let Rookhuyzen know:

- her instructions to her children that "whoever's turn it was to unload the dishwasher needed to place the salsa cup by my purse for return" Canning Decl., Ex. 55; or

- witnesses who while out to eat with Plaintiff have engaged in the same practice of taking a bowl and returning it washed. Klein Decl., Ex. 26.

Without talking to Plaintiff, Rookhuyzen simply reported it as theft. Klein Decl. Ex.27.[3]

---

[3]As described in section IV.A. below, whether Rookhuyzen had a reasonable belief that a theft occurred, and whether Rookhuyzen made his report in good faith are questions of fact for the jury.

Immediately, Defendant placed Plaintiff on a "Modified Duty Assignment." Klein Decl. Ex. 28. Modified Duty Assignments are a "temporary change in a person's normal work assignment, in order to support the staff member and/or legitimate business needs of the Office."

On February 28, WCPOA Union President Patrick Altiere wrote to the Undersheriff asserting that "[p]lacing her on administrative leave [modified duty], based on the nature of the complaint, is a gross case of overcall that can only be intended to be retaliation against Dep. Canning for her complaints to WCSO and the WCDA." Klein Decl. Ex. 29. Koch wrote back:

> "Thank you for sharing your perspective and concerns. As you know, every issue and complaint has a unique set of circumstances that drive our decision process -- and this is no exception. * * * *

> "At this point Dep Canning will remain on administrative leave [modified duty] until we have additional information that would warrant a change in her status."

*Id.*

However, even when Defendant received additional information warranting a change to her modified duty status, Defendant kept Plaintiff on modified duty for an additional three months.

3.  *Defendant Requested a Separate Police Agency to Conduct a Criminal Investigation; the District Attorney Declined to Prosecute; Defendant left Plaintiff on Modified Duty.*

In March, 2022, Defendant engaged the Beaverton Police Department to conduct a criminal investigation into Plaintiff's alleged theft of a plastic salsa bowl. The Beaverton detective contacted a manager at the restaurant, who told her "It's ok. We have a lot of them [plastic bowls]. It's not a big deal." Klein Decl. Ex. 30, p. 4. The detective learned "the individual cost was $1.91 each." *Id.* p. 17. The Detective also learned "the restaurant was not interested in pressing charges." *Id..* p. 18.

On March 31, Senior Deputy District Attorney Gerhard made the decision not to prosecute, noting,

> "[t]he witnesses that accompanied the suspect did not report the incident for a couple of days, the value of the property is de minimis, and your investigation confirmed that the victim restaurant was not interested in a criminal prosecution. * * * The suspect claimed that she intended to return the plastic serving bowl to the victim after consuming her leftover food and cleaning the bowl. There is at least some evidence to corroborate that state of mind, which would create reasonable doubt that the suspect committed a theft. Consequently, I will not bring criminal charges in this matter."

Klein Decl. Ex 31.

Defendant failed to notify Plaintiff of the charging decision for approximately three weeks. Canning Decl. ¶23. Despite the facts that (1) there was no victim desiring to pursue charges; (2) the value of the item was *de minimis*; and (3) Plaintiff

did not intend to permanently deprive the restaurant of its bowl so the elements of theft could not be met, Defendant kept Plaintiff on modified duty status.

On April 19, union President Altiere wrote to Undersheriff Koch:

> Dep. Canning is still on admin leave even though the criminal case has been closed and no-complainted. The DA's office issued the attached no-complaint on 033122, 19 days ago. There is no reason to believe that WCSO did not know this case was closed at that time. Why is she still on administrative leave? She committed no crime nor did she violate Sheriff's Office policy.

Klein Decl. Ex. 32.

Koch responded, stating that as there was an open IA investigation "there has been no determination if any Sheriff's Office policies have been violated or not." *Id.*

Under Defendant's policies, IA investigators "have 30 days from the date the complaint is received to complete the investigation. Investigators may request an extension of time in writing if an investigation cannot be completed within 30 days." Ex. 13 (IA Investigation Policy). Defendant took 123 days to complete its investigation.

On June 29, 2022, Defendant finally reinstated Plaintiff to regular duty. Motion, ECF 41, p. 3. At that time, Defendant acknowledged that Plaintiff "intended to bring the bowl back and we've established that, so, well well [sic] aware of that." Nonetheless, Defendant imposed an oral reprimand "because of the appearance of it." *Id.*

### 4. *FMLA/OFLA Eligibility: Work performed under Plaintiff's Modified Duty Assignment.*

Plaintiff's Modified Duty assignment came with a new schedule and new work requirements. Effective February 25, 2022, her new shift was "Monday through Friday, 8:00 a.m. to 4:00 p.m. with Saturday and Sundays off." During those "new shift hours [Plaintiff] must carry the PSU–issued cell phone * * * and be able to respond to the Sheriff's Office upon request within one hour." Canning Decl. Ex. 59. Additionally, Plaintiff was required to contact her supervisor "twice each weekday, Monday through Friday at 8:30 a.m. and at 1:30 p.m." *Id.*

Plaintiff remained on her modified duty assignment from February 25, 2022 until June 28, 2022. *See* ex. 28. During that time she was subjected to a total of 86 shifts of modified duty, for which Defendant coded 688 hours as "Leave Misc Paid." *See* Klein Decl. Ex. 33, pp 5–6. During this period of modified duty, to carve out time to use for her own purposes, she took a vacation day on May 26. Canning Decl., Ex. 60, p. 22.

Plaintiff was a union member. Klein Decl. Ex. 34 (Excerpts of Washington County/Washington County Sheriff's Office and Washington County Police Officers' Association, 2019–2022 Agreement ("CBA"), article 1.1). Under the CBA, the smallest unit of work is 15 minutes. *See id.*, Article 11.3 ("For purposes of compensating authorized off-duty communications * * * work performed will be rounded up in fifteen (15) minute increments at the employee's overtime rate of pay.

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 17

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

A subsequent call/text/communication * * * outside of the initial fifteen (15) minute increment will be compensated as a separate fifteen (15) minute increment."). As Plaintiff was required to call in to her supervisor twice daily on each of her 86 shifts of modified duty, under the CBA Plaintiff performed 43 hours of active work complying with Defendant's this work requirement.

Additionally, Defendant assigned Plaintiff a number of active work tasks during this time:

| DATE | ACTIVITY | ESTIMATED TIME SPENT |
|------|----------|----------------------|
| ~3/1/22 | Drafted a lengthy statement detailing her recollections of her dinner with Rookhuyzen and Bracamonte on February 22, 2022, as well as the evidence that substantiated her professed intent to return the salsa bowl. *See* **Exhibit 54.** | 15 hours |
| ~3/1/22 | Met with Sergeant Baker at Bethany precinct to turn in her second badge. | 1.5 hours |
| 3/17/22 | Correspondence between Plaintiff and Chaplain Paul Lyda. | .25 hours |
| 3/27/22 | Telephone conference between Plaintiff and Plewik regarding Plaintiff's pending applications for specialty assignments. | .5 hours |
| 4/6–20/22 | Correspondence between Plaintiff and supervisors regarding specialty assignments. Canning Decl. **Exhibit 61** | 1 hour |
| 4/12/22 | Reviewed letter from Defendant notifying that her going forward her point of contact would be Sergeant Brad King. Conferred with WCPOA regarding the impact of this. **Canning Decl., Ex. 62.** | 1 hour |
| 4/12/22 | Reviewed correspondence between the WCPOA and Sheriff's Office regarding continued modified duty status. | .25 hours |

| ~4/13/22 | Completed the filing of a complaint against Sergeant Rookhuyzen. (Plaintiff drafted and submitted the complaint because she was advised by WCPOA that she was obligated to do so.) All of the allegations that Plaintiff made were substantiated. (Roque Dep. 32:10–34:4); conferred with WCPOA regarding same. **Canning Decl., Ex. 58** | 10 hours |
| --- | --- | --- |
| 4/18/22 | Reviewed email correspondence between WCPOA and Defendant regarding modified duty status; analyzed policies provided to WCPOA by Defendant; conferred with WCPOA regarding this. *See* **Exhibit 32.** | 1.5 hours |
| 4/18/22 | Reviewed decision of Washington County DA not to press charges; conferred with WCPOA. *See* **Exhibit 31.** | 1 hour |
| 4/19/22 | Email correspondence with King and Plewik regarding change to her reporting structure while on modified duty. | .25 hours |
| 4/20/22 | Email from King confirming change in reporting structure. | .25 hours |
| 4/20/22 | Email from Plewik regarding Plaintiff's eligibility for specialty assignments. Meeting with WCPOA to discuss impact. | 1.5 hours |
| 4/27/22 | Telephone conference with King regarding status of IA investigation and anticipated modified duration. | .5 hours. |
| 5/2/22 | Telephone conference with Sgt. Todd Baker regarding IA interview for complaint about Rookhuyzen. | .25 hours |
| 5/3/22 | Telephone conference with employer regarding need to attend interview for complaint about Rookhuyzen; communications with WCPOA regarding ability to reschedule in order to attend doctor's appointment. | 1.5 hours |
| 5/3/22 | Travel to and from duty station for IA interview with Lieutenant Coley; attended same; meetings before and after with WCPOA. | 6.5 hours |
| 5/9/22 | Telephone call from Sergeant Hennessey to pick up subpoenas for testimony in criminal matter; travel to and from duty station; telephone conference with deputy district attorney regarding testimony in light of modified duty. | 2 hours |
| 5/17/22 | Telephone call from King regarding subpoenas and police reports | 1.5 hours |

| | | |
|---|---|---|
| | for pick-up and need to sign 24-hour notification form for scheduled IA interview; travel to and from duty station. | |
| ~5/17/22 | Review paperwork and police reports in anticipation of testifying in up-coming criminal trial. | 5.5 hours |
| 5/18/22 | Attended IA interview regarding alleged theft of a salsa bowl; traveled for same; meetings with WCPOA regarding same. | 6 hours |
| 5/23/22 | Letter to Sergeant Brad King regarding metadata on photographs. In preparation for that letter, required to spend multiple hours sifting through phone and computer records to identify and send King the metadata from messages. Canning Decl. Ex. 55. | 4 hours |
| ~5/23/22 | Communications with DA regarding release from subpoena. | .25 hours |
| 5/23/22 | Email to King regarding release from subpoena. | .25 hours |
| 5/26/22 | Reviewed correspondence between WCPOA and Defendant regarding Defendant's treatment of Plaintiff during her victim interview in the Rookhuyzen investigation; reviewed WCPOA request for information; conferences with WCPOA regarding same. Canning Decl., Ex 63. | 1 hour |
| 6/3/22 | Conferred with WCPOA regarding DA communications with criminal defense attorney regarding Plaintiff's modified duty status; analyzed correspondence between WCPOA and DA's office regarding same. | 3 hours |
| 6/6/22 | Conferred with WCPOA regarding DA communications with criminal defense attorney correcting prior misstatements about Plaintiff's modified duty status and incorrectly stating that Plaintiff was on modified duty for "dishonesty investigation." | 1.5 hours |
| 6/6/22 | Analyzed correspondence between WCPOA and Defendant requesting information about Plaintiff being under investigation for "dishonesty." | .5 hours |
| 6/6/22 | Telephone conference with Plewik to discuss operational matters and modified duty status. | .25 hours |
| 6/14/22 | Analyzed documents provided by Defendant to WCPOA regarding request for information; conferred with WCPOA | 2 hours |

| | regarding the same. | |
|---|---|---|
| 6/23/22 | Call with King informing Plaintiff that she had to be in court the next day; discussion of 24-hour requirement for subpoena; conferred with WCPOA regarding same. | 2 hours |
| 6/24/22 | Travelled to and from duty station to court; received subpoena from criminal defense counsel; conferred with Deputy District Attorney regarding same; conferred with WCPOA regarding same. | 5 hours |
| 6/28/22 | Call from King regarding return to "full, unrestricted duty"; conferred with WCPOA regarding same and outcome of IA investigation. | 1.5 hours |
| | **Total Estimated Time Completing Active Work Assignments (excluding the twice-daily call-in work):** | **79 hours** |

Plaintiff understood herself to be getting full credit for the modified duty shifts that she worked for Defendant. The table above reflects her best estimates of time spent based on a careful review of the facts, circumstances and documents relevant to each entry. Canning Decl. ¶¶25-27.

Plaintiff's modified duty involved at least 122 hours (43 hours of call-in time plus 79 hours of assigned tasks) conducting assigned working activities wholly for the benefit of her employer.

### 5. Defendant Denied Plaintiff's Requested OFLA and FMLA Medical Leave.

Plaintiff requested medical leave from Defendant on July 27, 2022. According to Defendant, the payroll records as of July 27 showed that Plaintiff had "actively worked" 1,175.75 hours over the previous 12-month period, which erroneously assumed Defendant's paid modified duty between February 25 and June 28, 2022

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 21

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

involved zero hours worked. By keeping Plaintiff on leave for an extra three months after a detective found the evidence did not support a charge of theft, and by counting the entirety of Plaintiff's modified duty assignment as zero hours worked, Defendant concluded that Plaintiff fell just 75.25 hours short of the 1250 hours needed for FMLA eligibility. Klein Decl., Ex 35.

### 6. A jury could find discrimination from Defendant's highly inconsistent pattern of discipline and application of modified duty.

When union President Altiere asserted that Plaintiff's ongoing status of modified duty "can only be intended to be retaliation against Dep Canning for her complaints to WCSO and the WCDA's Office" he provided Defendant "two specific cases where employees have been accused of very similar or more egregious conduct and not placed on [modified duty]."

> Dep. Frank Ward was accused of stealing latex gloves from WCSO. He was never placed even on modified/light duty, much less administrative leave, and the investigation was over quickly with an SRIM, not an IA. No mention was ever made of "pressing charges" (theft III), as has already been made in this case.
>
> Dep. Brett Winders was accused of dishonesty regarding the hiding of measure 11 crimes, an accusation far more impactful than any at stake here, and he was not placed on administrative leave.

Ex 29.

Other WCSO disciplinary incidents support an inference that Defendant's application of its practices and policies relating to modified duty and discipline to Plaintiff was retaliatory.

A. Sergeant Brandon Yon.

Male, non-whistleblowing, similarly-situated Sergeant Brandon Yon was the subject of an IA investigation in November 2022 for allegedly driving a golf cart on

the roadway under the influence of alcohol. Klein Decl. Ex. 36. An officer "asked Yon if he had been drinking to which he says Yon first said no, then eventually said yes, after being asked a couple more times." *Id.*, p. 3.The police officer did not require Yon to blow into a breathalyzer and did not make an arrest.

Despite the plain allegation of dishonesty, Defendant only investigated Yon for potential violations of its policies regarding Professional Conduct, Courtesy and Respect, Violation of Law and Conduct Unbecoming a Washington County Employee. *Id.* p 1-2. Yon was not exiled from the office. Instead, Yon was permitted to come into the Sheriff's office and perform "desk duty."[4] Canning Decl. ¶29.

     B.  <u>Brett Winders 2023 IA.</u>

In April 2023, Defendant received a report that Winders was "stopped for suspicion of DUI, when asked to perform [Standardized Field Sobriety Tests], Deputy presented their credentials and made a statement to the officer about whether or not that was allowed because of their job." Klein Decl. Ex. 37. Defendant initially assigned Winders (a male, non-whistleblowing employee similarly-situated to Plaintiff) to "desk duty" pending the investigation. Only after PSU concluded

---

[4] Chief Deputy Roque in a FRCP 30(b)(6) deposition explained that certified law enforcement assigned to "desk duty" are "[i]n the office on the phone, but handling calls by phone instead of responding in person." Klein Decl., Ex. 10 (Roque 30(b)(6) deposition excerpts ("Roque 30(b)(6) Dep."), 7:9-15.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

Winders had been dishonest did Defendant station Winders at home. Klein Decl. Ex. 38 (Notice of Modified Duty); Ex. 39 (IA Report, May 15, 2023).

C. Robert Rookhuyzen.

In April 2022, with guidance from her union, Plaintiff complained of retaliation and harassment by Rookhuyzen. Canning Decl., Ex. 58. Defendant opened an investigation. Klein Decl. Ex. 40. Rookhuyzen was initially placed on modified duty, duty-stationed at home. Klein Decl. Ex. 41. However, Rookhuyzen still received better treatment than Plaintiff in several respects. First, Rookhuyzen was returned to normal duty on June 30, only 77 days after the investigation was initiated, id., while Plaintiff's investigation dragged on for 123 days. Second, Defendant allowed Rookhuyzen to perform the "desk duty" assignment of conducting video review relating to a homicide. Klein Decl. Ex. 42.

D. Melissa Canning, Second IA.

In August 2022, while Plaintiff was on medical leave, Defendant opened a second IA investigation into Plaintiff. Klein Decl. Ex. 43. The basis for the second IA was a complaint from Bracamonte about Canning's April 2022 harassment complaint against Rookhuyzen. Klein Decl. Ex. 44. Bracamonte alleged that Plaintiff was "flat out lying" in her complaint. Id., p. 1.

Based on this accusation from Rookhuyzen's partner, Defendant made the decision to place Plaintiff again on a modified duty assignment duty-stationed at home. Roque Dep. 59:19–62:7.

By then, however, Defendant knew that Plaintiff had not lied in her complaint. Indeed, Roque admitted that all of Plaintiff's allegations against Rookhuyzen had been substantiated by an investigation. Roque Dep. 32:5-34:4. Even Bracamonte conceded that none of the information in Plaintiff's complaint about Rookhuyzen was factually incorrect. Bracamonte Dep. 61:20-65:8.

Despite knowing at the outset of the IA that Canning's complaint against Rookhuyzen was truthful, Roque had decided to place Plaintiff back on a modified duty assignment of duty-stationed at home.

**7.** *Defendant ensured that Plaintiff was placed on the* Brady *list for retaliatory reasons.*

At the conclusion of the Salsa-gate IA, the Sheriff emailed DA Barton to inform him that the IA investigation into Plaintiff had concluded "with no findings of misconduct reflecting a lack of truthfulness, candor or bias." Ex._[Depo Ex.59]. Notwithstanding that outcome, the WCDA's practice was to make its own determination as to whether or not the conduct required that Plaintiff be designated for the *Brady* list. Klein Decl., Ex. 11 (Barton deposition excerpts ("Barton Dep."), 30:1-16.

WCDA relies on a committee to make recommendations about *Brady* list designations. In December, 2022, the committee reviewed the "Salsa-gate" IA and recommended "No further action" be taken regarding placing Plaintiff on the *Brady* list. Klein Decl. Ex. 45. Instead, in February 2024, more than 14 months after the

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 25

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

DDAC recommended "no action," a citizen journalist asked the WCDA if "Deputy Melissa Canning [was] ever put on the Brady list * * * and if so when and why?" Klein Decl. Ex 46, p. 2. WCDA responded that Plaintiff's "status is 'pending' right now." *Id.* On April 30, 2024, the WCDA Public Information Officer wrote back, "She has been added to the list under the 'additional discovery' [*i.e.* tier 2 of the *Brady* list] category." *Id.* , p. 1. There is no evidence of the District Attorney making a *Brady* decision at that time. DA Barton testified that a witness's *Brady* status cannot change without his approval, Barton Dep. 71:12-16. In June 2024, months *after* the WCDA responded that Plaintiff had been placed on the Brady list, the County's DDAC again reviewed the Salsa-gate allegations and again recommended that Plaintiff not be put on the *Brady* list. Klein Decl. Ex. 47. On July 9, 2024, Barton overruled the recommendation of the committee, and decided to place Plaintiff on Tier-2 *Brady* status "based on Allegation #3 and theft activity."[5] *Id.*

Correspondence between the sheriff's office and Barton between June of 2022, and the July 2024 decision more than two years later to put Plaintiff on the *Brady* list indicates that on several occasions WCDA and high level Sheriff's office employees discussed Plaintiff. Klein Decl. Ex. 48. From this correspondence a jury

---

[5] The third allegation in the IA report that the DDAC and the DA reviewed to reach its decision was based on Personnel Rules and Regulations – Prohibited Conduct 5.1, prohibiting "Any action that reflects discredit upon the County service." Klein Decl. Ex. 49, p. 2.

could reasonably infer that through phone conversations, Defendant attempted to influence the WCDA to place Plaintiff on the *Brady* list notwithstanding the absence of any finding of "misconduct reflecting a lack of truthfulness, candor or bias."

### 8. Defendant's witnesses on matters of importance relating to Plaintiff's claims made statements from which a jury could reasonably conclude to be deliberately untruthful.

If the jury finds that "a witness has deliberately testified untruthfully about something important, [the jury] may choose not to believe anything that witness said." 9th Cir. model Civ. Jury Instr. 1.14 (2017). On several important matters relating to this case, Defendant made statements that a jury could reasonably find deliberately untruthful.

#### A. Lieutenant Brad King.

Lieutenant King was the PSU sergeant who conducted the "Salsa–gate" IA investigation. At his deposition, King was asked about referring to Plaintiff as "the village bicycle:"

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 27

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

> 3    **Q.**  Do you ever recall referring to Melissa Canning
> 4    as, quote, "the village bicycle"?
> 5    **A.  No.**
> 6    **Q.**  Have you ever used that phrase, "village
> 7    bicycle"?
> 8    **A.  I have uttered that phrase before in the**
> 9    **repeating of a story that I heard.**
> 10    **Q.**  What was the story that you heard in which that
> 11    phrase was used?
> 12    **A.  It was a story about somebody who was extremely**
> 13    **promiscuous, and that was the term that was referred to**
> 14    **them.**
> 15    **Q.**  About their promiscuity?
> 16    **A.  Yes.**
> 17    **Q.**  And by that, you mean sexual promiscuity?
> 18    **A.  Yes.  I did not coin the phrase, but that was how**
> 19    **it was utilized and I repeated that.**
> 20    **Q.**  And who did you repeat that story to?
> 21    **A.  I don't recall.  It was years ago.**
> 22    **Q.**  Okay.  And were you on duty when you repeated
> 23    that story?
> 24    **A.  No.  I wasn't working for the Washington County**
> 25    **Sheriff's Office at the time.**

> 7
>
> 1    **Q.**  Okay.  Do you know if you've ever used that
> 2    phrase, "village bicycle," while working at the
> 3    Washington County Sheriff's Office?
> 4    **A.  I don't believe so.**

King Dep: 6:3-7:4.

WCPOA President Altiere testified about negative comments he had heard others utter regarding Plaintiff. Altiere stated that while he was working with

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 28

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

Plaintiff as a union representative, "another rep basically told me that, Hey, be

careful, man. You know, I've heard she's the village bicycle." Klein Decl., Ex. 12

(Altiere deposition excerpts ("Altiere Dep."), 12:15-17. Altiere was asked what he

understood the term to mean:

```
1    A.  That means -- I can't believe I'm saying this in
2  a recorded deposition.  The village bicycle means that
3  everybody gets a ride.
4    Q.  Okay.  So sexually promiscuous?
5    A.  Sexually promiscuous, yes.
6    Q.  And was -- was that -- did you take that warning
7  to you to be a warning relating to your work as a union
8  rep?
9    A.  I honestly think they were trying to warn me to
10 not get involved with her personally.
11   Q.  Okay.  And who said it?
12   A.  Brad King.  And I don't know where he heard it
13 from -- you know, it's one of those things where he
14 heard it somewhere.  You know, it's one of those
15 things that -- and I was honestly trying to put an end
16 to it because it was -- it's not appropriate, but I mean
17 it's -- like I -- I don't --
```

*Id.* 12:25-13:17.

From this a jury could reasonably find that King, the PSU sergeant assigned to

investigate Plaintiff's "Salsa-gate" IA, had a clear bias against Plaintiff, and the jury

could reasonably choose not to believe anything the witness said at trial.

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 29

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

B. <u>Robert Rookhuyzen.</u>

On March 2, Rookhuyzen was interviewed regarding the bowl. Klein Decl. Ex.50, p. 2. Rookhuyzen reported, "my eyes were taken away from the table for a second and there was a very brief conversation between Tony and Melissa and … the context was, you know, 'you're just gonna load that up?' Or 'you're taking it? ' And my brain at the time was like, 'yeah, she loaded up her food.'"

On April 27, Rookhuyzen stated, "So she asked for a to-go box and I think it was either I was looking at my phone or I was, you know, paying the check. … And I don't remember the exact words, so this is total paraphrase, but it was something like, um, oh, you're just gonna take that or you're grabbing that or something to that effect. I was, again, not paying attention to the table, looking down either at my phone or signing the check, and it happened that fast." Klein Decl. Ex. 51.

On January 17, 2023 Rookhuyzen suggested for the first time that he and Bracamonte had been "watching our colleague steal something." Klein Decl Ex. 52, p. 4–5.

Then on September 12, 2024, at his deposition, Rookhuyzen claimed to recall Bracamonte mentioning "stealing" or "theft."

```
20        And I wasn't paying attention what was going on
21   at the table, but they were having some sort of
22   conversation that involved the two of them. Tony saying
23   like, "Isn't that stealing?" or, "Isn't that theft?" or
24   something like that. And they were having this
25   dialogue, but I'm still computing the check. And then
                                                          86
1   we get up to leave.
2        And it wasn't until much later that my brain was
3   like, Wait. What was he talking about? Why he would
4   say that? And of course our conversations are so full
5   of humor and jokes and sarcasm and wit that later I
6   decided I'm going to ask him what he was talking about,
7   because it doesn't make sense.
```

Rookhuyzen Dep. 85:23–86:7.

From these conflicting recollections, a jury could find that Rookhuyzen was not credible.

### III.    DISCUSSION

### 1.   *Legal Standard for Summary Judgement in Employment Cases*

"It should not take much for a plaintiff in a discrimination case to overcome a summary judgment motion." *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 499 (9th Cir. 2015). Employees alleging discrimination "need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because the ultimate question is one that can only be resolved through a searching inquiry — one that is most appropriately conducted by a factfinder, upon a full record." *Chuang v.*

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 31

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

*Univ. of Cal. Davis*, 225 F.3d 1115, 1123–24 (9th Cir. 2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

An employee does not necessarily have to produce additional evidence beyond that which establishes the *prima facie* case if that evidence itself also tends to demonstrate pretext. *Chuang*, 225 F.3d at 1127 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)). If the employee does produce evidence beyond that establishing the prima facie case, "**a factual question will almost always exist** with respect to any claim of a nondiscriminatory reason. The existence of this question of material fact will ordinarily preclude the granting of summary judgment." *Sischo-Nownejad v. Merced Comm. College District*, 934 F.2d 1104, 1111 (9th Cir 1991) (citations omitted, emphasis added).

### 2. *Defendant's Motion for Summary Judgment against Claims under OFLA and FMLA Must Be Denied.*

The law does not permit Plaintiff's paid modified duty assignment to be counted as zero hours work for purposes of FMLA/OFLA eligibility.

Defendant's motion on FMLA/OFLA eligibility must be denied for the three reasons.

(1) Plaintiff performed active assignments while on modified duty that added up to more than 75.25 hours of active work.

(2) Even when she was not actively completing assignments, Plaintiff was "engaged to wait," and therefore her shift time counted toward eligibility under both the FMLA and OFLA.

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 32

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

(3) Defendant's retaliatory extension of Plaintiff's time on modified duty assignment far beyond what was reasonable prevents Defendant from using that time to bar Plaintiff from receiving her FMLA and OFLA leave rights.

A. <u>Plaintiff actively completed assigned tasks of 122 hours while on Modified Duty, making her eligible for FMLA.</u>

      i. *Defendant bears the legal burden to disprove Plaintiff's working hours.*

Under FMLA, if "an employer does not maintain an accurate record of hours worked by an employee, including for employees who are exempt from FLSA's requirement that a record be kept of their hours worked . . . the employer has the burden of showing that the employee has not worked the requisite hours." 29 C.F.R. § 825.110(c).

Under DOL regulations, "when the employer does not record time that the plaintiff spent doing employer-required duties," the plaintiff is presumed to have worked 1,250 hours during the previous twelve-month period. 29 C.F.R. § 825.110(c); 29 C.F.R. § 825.500(f)(1). To overcome this presumption, the defendant must clearly demonstrate that the employee did not work 1,250 hours during the previous twelve months. 29 C.F.R. § 825.110(c).

Affidavits claiming hours arguably worked by an employee but disputed by the employer are more than sufficient to create a question of fact as to the employee's hours worked for purposes of FMLA eligibility calculation. *Kosakow v. New Rochelle Radiology Assocs., PC*, 274 F.3d 706, 717 (2d Cir. 2001) (affidavits showing an employee's pre-shift showering sufficient to overcome summary judgment as to the

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 33

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

plaintiff's FMLA eligibility); _Holladay v. Fairbanks N. Star Borough Sch. Dist_., 2017

U.S. Dist. LEXIS 105566, at *20 (D. Alaska July 7, 2017) (summary judgment denied

solely on the basis of the plaintiff's "sworn assertion that she worked more than 1,250

hours," contradicted by the employer's asserting that its records reflect fewer than

1,250 hours "Given the dispute as to the number of hours actually worked, the Court

cannot conclude as a matter of law that [the plaintiff] was not entitled to FMLA

benefits.")

> ii. _The evidence shows that Plaintiff was eligible for family medical leave because of active hours worked._

To be eligible for FMLA leave, an employee must have worked at least 1250

hours in the previous twelve-month period. 29 U.S.C. 2611(2)(A). To be eligible for

OFLA, an employee must have worked an average of 25 hours per week in the

previous 180-day period, which comes to 642.86 hours. ORS 659A.156(1)(b).

Even if this Court were to determine that not all of Plaintiff's paid Modified

Duty shifts were working time (see the next section, below), the evidence shows

Plaintiff actively worked on Defendants' behalf at least 122 hours during her

modified duty period between February 25 and June 28. Hours she was actively

completing assigned tasks for Defendant while on modified duty, combined with the

hours she had worked before she went on modified leave, pushed her over the

1,250-hour mark for FMLA eligibility.

Defendant kept no time records regarding the active tasks it was giving Plaintiff during her modified duty. Defendant cannot overcome the presumption that Plaintiff worked 1250 hours in the preceding 12 months. 29 C.F.R. § 825.110(c). Because Defendant has produced no such proof, and because Plaintiff did in fact work 1250 hours, Defendant's summary judgment as to FMLA eligibility should be denied on this basis alone.

B. **Even between active assignments, Plaintiff was "engaged to wait," making her eligible for FMLA and OFLA.**

    i. *"Waiting to be Engaged" vs. "Engaged to Wait" legal standards.*

29 CFR §785.16 provides the test for when on-call time counts for the time needed for FMLA and OFLA eligibility. That regulation provides:

> Periods during which an employee is **completely relieved from duty** and which are long enough to enable him to use the time effectively for his own purposes are not hours worked. He is not completely relieved from duty and cannot use the time effectively for his own purposes unless **he is definitely told in advance that he may leave the job and that he will not have to commence work until a definitely specified hour has arrived.**

29 C.F.R. § 785.16 (emphasis added).

Regulations acknowledge the concept of "engaged to wait" as compensable working time:

> [T]he Court ruled that there need be no exertion at all and that all hours are hours worked which the employee is required to give his employer, that "an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. * *

> *Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer." (*Armour & Co. v. Wantock*, 323 U.S. 126 (1944); *Skidmore v. Swift*, 323 U.S. 134 (1944)) The workweek ordinarily includes "all the time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed work place". (*Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680 (1946)).

29 C.F.R. § 785.7.

> The Ninth Circuit adopts the same standard:

> As the Supreme Court long ago recognized, the inquiry into whether "on-call" or "waiting" time constitutes compensable "working" time for purposes of FLSA § 207(a)(1) is particularly challenging. Although "no principle of law found either in the statute or in Court decisions precludes waiting time from also being working time[,] we cannot . . . lay down a legal formula to resolve cases so varied in their facts as are the many situations in which employment involves waiting time." *Skidmore v. Swift & Co.,* 323 U.S. 134, 136, 89 L. Ed. 124, 65 S. Ct. 161 (1944). Facts may show that the employee was 'engaged to wait,' which is compensable, or they may show that the employee 'waited to be engaged,' which is not compensable. *Brigham v. Eugene Water & Elec. Bd.,* 357 F.3d 931, 935 (9th Cir. 2004).

The *Brigham* case is instructive. The Ninth Circuit Court found that the "two predominant factors in determining whether an employee's on-call waiting time is compensable overtime are (1) the degree to which the employee is free to engage in personal activities; and (2) the agreements between the parties. *Brigham*, 357 F.3d at 936.

As to the "personal activities" standards, the *Brigham* court concluded the "on–call" time of employees of an electric utility was nevertheless compensable, even though the employees were permitted to remain at home, eat, sleep, and be with their families and were called out only about once or twice a month. *Id.* The court reasoned that while the employees were permitted to stay at home during call, they were "tethered" to their phone and "had to be absolutely prepared to respond at all times, without regard to how often they were actually called out." *Id.*

As to the question of an agreement, the Ninth Circuit explained: "An agreement between the parties which provides at least some type of compensation for on-call waiting time may suggest the parties characterize waiting time as work. Conversely, an agreement pursuant to which the employees are to be paid only for time spent actually working, and not merely waiting to work, may suggest the parties do not characterize waiting time as work." *Brigham*, 357 F.3d at 939.

> *ii. When Plaintiff did not have a specific task for Plaintiff, Defendant engaged Plaintiff to wait.*

In this case both of the *Brigham* "predominant factors" clearly signal that Plaintiff was engaged to wait. First, as the facts discussed in Section 1, above, show, Defendant assigned Plaintiff enough tasks during the Modified Duty period to exceed the 1,250-hour threshold for FMLA eligibility.

But even the time in between those assignments was compensable under the FLSA, since Plaintiff was "engaged to wait." Defendant never told Plaintiff "in

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 37

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

advance that [s]he may leave the job and that [s]he will not have to commence work until a definitely specified hour has arrived." It was the reverse. Defendant concedes that Plaintiff was not "completely relieved of duties," and in fact she was required to be able to respond to WCSO upon request with one hour's notice. That is why Defendant paid Plaintiff to remain available during specific, assigned shift hours.

In fact, when Plaintiff wanted to "use the time effectively for [her] own purposes," she "was required to request to use her personal leave for vacations, and had to request, and receive permission, to take vacation leave for her birthday." Defendant's Motion, ECF 41, p. 10. Defendant concedes that requiring Plaintiff to use vacation and sick leave was the process "required of all WCSO," which is to say it is the process required of employees working their normal, active work shifts. Defendant further concedes that Plaintiff "was able to engage in these personal pursuits on the same terms as before they were placed on administrative leave, and they were not prevented from engaging in these personal pursuits." *Id.* So Plaintiff, like other employees on compensable duty shifts, could only be "engaging in these personal pursuits" when she took vacation and sick leave. The identical limitation applied before she was put on modified duty assignment, when Defendant credited her paid working time to her FMLA/OFLA eligibility.

Defendant concedes that during the hours of her modified duty shift (like the *Brigham* plaintiffs) Plaintiff was tethered to a work-issued phone. "[D]uring your

new shift hours you must carry the PSU-issued cell phone (971-470-6190) and be able to respond to the Sheriff's Office upon request within one hour …." Roque Decl., ECF 43, ¶10.

The fact that Defendant agreed to pay Plaintiff for the time that she was on modified duty is what allowed Defendant to impose restrictions on Plaintiff during shift hours.

Under the regulations, Plaintiff's compensated "Modified Duty" shifts qualified as time worked for purposes of FMLA/OFLA eligibility. With the hours of those shifts, Plaintiff's annual hours far exceeded 1,250 within the preceding 12 months (the FMLA minimum), and averaged more than 25 hours per week within the preceding 6 months (the OFLA minimum). Therefore, the evidence shows Plaintiff was eligible for FMLA and OFLA.

C. <u>Defendant's retaliatory imposition and extension of Plaintiff's time on modified duty precludes Defendant from using that time to refuse her FMLA and OFLA benefits.</u>

The Court need only reach this step if it disregards the evidence that Plaintiff engaged in over 75.25 hours of active, compensable work during modified leave and further concludes that Defendant did not engage Plaintiff to wait. Even then, Plaintiff's FMLA and OFLA claims still should not be dismissed. If Defendant put or kept Plaintiff on extended modified duty leave for retaliatory reasons, the foreseeable

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 39

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

damages arising from Defendant's retaliation are actionable as FMLA/OFLA
interference.

   *i. Legal Standard: Employers may not interfere with an employee's FMLA eligibility.*

   In Oregon, an employee's assignment to administrative leave can constitute
an adverse action under the whistleblower statute. *Seater v. Klamath Irrigation Dist.*,
336 Or. App. 195, 197, 560 P.3d 731 (2024) (listing alleged adverse actions as "
including the alteration of her duties, formal reprimands, being placed on
administrative leave, and ultimately being terminated."); *Hanson v. State of Or.*, No.
3:21-cv-780-SI, 2023 U.S. Dist. LEXIS 198, at *23 (D. Or. Jan. 3, 2023) ("Viewing
the evidence in the light most favorable to Hanson, the Court finds that a jury could
reasonably conclude that Hanson's administrative leave, although paid, was an
adverse employment action."); *Moore v. City of New Brighton*, 932 N.W.2d 317, 325
(Minn. Ct. App. 2019) (ruling in favor of a police employee investigated and put on
leave after a whistleblowing event: "We have no difficulty concluding that, as a
matter of law, an employee's assignment to administrative leave might in some
circumstances constitute a penalty under the whistleblower statute.") That conclusion
follows from the definition of "adverse treatment," which is any action "reasonably
likely to deter protected activity, regardless of whether it materially affects the terms,
conditions, or privileges of employment." OAR 839-005-0125.

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 40

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

An employer's retaliation against an employee by placing them on administrative leave, which subsequently undercuts their FMLA eligibility due to insufficient work hours, can be considered a violation of both the FMLA and OFLA. 29 CFR § 825.220 provides:

> (b) Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act….
>
> Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. It would also include manipulation by a covered employer to avoid responsibilities under FMLA, for example:
>
> > …
> >
> > (2) Changing the essential functions of the job in order to preclude the taking of leave;
> >
> > (3) Reducing hours available to work in order to avoid employee eligibility.

29 CFR § 825.220.

In summary, putting an employee on leave or modified duty assignment for retaliatory or discriminatory reasons, with the reasonably foreseeable result that the employee's FMLA eligibility would be impacted, constitutes FMLA interference. 29 CFR § 825.220.

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 41

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

> ii. *Defendant put and kept Plaintiff on modified duty longer than similarly-situated, male, non-whistleblower employees.*

Three of Plaintiff's male, non-whistleblower co-workers were the subjects of IA investigations within six months of Plaintiff's investigation. Despite the fact the allegations against them were much more complex than Plaintiff's $1.91 salsa-bowl borrowing, Defendant treated them much better than Plaintiff. As discussed above, Defendant conducted IA investigations of Deputy Winders (twice), Sergeant Rookhuyzen, and Sergeant Yon within six months of the investigation Defendant conducted of Plaintiff. The investigations of those similarly-situated male, non-whistleblowers involved, respectively: the a failure to report a victim's claim of rape-at-gunpoint and subsequent dishonesty about it; sexual harassment and the improper use of police equipment; and DUII in a vehicle not certified for street use. During their investigations, Deputy Winders was not placed on modified duty or leave for the first claim and placed only on "desk duty" during his second investigation; Sergeant Rookhuyzen was placed on desk duty for 2.5 months; Sergeant Yon was placed on desk duty at the sheriff's station for 1 month.

In 2023, Defendant conducted a second IA investigation into Winders on a different matter. Despite that the allegations of the second IA included Class I violations of criminal statutes and truthfulness, Defendant initially placed Winders on "desk duty." Only when Winders was found to have been untruthful in his IA interview, did Defendant assign Winders a duty station at home.

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 42

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

Defendant's favorable treatment of Plaintiff's similarly-situated coworkers is a clear corroboration of the retaliatory and discriminatory nature of Defendant's treatment of Plaintiff. Defendant's decision to keep Plaintiff away from the workplace far longer than was reasonably necessary and far longer than Plaintiff's coworkers whose investigations were much more complex, added to the facts in Section 1, above, shows retaliatory intent. Taken together, there is more than enough evidence to raise a genuine issue of fact as to whether the length of Plaintiff's Modified Duty was part of Defendant's retaliation against her.[6]

> iii. *In taking retaliatory action that allowed Defendant to claim Plaintiff was not eligible for FMLA/OFLA leave, Defendant interfered with Plaintiff's FMLA/OFLA eligibility.*

Having retaliated against Plaintiff by first placing Plaintiff on modified duty for an alleged theft of a $1.91 salsa bowl, and then unreasonably extending her modified duty, Defendant was able to leverage that retaliation into an argument allowing Defendant to deprive Plaintiff of her FMLA/OFLA eligibility. In this way, Defendant's retaliatory and differential treatment of Plaintiff constituted interference with Plaintiff's FMLA/OFLA eligibility.

---

[6] The use of modified duty to retaliate against Plaintiff is further underscored by the fact that Defendant had decided to place Plaintiff on modified duty again, based on Bracamonte's complaint, alleging that allegations WCSO had investigated and found to be true, were in actuality evidence of Plaintiff's supposed dishonesty.

In sum, the Court should deny Defendant's motion to dismiss the claims of OFLA and FMLA for the three independently sufficient reasons cited above.

### 3. *Defendant's Motion for Summary Judgment Seeking to Preclude Plaintiff from Arguing Retaliation relating to "Salsa-gate" Must Be Denied.*

Plaintiff understands Defendant's "Salsa-gate" motion to ask the Court to declare as a matter of law that:

- Sergeant Rookhuyzen was obligated by both statute and Washington County policy to submit the report of alleged theft. ECF 41, pp. 13-15.

- The County's decision to place Plaintiff on modified duty and the duration of Plaintiff's time on modified duty, do not constitute unlawful retaliation. *Id.* at 16-17; and

- "Plaintiff's allegations of retaliation relating to the [Washington County District Attorney's] WCDA's decision to placer [sic.] on Brady list cannot result in county liability." (*Id.* at p. 18).

Because each of those separate legal assertions within Defendant's "Salsa-gate motion" requires a distinct analysis, Plaintiff will address them individually.

### A. Defendant's decision to open an IA and put Plaintiff back on modified duty while it investigated Bracamonte's complaint that Plaintiff's complaint about Rookhuyzen was improper belies its asserted position that a required complaint, as a matter of law, cannot be retaliatory.

In its motion seeking a ruling that Rookhuyzen's allegation of theft could not be retaliatory, Defendant cites various statutes and policies that imposed an obligation on Rookhuyzen to file complaints. ECF 41, 13015. Defendant argues that

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 44

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

Rookhuyzen's complaint "was not an act of retaliation because it was compelled by law." *Id.*, p. 15. Defendant's argument contradicts its previous interpretation.

As described above, in April 2022, Plaintiff filed a complaint against Rookhuyzen. She was following guidance she received from the WCPOA that she had an obligation to report Rookhuyzen's misconduct, and that a failure to do so could lead to discipline against her. Canning Decl. ¶32. As noted above, Defendant's investigation sustained all of Plaintiff's allegations against Rookhuyzen. Roque Dep. 32:5-34:4.

After the Rookhuyzen IA was completed, Bracamonte filed a complaint against Plaintiff. Bracamonte alleged that Plaintiff was "flat out lying" in the complaint that she had brought against Rookhuyzen. Defendant understood Bracamonte's complaint to "allege that [Plaintiff retaliated] against [Rookhuyzen] * * * by making false allegations about the reporting staff member." Ex. 44.

Defendant took the opposite approach to what it argues in its Motion. Defendant ignored both the fact that Plaintiff was obliged to report the misconduct she was aware of, and that her allegations had been sustained. Instead, Defendant opened an IA investigation into the question of whether Plaintiff's already-sustained complaint was retaliatory. *Id.* Defendant then went one step further and made the adverse employment decision to put Plaintiff on modified duty while it investigated the complaint of retaliation by means of lodging a complaint. Roque Dep. 59:21-61:5

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 45

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

The fact that Defendant had decided to investigate Plaintiff for retaliation based on her legally compelled report about Rookhuyzen confirms that Defendant understood that, under its own policies, a report of misconduct could under certain circumstances constitute retaliation in violation of its policies. Defendant cannot assert one interpretation for Plaintiff and the opposite interpretation for itself. The Court should deny Defendant's motion to prevent Plaintiff from arguing that Rookhuyzen report of discrimination was retaliatory.

    B.  <u>A jury could reasonably find that Rookhuyzen's allegation of theft was not brought in good faith.</u>

Given the multiple inconsistencies and instances of dissemblance described in Section II.8.B above, a jury could reasonably find Rookhuyzen to not be credible about anything that he testifies to.

Accordingly, a jury could believe the initial version of Rookhuyzen's narrative that he did not see Plaintiff put the salsa cup in her to-go container at the time. The jury could therefore conclude that Rookhuyzen did not believe a theft had occurred.

Alternatively, a jury could reasonably believe his later version that Rookhuyzen had in fact seen Plaintiff place the plastic bowl in her to-go container: he and Bracamonte "were put in the unfortunate decision of **watching** our colleague steal something." Ex. 52, p. 4–5. If the jury were to credit that inconsistent recollection of Rookhuyzen, it could conclude not only that he violated ORS 181A.681(2) (requiring a police officer to intervene to prevent misconduct), but also notice that he spent several more hours with Plaintiff, including driving Plaintiff home and reminding Plaintiff not to forget her leftovers. He had simply asked her about it, he would have confirmed that no crime had occurred.

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 46

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

The jury could also find that Rookhuyzen lacked the proper belief that a crime had occurred, because he skipped his obligation to inquire whether Plaintiff had the requisite intent to permanently deprive the restaurant of its property. That is, a jury could find that Rookhuyzen's decision to ignore Bracamonte's advice to ask Plaintiff, to "complete the circle of investigation" Bracamonte Dep. 47:12-24. supports a finding that Rookhuyzen made his complaint for an improper retaliatory purpose, not for a good-faith belief.

Rookhuyzen had a motive to set Plaintiff up for termination. He knew that sergeants were angry about Plaintiff's whistleblowing regarding Winders, and that several people within the department including his supervisor, Degman, viewed Plaintiff in a negative light. He knew he was viewed as connected to Plaintiff, having been criticized by Degman and Commander Marzilli about his friendship with Plaintiff and coached on the need to limit "supervisor and deputy relationships" Degman Dep. 68:24-69:10.

From this evidence it is at a minimum a question of fact for a jury to determine whether Rookhuyzen brought his allegation of theft in good faith, or whether it was instead brought for an unlawful retaliatory purpose.

      C.  <u>Even if Rookhuyzen was required to bring his complaint, the evidence of retaliation that followed must be admitted.</u>

Defendant attempts to bootstrap onto its theory that Rookhuyzen was obligated to report Plaintiff, a second claim that all of Defendant's subsequent decisions regarding placing Plaintiff on modified duty and then keeping her on extended extended modified duty cannot themselves be retaliatory.

Defendant argues that "Because the allegations constituted first an allegation of criminality and second an act of dishonesty, both 'Class I' violations, Plaintiff was

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 47

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

on administrative leave for the duration." *See* Declaration of Al Roque, ECF 43, ¶32.
Roque's declaration, however, is false. There was never an allegation of dishonesty
associated with the "Salsa-gate" IA. The allegations at issue in Salsa-gate were set
forth at the beginning of the IA report:

- Allegation #1 Policy #207-R10 General Conduct § 1. Professional Conduct
  ("Staff will conduct themselves in the discharge of their duties and their
  relations with the public and each other in a tactful and professional manner.")

- Allegation #2 Policy #102-R07 MEETING OUR MISSION AND SERVICE
  VISION § 4 Every Decision We Make is Grounded in Our Core Values.

- Allegation #3 Washington County Personnel Rules and Regulations -
  Prohibited Conduct 5.1 ("Any action that reflects discredit upon the County.
  * * * Cause [for discipline] may include * * * Theft, or attempted theft of
  property of Washington County, its employees, or the public.")

Ex. 49 p. 1-2; *see also* Ex. 18, p. 2 (listing all internal affairs investigations for
truthfulness between 2019 and 2022, and not including IA2022-00002 regarding
Melissa Canning.

 Had dishonesty been an allegation in Salsa-gate, Defendant would have
included an additional allegation of dishonesty. *See e.g.* Ex. 39, p.2. (2023 IA
investigation of Brett Winders including the allegation, Policy 201-R10 General
Conduct 2. Truthfulness).

 Defendant acknowledged that its decisions on whether and when to place an
employee on modified duty pending the outcome of an investigation, is a matter of
discretion. As Roque and Koch testified Defendant considers many "factors" when
making that decision. As Koch stated in an email to Altiere, "every issue and

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 48

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

complaint has a unique set of circumstances that drive our decision process." Ex 29.

As exemplified by the disparate treatment that Plaintiff experienced from similarly

situated male, non-whistleblowing employees, Winders in 2021, Winders in 2023,

Yon, and Rookhuyzen, Defendant has in many instances exercised that discretion to

the benefit of those non-whistleblowing employees. A jury could find that

Defendant's exercise of discretion to first place and then leave Plaintiff on modified

duty for 123 days was retaliatory.

D. Defendant's argument that WCDA's decision to place Plaintiff on the Brady list is entitled to prosecutorial immunity is a red herring.

Plaintiff does not bring a claim against the DA for his or his office's decision

to Place Plaintiff on a Brady list. However, it is well established that

> if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process.

Poland v. Chertoff, 494 F.3d 1174, 1182-1183 (9th Cir. 2007). As described

above, there is a genuine question of material fact about whether representatives of

Defendant, who are not decisionmakers when it comes to making Brady list

decisions, improperly influenced the process that led to an adverse result for Plaintiff.

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 49

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

This assertion does not depend on Plaintiff challenging any immunity the DA may enjoy for a decision to place Plaintiff on a *Brady* list.

## IV.    CONCLUSION

Because genuine questions of material fact exist for each of the issues that Defendant moves against, this Court should deny Defendant's Motion in its entirety.

DATED this 18th day of February, 2025.

KLEIN MUNSINGER LLC

By *s/Jose Klein*
Jose Klein, OSB No. 083845
jose@kleinmusinger.com
Damien Munsinger, OSB No. 124022
damien@kleinmunsinger.com
Of Attorneys for Plaintiff

Certification of Compliance with LR 7-2(b)

Microsoft Word word count of the foregoing brief indicates that it is 10,461 words, including footnotes, but excluding captions, exhibits, signature block and footer.

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT
3:23-cv-00210-ACN | Page 50

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078