**KAREN M. VICKERS,** OSB No. 913810
kvickers@vickersplass.com
Telephone: 503-726-5985
**BETH F. PLASS,** OSB No. 122031
bplass@vickersplass.com
Telephone: 503-726-5975
VICKERS PLASS LLC
5200 SW Meadows Road, Suite 150
Lake Oswego, OR 97035

  Of Attorneys for Defendant

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **MELISSA CANNING**,<br><br>        Plaintiff,<br>v.<br>**WASHINGTON COUNTY**,<br><br>        Defendant. | Case No. 3:23-cv-00210-AN<br><br>DEFENDANT'S TRIAL MEMORANDUM |

Defendant Washington County respectfully submits the following trial memorandum.

## INTRODUCTION

This is an employment case. Plaintiff Melissa Canning makes a mix of state and federal claims against her former employer, defendant Washington County, arising out of her work as a Washington County Sheriff's Deputy. Washington County did not fire Canning: The County granted Canning's request for six months of leave. Following the period of leave, she was medically laid off and permitted to return at any time within 18 months if cleared by her doctor. Canning never attempted to return and instead filed this suit one month after the layoff. She promptly obtained alternative employment.

# FACTUAL BACKGROUND

Washington County anticipates that the evidence at trial will establish the following relevant facts.

Plaintiff Melissa Canning was hired on April 9, 2018 as a recruit deputy with the Washington County Sheriff's Office (WCSO). She was promoted to a regular deputy position on October 5, 2019. Canning received positive performance evaluations. The only discipline Canning received was an oral reprimand. Canning was not fired.

### A. The March 6, 2021 Incident.

On March 6, 2021, Canning was dispatched as primary officer to a suicide threat call at the Portland Golf Club. Deputy Brett Winders (Winders) was dispatched to the call as the back-up officer. Winders arrived on scene first and contacted the male subject of the call (Subject). Winders' police report indicated Subject had been crying and told Winders he had "a rough forty-eight hours" and had been having "personal issues for several months." Subject admitted to Winders he was having suicidal thoughts and agreed to accept a voluntary transport to the hospital.

Canning arrived as Winders and Subject were walking out to the parking lot, and Winders asked Canning to assist by providing a courtesy transport up to the hospital. During the transport, Subject told Canning he had been sexually assaulted at gunpoint two days prior.

Canning called Dispatch over the radio and asked them to change the call type from Suicide Threat to a SXA (Sex Crime). A couple minutes after, Winders sent her an MDC message that said something like, "What, what happened?" Canning ignored the message.

**B. Canning voices her concerns and WCSO investigates the matter.**

On March 7, 2021, Canning reported the issue first to Sergeant Christopher Bowman (Bowman) and then to her direct supervisor, Sergeant Joshua Snyder (Snyder), who was also Winders' direct supervisor. The same day, Sgt. Snyder spoke with Canning and Winders. When Snyder spoke with Winders, Winders was forthcoming with information. Winders admitted the Subject told him about the assault and admitted he made a mistake. Winders was directed to supplement his report and was given a written Performance Observation (PO).

On March 8, 2021, the issue was reported to WCSO's Professional Standards Unit (PSU) who opened a Service-Related Inquiry Memo (SRIM), which is a report to memorialize a supervisory inquiry into possible violations of WCSO policy. After an investigation, on April 15, 2021, the SRIM was completed with sustained violations because Winders failed to conduct a proper investigation into crimes which were reported to him by the victim. The WCSO follows progressive discipline. Winders received an oral reprimand.

On March 9, 2021, Winders apologized to Canning in a text message. Canning responded, seemingly accepting the apology and stated that Winders did not need to feel like he owed her anything.

**C. Dissatisfied with the outcome of the SRIM, Canning raises allegations of untruthfulness, which are investigated and found to be unsubstantiated.**

May 10, 2021, Canning met with PSU Sergeant Tony Bass (Bass) to report her belief that Winders had been untruthful. In accordance with WCSO Policy, an Internal Affairs (IA) was opened. Canning stated Winders lied to her on three separate occasions: 1) at the scene of the call when Winders did not tell her about Subject's sexual assault disclosure; 2) at Service Center East when Canning confronted Winders by stating: "Hey, Brett, your guy," as she was giving a

summary of the call, and Winders interrupted her and said, "My guy?" Canning finished her sentence and told him that Subject was raped at gunpoint two days earlier. Winders' reply was, "What – what do you mean?" Canning stated Winders had a "stupid look" on his face when he said that, and 3) when Winders sent Canning a text message on March 9, 2021, stating he thought Subject was "12-34" (code for mental illness) and he took Subject's "ramblings as utterances." Canning told the investigator it made her even more mad when he sent the message to her.

When interviewed, Winders admitted Subject told him about the sexual assault, however Winders did not believe him. Winders further stated he was so excited Subject agreed to be transported to the hospital and admitted he should have told Canning about Subject's allegations. Winders owned his mistake and asked Sgt. Bass to tell Canning that he was sorry that he was "a shitty district partner" and that he let Canning down. The investigators recommended the investigation be closed as "unfounded." In May the investigation was closed as unfounded based on lack of evidence supporting untruthfulness.

Canning suffered no retaliation for her report. She was given a Performance Observation by Sergeant Robert Rookhuyzen and then-Sheriff Pat Garrett highlighted her work in WCSO report. Winders and Canning were personal friends. Winders continued to communicate with Canning in a friendly manner.

**D. In September 2021 Canning applies for the Crisis Negotiation Unit and states she cannot work with Winders.**

On August 6, 2021, WCSO announced a selection process for the Crisis Negotiation Unit (CNU). The CNU is an interagency team comprised of law enforcement officers and mental health professionals from Beaverton, Forest Grove, Hillsboro, Tigard, and Tualatin police

PAGE 4 – DEFENDANT'S TRIAL MEMORANDUM

departments, the FBI, and the Washington County Sheriff's Office. Placement into CNU does not come with an increase in pay or benefits.

Canning learned during an information session that Winders was considering applying to CNU. She sent Sgt. Cliff Lascink (Lascink) an e-mail requesting to speak with him. Lascink met with Canning on September 2, 2021, at which time Canning stated she did not think Winders should be applying to the position as he would not be a good fit due to his role in the March 6, 2021 incident. Lascink listened to Canning, and later confirmed that there was nothing in Winders' disciplinary history that prevented his application.

The applicant selection process is a full day event for the entire CNU team. Current members of CNU assist with the facilitation and evaluation of applicants. CNU members are experienced law enforcement professionals who are familiar with the duties and core competencies of a crisis negotiator. Prior to applicant test day, the CNU Team Lead selects the evaluators and facilitators for each scenario. At the end of the testing phase, Winders scored higher than Canning in three out of four categories and overall.

**E. Canning ranks seventh in her application for a detective position.**

In Fall 2021, WCSO held a Detective Promotional Process. The competitive process, referred to as an assessment center, is a structured evaluation of a candidate's readiness and qualifications for the position, and the exercises are based on real work situations and topics and are facilitated by assessors.

An assessment center is by invitation only and consists of four components as follows: portfolio review and supplemental questions, case presentation, oral interview and a search warrant writing exercise. The portfolio review consists of a review of the candidate's application

material and response to supplemental questions.  The case presentation component consists of preparation and delivery of the candidate's topic of choice.  The structured interview consists of a meeting with the assessors who evaluate the candidate's answer to structured questions. Finally, the warrant writing component is self-explanatory, and candidates are provided with a template at the time of testing. Evaluators are selected prior to the beginning of the selection process.

      Ten candidates ultimately applied for one position, including Canning. The Assessment center took place October 5 – 7, 2021. Canning participated on October 6, 2021.  At the end of the process, Canning ranked seventh out of ten candidates, receiving a score of 75.60.

**F. Canning is placed on Paid Administrative Leave pending a potential criminal investigation.**

      On February 22, 2022, Sgt. Rookhuyzen and his romantic life partner WCSO Jail Services Technician Anthony Bracamonte (Bracamonte) and Canning went out for dinner as they had done on numerous occasions.  Sgt. Rookhuyzen and Canning had been friends since March of 2020 as they knew about each other and had attended the same university.  At the conclusion of their dinner, Canning put a small plastic serving dish with bean dip in it in her Styrofoam leftover container and then into her purse.  Bracamonte asked her whether what she was doing was stealing or theft, to which Canning repeated the words back to him.

      Out of "an abundance of caution" and because he thought it constituted theft, Sgt. Rookhuyzen reported the incident up the chain of command and the matter was ultimately referred to the Beaverton Police Department (BPD) for investigation.  BPD forwarded their investigation to the Washington County DA who declined to prosecute the matter.

      Upon BPD's conclusion of their investigation, WCSO initiated its internal investigation

into potential policy violations. On June 15, 2022, WCSO concluded its investigation into violations of WCSO and County policies. Canning was given an oral reprimand and on June 28, 2022, returned to full duty.

G. **Canning applies for a Field Training Officer (FTO) position, does not interview due to a scheduling conflict and, in accordance with WCSO practice, her application is put on hold pending conclusion of her investigation.**

On January 25, 2022, the WCSO posted the position for Field Training Officer. Canning submitted her letter of interest on February 1, 2022. On February 14, 2022, in accordance with the procedures for selecting FTOs, Sgt. Musser requested feedback on FTO applicants from current FTOs and received some negative feedback regarding Canning. The negative statements are consistent with Canning's own text messages denigrating WCSO recruits and her own colleagues.

FTO applicants, including Canning, were scheduled for interviews on February 23, 2022. Canning was unable to attend her scheduled interview because she was scheduled to testify in a trial. Canning's interview, along with that of others who were unable to interview on February 23, 2022, was rescheduled to March 1, 2022. However, on February 25, 2022, Canning was placed on Paid Administrative Leave pending the internal and criminal investigations into the allegations raised by Sgt. Rookhuyzen. In accordance with WCSO's procedures and past practice, Canning's application for FTO was put on hold.

H. **Canning files various allegations of improper conduct against Sgt. Rookhuyzen regarding conduct occurring in the prior year.**

On April 13, 2022, after she had been placed on leave, Canning raised allegations of improper behavior by Sgt. Rookhuyzen on advice of her union. The complaint alleged Sgt. Rookhuyzen improperly used WCSO equipment (intoxilyzer) and made inappropriate comments

regarding the physical attributes of other males, including other WCSO employees, and made other inappropriate sexual comments. For the record, and to provide context, Sgt. Rookhuyzen identifies as gay and is in a romantic relationship with WCSO Jail Services Technician Anthony Bracamonte. Sgt. Rookhuyzen was placed on administrative leave pending the outcome of an investigation into the allegations.

To support his defense that Canning actively engaged in the conduct she accused Sgt. Rookhuyzen of, Sgt. Rookhuyzen submitted copies of text messages between Canning and himself. The text messages indicated Canning was an active and willing participant in the inappropriate, sometimes sexual, banter she accused Sgt. Rookhuyzen of.

Nonetheless, the investigation found Sgt. Rookhuyzen displayed poor judgement and violated WCSO and County policy. Accordingly, Sgt. Rookhuyzen was disciplined for his role even though it was also clear Canning was an active and willing participant.

### I. Canning's application for OFLA/FMLA is denied because she has not worked enough hours.

Canning last worked for the WCSO in July of 2022. On July 27, 2022 Canning applied for OFLA/FMLA. Administration of OFLA/FMLA is handled by a third party, Unum. Additionally, the requirements to qualify for OFLA and FMLA are statutory. To qualify for FMLA, an employee must have worked 1250 hours in the year immediately preceding the request for leave. Canning worked 1,174.75 hours in the year immediately preceding her requested leave and therefore on July 29, 2022, Canning was denied FMLA by Unum.

To qualify for OFLA, an employee must have worked an average of at least 25 hours per week during the 180 calendar days immediately preceding the leave. During the period January 22, 2022 through July 22, 2022, Canning worked an average of 9.6 hours per week. For this

reason, on August 16, 2022, Unum denied Canning's request for OFLA.

Washington County applies this same policy to all of its employees. Canning's union took the issue to arbitration on her behalf and on behalf of a male colleague. The arbitrator sided with Washington County.

**J.  Canning's request for reasonable accommodation is approved.**

Beginning on or about August 23, 2022, Canning requested reasonable accommodation pursuant to the Americans with Disabilities Act (ADA). However, Canning did not provide medical certification as required. On September 15, 2022, Canning submitted medical certification completed by her doctor indicating Canning was to work from home. The form did not, however, contain any information regarding Canning's work restrictions or functional limitations to assist WCSO in determining a reasonable accommodation. Canning was advised of the deficiencies in her paperwork and Holli Bridgens offered to contact Canning's physician to get clarification.

Canning did not like that option. On September 28, 2022, Canning provided documentation from her doctor indicating her work restrictions and functional limitations. The County engaged in the interactive process with Canning. Having found no suitable accommodation to permit Canning to perform the essential duties of her position, on October 27, 2022, the County offered Canning a personal medical leave in accordance with the County's Personnel Rules and Regulations through December 28, 2022, the date of her doctor's note, as a reasonable accommodation.

**K.  Canning is medically laid off but permitted to return at any time within 18 months.**

On January 10, 2023, following a six-month absence from work, Canning was medically

laid off. Canning was permitted to return any time in the following 18 months, provided she submitted a note from her doctor clearing her for work. Canning never attempted to return and opted to file suit one month after her layoff.

In February 2023, one month after she was medically laid off from Washington County, Canning obtained alternative employment with the Oregon Department of Human Services. She continues to hold that position. Since leaving Washington County, Canning has not applied for any law enforcement positions.

## CLAIMS

### I. Whistleblower Retaliation

Canning's first and second claims for relief are for alleged violations of Oregon's whistleblowing laws found at ORS 659A.199 and 659A.203. Canning alleges that she did not get certain assignments, was placed on administrative leave over the theft concern, and was ultimately terminated from employment because of various complaints.

ORS 659A.199 makes it unlawful for an employer to "discharge…suspend or in any manner discriminate or retaliate against any employee…for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation." Similarly, ORS 659A.203 make s it unlawful for an employer to "take disciplinary action against an employee for the disclosure of any information that the employee believes is evidence of…a violation of any federal, state or local law, rule or regulation; mismanagement…or abuse of authority."

Canning will not be able to establish the causation element of her whistleblower claims. Canning was praised for her work regarding the Winders incident. There is not so much as a

"stray remark" criticizing her for her reports. Winders, who was Canning's friend, continued to treat her positively after Canning made complaints about him. As described above, Canning did not get the positions she applied to for legitimate reasons.

There is no connection between the theft allegation and Winders. Sgt. Rookhuyzen, who forwarded the theft allegation as required by WCSO policy, supported Canning with respect to her complaints about Winders. Canning is expected to testify that she thought paid administrative leave was pretty great and that she enjoyed being paid to be away from the people she "hate[d]." Finally, Canning was not terminated from employment. Washington County medically laid her off. She could have attempted to return to employment at any time within 18 months of the layoff but opted to file this suit instead.

## II.     Gender Discrimination

Canning's fifth and sixth claims for relief are for alleged gender discrimination under ORS 659A.030 and Title VII. Canning brings gender-based hostile work environment and disparate treatment claims.

To prevail on a hostile work environment claim, a plaintiff must prove: (1) she was subjected to slurs, insults, jokes or other verbal comments of a sexual nature; (2) the conduct was unwelcome; (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create a sexually abusive environment; (4) the plaintiff perceived the working environment to be abusive or hostile, and (5) a reasonable person in plaintiff's circumstances would consider the working environment to be abusive or hostile. *Fuller v. City of Oakland, California,* 47 F.3d 1522, 1527 (9th Cir. 1995).

The current pleadings and proposed evidence do not provide support for a gender-based

hostile environment claim. Washington County anticipates that the evidence on this issue will be Canning's own testimony that her colleagues called her a "girl driver" one time when she got her car stuck in the mud and needed to call for help. That is not severe or pervasive gender-based conduct. Additionally, Washington County expects the evidence will show that Canning later laughed and joked about the incident with others.

To establish a gender discrimination claim, a plaintiff must prove that her employer took an adverse action against her because of her gender. *See Berry v. Dep't of Soc. Servs.,* 447 F.3d 642, 656 (9th Cir. 2006). As described above, the actions Canning complains of were taken for legitimate reasons, unconnected to her gender.

### III.   Disability Discrimination

Canning's seventh and eighth claims for relief are for disability discrimination under ORS 659A.112 and the Americans with Disabilities Act ("ADA"). She alleges that from 2022 through present, she was a qualified individual with a disability and that Washington County discriminated against her by denying her protected leave for her disability, refusing to engage in a meaningful interactive process, and ultimately terminating her employment.

To prove a failure-to-accommodate disability claim, a plaintiff must prove that (1) she is a "qualified individual"; (2) defendant received adequate notice of plaintiff's disability and desire for a reasonable accommodation; and (3) a reasonable accommodation was available that would have enabled plaintiff to perform the essential functions of the job. *See Snapp v. United Transp. Union,* 889 F.3d 1088, 1095 (9th Cir. 2018).

Here, Canning will not be able to establish that there was a reasonable accommodation available that would have permitted her to perform the essential functions of her deputy job.

IV. **Family Medical Leave Claims**

Canning's third and fourth claims for relief are for OFLA and FMLA interference (family leave). She alleges that she was eligible for family leave and that Washington County denied her requests. She further alleges that but for her "retaliatory placement" on paid administrative leave, she would have worked the requisite hours. There is a motion for partial summary judgment pending on these claims. If the motion is not granted, the County intends to move for JMOL on this claim because Canning was not an eligible employee and because allegations of "retaliatory placement on administrative leave" do not state a claim for interference under the family leave statutes.

**A. Canning was not eligible for family leave because she did not work enough hours.**

To state an FMLA claim, "The employee must establish that: (1) she was eligible for FMLA's protections, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled." *Perez-Denison v. Kaiser Found. Health Plan of the Nw.*, 868 F. Supp. 2nd 1065, 1080 (D. Or. 2012). The requirements to state an OFLA claim are similar. *See* ORS 659A.186(2).

Under FMLA, the term "'eligible employee' means an employee who has been employed…for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611. Under OFLA, eligible employees must have worked an average of 25 hours per week for 180 days. ORS 659A.156(1)(b). Although the FMLA does not have a definition for "hours of service," it relies on the standards in the Fair Labor Standards Act (FLSA), 29 U.S.C. § 2622(2)(C). FLSA guidelines clearly state that only hours spent actually

working count toward the FMLA "hours of service" requirement.  29 C.F.R. § 785.16(a); *see also Robbins v. Bureau of Nat'l Affairs, Inc.,* 896 F. Supp. 18, 21 (D.C.C. 1995 ("The FLSA clearly states that 'payments made for occasional periods when no work is performed due to vacation, holiday, illness…and other similar causes' are not considered compensation for 'hours of employment.'")

Canning applied for family leave on July 22, 2022.  As of that date, she had only actually worked 1,174.75 hours, so her FMLA was denied.  And she had only worked 9.6 hours per week, so her OFLA claim was denied.

**B. Canning's paid administrative leave hours are not hours worked.**

Canning is likely to argue that paid administrative leave hours are hours worked for purposes of the family leave statutes.  This same argument was already considered and rejected by an arbitrator regarding Canning's specific situation.  Additionally, Canning's paid administrative leave was spent on personal pursuits not hours worked.  *See Kennedy v. Las Vegas Sands Corp.,* 110 F.4th 1136 (2024).

Canning was placed on paid administrative leave by the County for a period of four months.  She was given a County cell phone, required to make contact with the County twice a day, and required to respond to the County within one hour of contact.  Otherwise, she was free to do as she pleased.

To determine whether on call time (here, Canning's paid leave) is actually hours worked, the Court considers two key factors: "(1) the degree to which the employee is free to engage in personal activities; and (2) [an] agreement[ ] between the parties" suggesting the time waiting was compensable." *Owens v. Loc. No. 169, Ass'n of W. Pulp and Paper Workers,* 971 F.2d 347,

350 (9th Cir. 1992). Only the first factor has any relevance here.

In determining, "the degree to which [an] employee is free to engage in personal activities," the court examines "whether [an employee] is so restricted during on-call hours as to be effectively engaged to wait." *Owens,* 971 F.2d at 350. In making that determination, the Court considers seven non-determinative factors:

> (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.

*Id.* at 351. An employee "need not 'have substantially the same flexibility or freedom as he would if not on call, else all or almost all on-call time would be working time, a proposition that the settled case law and the administrative guidelines clearly reject.'" *Brigham v. Eugene Water & Elec. Bd.*, 357 F.3d 931, 936 (9th Cir. 2004) (quoting *Owens*, 971 F.2d at 350–51). Analyzing these factors shows that Canning was not engaged to wait.

Factor 1: Canning was not required to live on or in close proximity to Washington County so long as she could arrive within one hour of contact. *Kennedy,* 110 F.4th at 1146. This factor weighs against finding that Canning's paid administrative leave was not time worked. Factor 3: "the frequency of calls" was not "unduly restrictive." *Owens,* 971 F.3d at 351. Over her period of leave, Canning only received two requests from Washington County to come to work for interviews. Factor 4: Canning had an hour to respond to requests from Washington County. *Kennedy,* 110 F.4th at 1147. Factor 5: Canning could take sick time or vacation time while on paid administrative leave without facing repercussions. *See id.* Factor 6: Canning

could move freely and communicate with Washington County without being tethered to a physical location. *Id.* Factor 7: Canning engaged in personal pursuits while on paid administrative leave. She will testify that she slept in until 10 a.m. most days, got projects done around the house, shopped for groceries, engaged in personal counseling appointments, and the like.

The only factor that remotely favors Canning is the second. Here, as in *Sands,* although Washington County did not place a geographic restriction on Canning, she did need to remain within an hour's travel from Washington County. But even assuming that this factor favors Canning, it does not tip the scale in favor of finding that Canning's paid administrative leave constituted time worked. Canning was free to, and in fact did, engage in personal activities during her period of paid administrative leave. Under *Sands,* that time does not count as hours worked.

### C. Canning's retaliatory placement on administrative leave interference theory does not state a claim.

Canning's theory that, but for her alleged "retaliatory placement" on administrative leave, she would have been entitled to the protection of family leave laws interference theory fails to state a claim for relief.

The family leave laws protect more than outright denial of leave. The laws also prohibit interfering with leave. Specifically, 29 CFR § 825.220 provides:

> (b) Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act….
>
> Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. It would also

include manipulation by a covered employer **to avoid responsibilities under FMLA**, for example:

…

(2) Changing the essential functions of the job in order to preclude the taking of leave;

(3) Reducing hours available to work in order to avoid employee eligibility.

29 CFR § 825.220 (emphasis added).

Canning does not allege nor is there any evidence that Washington County placed her on paid administrative leave "to avoid responsibilities under FMLA" as required by the statute. Rather, Canning argues that "putting an employee on leave for retaliatory or discriminatory reasons, with the reasonably foreseeable result that the employee's FMLA eligibility would be impacted, constitutes FMLA interference." Plt Response to MSJ at 41. There is no authority for this "reasonably foreseeable" result conception of a family leave interference claim.

DATED: March 27, 2025.

VICKERS PLASS LLC

_s/ Karen M. Vickers_
**KAREN M. VICKERS,** OSB No. 913810
kvickers@vickersplass.com
503-726-5985
**BETH F. PLASS,** OSB No. 122031
bplass@vickersplass.com
503-726-5975
Of Attorneys for Defendant