Jose Klein, OSB No. 083845
jose@kleinmunsinger.com
Damien Munsinger, OSB No. 124022
damien@kleinmunsinger.com
KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F
Portland, OR 97214-3497
(503) 568-1078
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **MELISSA CANNING**, | Case No. 3:23-cv-00210-AN |
| Plaintiff, | PLAINTIFF'S TRIAL MEMORANDUM |
| v. | |
| **WASHINGTON COUNTY**, | |
| Defendant. | |

      Pursuant to the Court's Amended Trial Management Order (ECF 48) §
III.D.4, Plaintiff submits the following brief summary of material factual and legal
contentions, along with the elements of Plaintiff's claims.

      In this employment matter, Plaintiff Melissa Canning brings claims against
her former employer Washington County for claims arising out of the Sheriff's
Office's escalating pattern of retaliatory conduct towards her that ultimately resulted
in her termination.

# I.    FACTUAL AND LEGAL CONTENTIONS

Plaintiff Melissa Canning is a single mother of two who grew up in a family of law-enforcement professionals. In 2018, she joined the Washington County Sheriff's Office ("WCSO" or "Sheriff's Office"). After graduating from the state police academy and successfully completing her probationary period, Canning transitioned into a role as a fulltime patrol deputy in 2019.

Over the course of her first years on the job, Canning performed very well. Supervisors noted her "high drive and eagerness to learn." They celebrated her willingness "to jump in and help often," and quickly identified her aptitude for conducting more complicated and higher-level criminal investigations. Supervisors informed her that she was an excellent candidate for advancement.

## A.  *Deputy Canning's Protected Whistleblowing Activity*

Her upward career trajectory abruptly halted after March 6, 2021, the date Canning reported that her colleague, Deputy Brett Winders, had disregarded a citizen's report of being sodomized at gunpoint, and then subsequently lied about it. Deputy Canning reasonably understood Winders' dishonesty to violate obligations that the law imposed upon peace officers.

Canning initially reported the dishonesty to supervising sergeants. Despite knowing about Canning's allegations, Defendant sought to minimize Winders' lies as a simple failure to understand that a victim had reported a crime to him. In a non-disciplinary "Performance Observation," Winders' supervisor, Sergeant Joshua Snyder, observed that "Winders failed to recognize and/or act on the elements of ORS 173.405 Sodomy I." Snyder concluded that Winders had merely failed to recognize that a crime had been reported to him at the time a victim described being forced to perform sexual acts while a gun was held to his head.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

In responding to Canning's complaint regarding Winders' conduct in this fashion, Defendant turned a blind eye to the multiple incidents in which Winders made statements to create the false impression that the victim had not told him about the crime. Defendant also turned a blind eye to the multiple opportunities Winders had to acknowledge that a crime had been reported to him, but failed or refused to do so.

In May 2021, the Professional Standards Unit finally opened an internal affairs ("IA") investigation into Winders' clear dishonesty. Throughout the duration of that investigation, Defendant did not place Winders on an administrative modified duty assignment. Canning was forced to work shift alongside a colleague that she had known to be dishonest, and who knew that she had accused him of serious misconduct.

Being required to continue working alongside Winders caused Canning tremendous stress. She reasonably perceived hostility and targeting from colleagues. She suffered tension headaches, sleeplessness, and bouts of panic. Because her symptoms spiked on shifts where she and Winders were expected to work side-by-side, she called in sick repeatedly during the summer of 2021. In or around August 2021, Canning learned that the IA investigation came back as unfounded.

When Canning learned that Defendant absolved Winders of what was a series of plain and obvious lies regarding something as serious as a violent sexual felony, she felt compelled to report her concerns to someone in a position to potentially address the matter. In August 2021, Canning met with Undersheriff John Koch regarding the issue. During that meeting, she reported in good faith information that she believed was evidence of a violation of laws regulating the moral character of sworn law enforcement officers. *See e.g.* OAR 265-010-0025(1)(g) (defining lack of good moral character to include conduct constituting untruthfulness); Oregon

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

Commission on Statewide Law Enforcement Standards of Conduct and Discipline ("LESC"), Guide to the LESC Rules (setting forth presumptive termination of employment for "untruthfulness" and defining untruthfulness to include "omitting material facts or material information, or answering questions or providing information in a manner that is incomplete, evasive, deceptive, or misleading.")

During the August meeting, Koch admitted that sometimes the Sheriff's Office "gets it wrong," that he would take a "second look," and that her supervisor should be able to adjust the schedule so that she and Winders would not have to share shifts.

### B. *The County Retaliated by Denying Special Assignments and Promotions*

In August and early September, Canning and Winders were both among a pool of applicants seeking appointment to the Crisis Negotiation Unit ("CNU"), a special assignment within the sheriff's office. The Sergeant managing the recruitment and selection process was Cliff Lascink. Canning met with Lascink to notify him that Koch was taking a "second look" at allegations of dishonesty regarding Winders. She suggested Lascink reach out to Koch regarding the status of that review. She also expressed discomfort with working alongside someone who was a "liar." Lascink did not talk to Koch about the Winders investigation. Instead, he went to his supervisor, Lieutenant Weston, and told Weston that he did not believe Canning met minimum qualifications for the special assignment because she had communicated to him that she could not work with Winders on account of his dishonesty. Weston advised Lascink to let Canning test for the position. Defendant then manipulated the outcome of the test to ensure that Canning was not selected.

Canning's non-selection for CNU was the first in a series of retaliatory actions by Sheriff's Office supervisors. On September 9, based on Koch's guidance, Canning emailed her supervisor (copying Koch) requesting that Winders be moved to a

different district on days when their schedules overlapped. This email was circulated among sergeants and lieutenants. The responses revealed hostility towards Canning ("Canning is twisting or misunderstanding the [Undersheriff's ] direction and assuming she should be directing a sergeant.") and/or support for Winders (changing one day of Winders' schedule may give rise to a "hostile work environment complaint from Deputy Winders.").

During the fall of 2021, Canning applied for a detective position. Despite that prior to her whistleblowing, Canning had been told repeatedly that she was among the strongest candidates for detective and that she would likely be selected, after the Winders complaint she was pushed down to seventh on the list of applicants and was not selected for a detective position.

Similarly, in early 2022 Canning applied for a position as a Field Training Officer ("FTO"). As with other special assignments prior to her whistleblowing about Winders, she was identified as an excellent candidate, only to be rejected after her whistleblowing came to light. Fourteen deputies were selected as FTOs. Canning was one of only two applicants who were not selected. The decision was made ostensibly because she "got bad reviews from her supervisors." This claim was false; Canning's quarterly reviews from supervisors were uniformly positive.

During this period of escalating retaliation in the summer, fall and winter of 2021 and early 2022, Canning continued to seek accountability for Winders' dishonesty. In September 2021, she reported to the Washington County District Attorney ("WCDA"). Based on Canning's report, Winders was placed on the WCDA's *Brady* list in January 2022, but the Sheriff's Office that employed Canning took no further action.

Following Winders' placement on the *Brady* list, supervisor opposition to Canning increased. At a February 2, 2022, sergeant meeting, sergeants discussed that Winders was "only on the Brady list because Canning turned him in to the DA."

C. *Rookhuyzen's Initiation of Salsa-gate and Defendant's Retaliatory Use of Disciplinary Processes*

Between March 6, 2021 and February 22, 2022, Canning understood that she had the support of Sergeant Robert Rookhuyzen. Rookhuyzen had issued a Performance Observation commending Canning for "representing our profession and agency so well" when responding to the March 6, 2021 call for service that gave rise to her complaint about Winders' dishonesty.

Rookhuyzen and Canning developed a friendship. In the course of that friendship Rookhuyzen repeatedly affirmed that he believed Winders should have been terminated for dishonesty, and Canning confided about the retaliation she was experiencing and the increasing distress she felt at work as a result of her opposition to Defendant's decisions not to hold Winders accountable.

What Canning did not know at the time is that supervisors including Lieutenant Kelly Degman and Commander David Marzilli were advising Rookhuyzen to end his friendship with Canning. Marzilli and Degman instructed Rookhuyzen that his friendship with Canning was incompatible with his role as a sergeant.

On February 22, 2022, Canning, Rookhuyzen and Rookhuyzen's domestic partner Anthony Bracamonte went out to dinner. During dinner, Canning discussed her disfavored status within the WCSO as a result of her whistleblowing about Winders and the tremendous stress that she was under as a consequence. During the dinner, Canning mentioned the possibility of her needing to bring legal claims against the County and her understanding that Rookhuyzen was someone in a

position to provide supportive testimony regarding those claims. Rookhuyzen responded to that statement with a physical gesture that communicated that he would not be helpful to any claims Canning brought against Defendant.

At the end of the dinner, Canning packed up a small plastic bowl of beans into her to-go container. She would sometimes use inexpensive plastic bowls to keep her leftovers separated, before washing the bowl at home and returning it clean.

Neither Rookhuyzen nor Bracamonte asked Canning about why she packed up the bowl or what her intentions were. They paid their separate bills and then proceeded to socialize for several more hours at a different establishment.

The next day Canning and Rookhuyzen exchanged text messages about a criminal investigation Canning was working on. Again, Rookhuyzen expressed no concern about Canning departing the restaurant in possession of a small plastic bowl.

At nearly nearly midnight on Thursday, February 24, 2022, Rookhuyzen sent an email to Degman (the same supervisor who advised Rookhuyzen that his friendship with Canning was not good for his career) that three days earlier, "my partner and I went out to dinner/happy hour with Deputy Canning. As we were leaving the Mexican restaurant, she boxed up her to-go food and also took the [plastic] mortar salsa container that had been on the table. Apparently, she put this in her to-go box. I was looking at my phone and didn't see it, but my partner, JST Anthony Bracamonte did."

Neither Bracamonte nor Rookhuyzen ever asked Canning about the incident.

Defendant asked the Beaverton Police Department to conduct a criminal investigation. That investigation confirmed: that the value of the bowl was $1.91; that Canning had intended to (and in fact did) return the bowl; that the restaurant did not consider it a "big deal"; and that the restaurant did not wish to press charges.

While resources were being expended to pursue this criminal investigation, Defendant kept Canning on an administrative modified duty assignment. Canning remained duty-stationed at home from February 26, 2022 through the duration of the Beaverton criminal investigation. The outcome of the Beaverton criminal investigation was that no charges were brought against Canning. That decision was finalized on March 31, 2022.

Even though Defendant knew as of March 31, 2022, that Canning would not be charged and had not committed a crime, Defendant kept her on administrative modified duty assignment for about three additional months, until June 30, 2022, while it conducted its workplace investigation into the debunked allegation that she had stolen a $1.91 plastic bowl. Ultimately, Defendant was forced to conclude its investigation with "no findings of misconduct reflecting a lack of truthfulness, candor or bias." (The investigation into the $1.91 plastic bowl was derisively referred to as "Salsa-gate" within the WCSO.)

### D. *Defendant's Sustained Investigation of Harassment by Rookhuyzen*

Based on guidance from her union after disclosing concerning behavior by Rookhuyzen, Canning reported Rookhuyzen for misconduct that included allegations of violations of WCSO policies against sexual harassing behavior.

All of Canning's allegations about Rookhuyzen were sustained.

Rookhuyzen was placed on an administrative modified duty assignment pending the outcome of the WCSO investigation into his conduct. However, Rookhuyzen received preferential treatment during his modified duty that was not extended to Canning. Rookhuyzen was allowed to conduct "desk duty" work from home including investigatory work.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

E.  *Plaintiff's emotional distress; Defendant's Discriminatory and Retaliatory Application of its Leave and ADA Rules*

Throughout the duration of Canning's time on forced administrative modified duty, Canning performed a number of activities for the benefit of the County. She was required to carry a WCSO-issued phone; she was assigned specific shift times totalling 40 hours per week; was instructed and expected to contact her supervisor by phone two times every work shift; was obligated to be available to report to the Sheriff's Office within one hour; was required to respond to a number of issues relating to her duties, the multiple investigations of the plastic salsa bowl, and the investigation into Rookhuyzen's harassing behavior. Canning reasonably estimates that she performed at least 122 hours of active work for Defendant during the four months of her administratively modified duty. Though Defendant imposed numerous obligations on Canning during this time, its requirements did not include making Canning track or record her time. During her administratively modified duty, Canning received regular pay.

In the wake of her whistleblowing activity and through her extended administratively modified duty relating to the $1.91 plastic bowl, Canning experienced a significant decline in her psychological wellbeing. The hostility and retaliation that she experienced from supervisors, and the shunning she experienced from colleagues, all of whom tended to close ranks around Winders, left her with feelings of panic, hypervigilance, sleeplessness, anxiety and depression. In April 2022, she began seeing a therapist, who continues to treat Ms. Canning. Her primary care physician also observed a marked change in her overall health as a result of her treatment at work. He noted "ongoing anxiety, fatigue, insomnia, joint pain, gastrointestinal distress, [and] skin breakouts related to work stress."

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

Canning resumed regular patrol duties on or about June 30, 2022. When she returned to work she continued to experience severe anxiety and panic while on the job. Canning reported to her physician on July 26, 2022:

> I am now back at work. First few days were administrative only catching up. The next week I had a supervisor pull out one of my reports to tell me 'good job.' This was the same supervisor that was involved in this whole work incident. I am experiencing diarrhea, nausea and stomachache before a shift and at work. Massive spike in anxiety on shift. * * * *
> I can't keep working in a job that creates a scenario w[h]ere I am on guard and feeling attacked from the outside and the inside including those that should be on my side.

Canning told her physician that she was "having a hard time being at work right now. Knowing that I have to return to work tomorrow is creating a massive amount of anxiety and stress. I cannot relax or sleep. My gut is constantly upset. I am on the verge of panic even before arriving at work." Canning's doctor advised her to take FMLA leave, "recommending [she] avoid the workplace until a suitable resolution can be reached that does not expose you to the stressors that have been and are currently present there that have clearly driven your system into the state it is currently in."

In July and August 2022, Canning sought first FMLA leave and then OFLA leave. Defendant denied her both, claiming that the shifts she spent during her approximately 4-month administrative modified duty assignment did not count as "hours worked" for purposes of calculating her protected leave eligibility.

Canning drew down her banks of paid time off ("PTO"). On August 23, 2022, she returned to her doctor, reporting, "My FMLA was denied. I only have 2

weeks of PTO left. I would like to work, but the negative health effects of returning to the office ha[ve] been incredibly stressful. My anxiety goes through the roof and my gut turns inside out."

On approximately September 6, 2022, Canning requested a temporary reasonable accommodation under the ADA. Based on the recommendation of her physician, Canning requested that she be permitted to work remotely for a period of 90 days. Canning was aware that WCSO had made such allowances for certain patrol deputies and supervisors, and was also aware that there was ample work available that she could have performed from home. Defendant denied her request for remote work but granted her a personal leave of absence through December 28, 2022.

On December 28, 2022, Canning requested that her leave of absence be extended for 90 days. Defendant denied that request and informed her that she would be subject to a medical layoff effective January 31, 2023.

### F. *Evidence of Discriminatory Applications of the Disciplinary Process*

Unbeknownst to Canning at the time, was that Defendant had opened a new IA investigation against her, and had resolved to put her on an administrative modified duty assignment as soon as she returned from her medical leave. The new complaint concerned allegations from Bracamonte that Canning had "lied" in her complaint about Rookhuyzen. However, as noted above, Defendant had investigated Canning's allegations regarding Rookhuyzen and determined that her allegations were true. Accordingly, Defendant knew from its own prior investigation into Canning's allegations that the new IA would not be sustained. Nonetheless, despite

knowing the inevitable outcome that Canning would be cleared, Defendant through Chief Deputy Al Roque had already resolved to place Canning on another period of administrative modified duty. What prevented Defendant from taking this adverse action against Canning was that it arrived at another way to get rid of her first-- the January 31, 2023, termination.

Defendant's use of the disciplinary process to retaliate against Canning can be seen clearly through the difference in the manner that she was treated from how Defendant treated more favored, male employees who did not engage in protected whistleblower activities:

- <u>Winders:</u> During Winders IA for dishonesty, WCSO had clear evidence that Winders had lied regarding his behavior responding to a report of a major felony. He attempted to deceive Canning that the victim had reported the crime; he then attempted to claim that he did not know that a crime had been reported to him, describing the victim's report as raving "utterances" of a mentally unstable person; and he omitted the material fact of a crime having been reported to him in an official police report. Yet, throughout the IA investigation, Defendant did not place Winders on an administrative modified duty assignment.

- <u>Brandon Yon:</u> Sergeant Yon consumed alcohol and then drove his golf cart on public roadways from his house to a high school football game. While at the game, Yon encountered a Forest Grove detective. According to the detective, he could "smell a light odor of alcohol on Yon and asked Yon if had been drinking to which he says Yon first said no, then eventually said yes, after being asked a couple more times." Despite this plain allegation of untruthfulness -- answering questions in a manner that is deceptive, or misleading-- Defendant investigated the incident only as potential violations of its rules of courtesy and professionalism, and a potential driving under the influence violation. Throughout the investigation, Yon was permitted to do "desk duty" in the sheriff's office and was not duty stationed at home.

### G. *Key Witnesses of Defendant have Been Untruthful Regarding Material Facts*

During Defendant's IA investigation, Rookhuyzen was untruthful about a material issue in the investigation. One of Canning's allegations was that Rookhuyzen had made multiple requests for her to secure a "locker room" photo of a San Francisco police officer who worked alongside Canning's brother. In the IA investigation, Rookhuyzen untruthfully asserted that the locker room comment was "[t]otally inappropriate, totally for her side, not from me. Never asked at all."  After the interview, Rookhuyzen did submit copies of some text messages. He did not provide the exchange regarding the locker room photo. Had he done so, Defendant would have seen that Rookhuyzen's assertion that he "Never asked at all," for a locker room photo was false:



(The green texts were sent by Rookhuyzen.)

Lieutenant Brad King testified that he had never heard discussion regarding the existence of a topless photo relating to a female patrol deputy. Multiple witnesses will contradict that assertion. King also testified that he did not refer to Canning as a "village bicycle" to suggest that she was "sexually promiscuous." King claimed that he

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

did not believe he had ever used the phrase, "village bicycle," while working at WCSO. There again, on an issue directly relevant to bias against Canning, a witness will contradict King.

### H.  Canning's Substantial Economic Damages

Expert economist Dr. David Fractor has calculated Canning's economic losses to be at least $923,752, and as much as $1,206,172 if the jury were to find that but for Defendant's unlawful conduct, Canning would have been promoted to detective.

Defendant did not hire an expert and has not designated any witness qualified to talk about Canning's economic losses. Accordingly, Canning's evidence regarding her economic damages will not be subject to meaningful challenge at trial.

### I.  Defendant's Post-Employment Retaliation of Plaintiff

In July 2024, more than two years after the Salsa-gate investigation concluded with "no findings of misconduct reflecting a lack of truthfulness, candor or bias" WCDA Kevin Barton overruled at least two recommendations from the WCDA's Conviction Integrity Committee ("CIC") and decided to place Canning on its "Additional Discovery" *Brady* list. Correspondence between the Sheriff's Office and Barton between June of 2022, and the July 2024 decision more than two years later to put Plaintiff on the *Brady* list indicates that on several occasions WCDA and high level Sheriff's Office personnel discussed Canning. Those communications, coupled with the suspect timing of Canning's placement on the *Brady* list support an inference that WCSO retaliated against Canning by improperly lobbying the WCDA to put Canning on the *Brady* list in retaliation for her decision to bring this case and oppose unlawful conduct.

## II.    CLAIM ELEMENTS

Canning brings eight claims for relief against Defendant Washington County: Whistleblower Retaliation under ORS § 659A.199; Prohibited Conduct by a Public Employer under ORS § 659A.203; Deprivation of OFLA Rights under ORS § 659A.171; Deprivation of FMLA Rights under 29 USC § 2612; Protected Class Discrimination under ORS § 659A.030; Protected Class Discrimination under 42 USC § 2000e (Title VII); Disability Discrimination under under ORS §§ 659A.112 and .118; and Disability Discrimination under the ADA, 42 USC § 12112.[1]

### A.  Whistleblower Retaliation, ORS § 659A.199

To prove her state whistleblowing claim, Canning must show:

1.  She reported information believed to be evidence of a violation of a state or federal law, rule, or regulation;

2.  She acted in good faith in reporting the information;

3.  Defendant discharged, demoted, suspended, or discriminated or retaliated against Plaintiff with regard to any term, condition, or privilege of employment, because Plaintiff reported the information.[2]

Plaintiff has ample evidence from which a jury is likely to find in Plaintiff's favor on each of the elements. In March, Canning informed her supervisor about Winders' dishonesty. In August and September, Canning escalated her reports of dishonesty to Koch and to the WCDA. Canning will confirm that in making those reports, she provided information which she believed to be evidence that Winders had violated legal requirements relating to police officer truthfulness.

Canning and other witnesses, including Koch, Rookhuyzen, Lascink, Patrick Altiere and others will confirm that Canning brought her complaint in good faith,

---

[1] Defendant has moved for summary judgment against Canning's claims of OFLA and FMLA interference. That motion remains pending.
[2] ECF 60, at p. 60 (Plaintiff's Alternative Instruction #18).

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

based on a sincere conviction that Winders had lied, and that his dishonesty was a liability to the WCSO.

There is ample evidence from which to find that Defendant discharged, suspended, discriminated or retaliated against Canning because she reported the information. A jury is likely to find that Defendant's decisions to deny Canning's applications for CNU, detective and FTO were because of her reported information. Indeed, with respect to CNU, Lascink, who was in charge of the selection process, characterized Canning's act of reporting Winders' conduct to him, as a "red flag."

There is also ample evidence that Defendant applied its disciplinary procedures in a discriminatory manner towards Canning because of her reports of unlawful conduct by Winders. That discriminatory application of its disciplinary procedures included requesting a criminal investigation into Canning; putting her on an administrative modified duty assignment for four months, including three months during which WCSO knew that no crime had occurred; resolving to put Canning back on an administrative modified duty assignment for a dishonesty investigation that the WCSO knew would be unfounded; and pressuring the WCDA to put Canning on its *Brady* list more than two years after the IA investigation concluded with "no findings of misconduct reflecting a lack of truthfulness, candor or bias." Finally, the jury is likely to find that Defendant's decision to terminate Canning's employment was because of her whistleblowing activity.

Canning suffered damages as a result of Defendant's unlawful conduct. Those damages included significant emotional distress, which will be confirmed not only by Canning herself, but also by her primary care provider, and her therapist. Canning also suffered economic damages between $923,000 and $1,206,000, which will not be contradicted by any witness for Defendant.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

### B.  Prohibited Conduct by a Public Employer (Whistleblowing – Public Employer), ORS § 659A.203

To prove her Whistleblowing – Public Employer claim, Canning must show:

1. Canning disclosed information that she reasonably believed to be evidence that Defendant
   a. violated a federal or state, law, rule, or regulation;
   b. engaged in mismanagement, or abuse of authority; and/or
   c. took an action resulting in substantial and specific danger to public health.

2. Defendant took or threatened to take prohibited actions:
   a. against Canning because of her disclosure(s); and/or
   b. which might discourage, restrain, dissuade, coerce, prevent, or otherwise interfere with any Defendant employee from making protected good faith disclosures.

3. Canning was damaged because of Defendant's actions.[3]

From the evidence cited above regarding her ORS 659A.199 claim, the jury is also likely to find that Canning has proved a claim of Whistleblowing-Public Employer.

### C.  Deprivation of OFLA Rights, ORS § 659A.171

To prove her OFLA claim, Canning must show either that Defendant retaliated or discriminated against her because of her exercise of rights protected under OFLA (Activity Theory); or that Defendant unlawfully denied her OFLA claim (Denial Theory).[4]

To prove her OFLA claim under the Activity Theory, Canning must prove:

---

[3] ECF 66, at p. 63 (Plaintiff's Alternative Instruction #19).
[4] ECF 66, at p. 67 (Plaintiff's Alternative Instruction #20).

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

1. She inquired about OFLA, submitted a request for OFLA leave, or invoked any provision of OFLA;

2. Defendant retaliated or in any way discriminated against her with respect to hire or tenure or any other term or condition of employment; *and*

3. Defendant retaliated or discriminated against her because of her OFLA activity.

To prove her OFLA claim under the Denial Theory, Canning must prove:

1. She was an employee eligible for OFLA leave; *and*

2. Defendant denied her OFLA leave.

Regarding the Activity Theory, a jury is likely to find that Canning requested OFLA leave. After that request was made Defendant discriminated against her by denying her request for a temporary reasonable accommodation of 90 days to perform duties remotely or in a location on County property where she would not be forced to encounter the individuals who were activating her acute anxiety and emotional distress. The jury will likely find that WCSO had sufficient work available for Canning to perform but declined to give her that opportunity to perform those job duties, which, according to her physician, could have been critical to stabilizing herself medically and rehabilitating to a level necessary to resume normal day-to-day duties.

Regarding the Denial Theory, the jury will likely find that during the period that Canning was on an administrative modified duty, the County had given her work assignments of calling in twice per day and being available to report to the office within one-hour. Because those work assignments effectively engaged Canning to wait, Defendant should have counted her hours on an administrative

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

modified duty assignment as hours worked. Defendant's failure to credit her for those hours worked resulted in an unlawful denial of her OFLA benefits.

### D. Deprivation of FMLA Rights, 29 USC § 2612

To prove her FMLA claim, Canning must show either that Defendant unlawfully manipulated her working hours or essential functions of her job in order to avoid their responsibilities of providing her with FMLA leave (Manipulation Theory); or that Defendant unlawfully denied her FMLA claim (Denial Theory).[5]

To prove her FMLA claim under the Manipulation Theory, Canning must prove:

1. Defendant changed Plaintiff's working hours or job functions; *and*

2. The changes to Plaintiff's working hours and job functions adversely affected her FMLA eligibility.

To prove her OFLA claim under the Denial Theory, Canning must prove:

3. She was an employee eligible for FMLA leave; *and*

4. Defendant denied her FMLA leave.

Regarding Canning's claim of Deprivation of FMLA Rights, Canning will be able to show that Defendant improperly first put her on an administrative modified duty assignment under circumstances where Defendant allowed similarly situated employees to continue performing normal duties, or allowed employees to perform "desk duty." The adverse treatment of Canning in this regard amounted to a discriminatory change of Canning's working hours and/or job functions. Under Canning's manipulation theory, these improper modifications to her job duties resulted in her FMLA ineligibility giving rise to relief under FMLA.

Alternatively, there are multiple paths by which a jury is likely to find that Canning was eligible for FMLA benefits and those benefits were wrongfully denied.

---

[5] ECF 66, at p. 69 (Plaintiff's Alternative Instruction #21).

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

First, Canning should have been credited for the shifts that she was effectively engaged to wait while on an administrative modified duty assignment. Had Canning been credited with those hours, she would have been eligible for FMLA benefits which were denied. Alternatively, Canning actively performed at least 129 hours of work for Defendant's benefit during her period of administrative modified duty that Defendant failed to credit her with. Because of that failure to adequately credit her for hours worked, Canning was improperly denied FMLA benefits.

### E. Gender Discrimination and/or Hostile Work Environment, ORS 659A.030 and 42 USC § 2000e

To prevail on either her state or federal discrimination claim, Canning must prove:

1. Defendant took adverse action against Plaintiff; *and*

2. Defendant took adverse action against Plaintiff because of her gender.[6]

To establish that Plaintiff was subjected to a hostile work environment, she must show that WCSO was "permeated with unwelcome discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the condition of her employment and create an abusive working environment."[7]

The jury is likely to find that Defendant discriminated against Canning on the basis of her gender in several respects. First, the evidence will show that Canning was subjected to a level of scrutiny that similarly situated male employees did not experience. This scrutiny included rampant speculation from supervisors about her drinking habits and sexual activities, which similarly situated male employees were not subjected to. Defendant, through Lieutenant King and other employees in positions of authority, objectified female employees

---

[6] ECF 66, at p. 71 (Plaintiff's Alternative Instruction #21)
[7] ECF 66, at p. 44 (Plaintiff's Alternative Instruction #12)

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

including Canning for their own purposes. That objectification included sharing photographs and videos of female employees; speculating about their bodies and/or sexual predilections; and spreading rumors about their personal lives. As a consequence of that conduct, female employees of WCSO, including Canning, had a much narrower bandwidth of acceptable behavior and were more likely to be selected for adverse treatment.

That tacit dehumanization of Canning permeated the workplace and subjected her to unwelcome intimidation, ridicule, and insult so as to alter the condition of her employment and to create an abusive working environment. The unwelcome discriminatory behavior was a substantial factor in the adverse actions that Defendant took against her, including her rejection from special assignments, promotion to detective, the decision to place her on an administrative modified duty assignment for four months, and the decision ultimately to terminate her employment.

G. *Disability Discrimination, ORS § 659A.112 and 42 USC § 12112*

To succeed on this claim, Plaintiff has the burden of proving each of the following elements by a preponderance of the evidence:

1. She was a person with a disability;

2. She was a qualified to perform the essential functions of her job, with or without reasonable accommodations;

3. Defendant discriminated against her by subjecting her to prohibited treatment, in one or more of the following ways:

    a. taking adverse actions against her;

    b. failing to accommodate her disability; *and/or*

    c. failing to engage in a good faith interactive process; *and*

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

4. Defendant engaged in prohibited conduct because of her disability.

A jury will find that Canning was a qualified patrol deputy performing well in her position. In 2022, she experienced a "physical or mental impairment that substantially limit[ed] one or more major life activities,"[8] including sleeping, interacting with others and the operation of major bodily functions. Canning's physician recommended that she be permitted to work for a limited period on tasks that did not require direct contact with colleagues, to give her symptoms an opportunity to abate.

With the accommodation, Canning could perform essential functions of her position for which Defendant had a need. Despite the absence of an undue burden Defendant failed to accommodate Canning's disability and terminated her employment instead.

DATED: March 27, 2025            KLEIN MUNSINGER LLC

                                 By: *s/ Jose Klein*
                                 _____
                                 Jose Klein, OSB 083845
                                 jose@kleinmunsinger.com
                                 Damien Munsinger, OSB 122024
                                 damien@kleinmunsinger.com
                                 Attorneys for Plaintiff

---

[8] ECF 66, at p. 46 (Plaintiff's Alternative Instruction #13, defining disability)

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078