IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MELISSA CANNING,

        Plaintiff,

    v.

WASHINGTON COUNTY,

        Defendant.

Case No.: 3:23-cv-00210-AN

OPINION AND ORDER

Plaintiff Melissa Canning brings this action against defendant Washington County, alleging eight claims relating to wrongful termination and discrimination: (1) whistleblower retaliation in violation of Oregon Revised Statutes ("ORS") § 659A.199; (2) prohibited conduct by a public employer in violation of ORS § 659A.203; (3) Oregon Family Leave Act ("OFLA") interference in violation of ORS § 659A.171; (4) Family Medical Leave Act ("FMLA") interference in violation of 29 U.S.C. § 2611(2); (5) race and gender discrimination in violation of ORS § 659A.030; (6) race and gender discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e; (7) disability discrimination in violation of ORS §§ 659A.112 and 659A.118; and (8) disability discrimination in violation of the American with Disabilities Act, 42 U.S.C. § 12112.  On January 27, 2025, defendant filed a motion for partial summary judgment on plaintiff's OFLA and FMLA interference claims.  After reviewing the parties' filings, the Court finds this matter to be appropriate for decision without oral argument.  Local R. 7-1(d).  For the reasons stated below, defendant's motion is GRANTED in part and DENIED in part.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the burden of showing that there is no genuine issue of material fact.  *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Lindsey v. Tacoma-Pierce Cnty. Health Dep't*, 195 F.3d 1065,

1068 (9th Cir. 1999)).  Material facts are those which might affect the outcome of the suit.  *Anderson v.*
*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Materiality is determined using substantive law.  *Id.*  A
dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving
party."  *Id.*

When a "moving party demonstrates the absence of a genuine issue of material fact, the
nonmoving party that bears the [] burden at trial must show [in response] that there is evidence creating a
genuine issue of material fact."  *Rivera*, 395 F.3d at 1146 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317,
323-25 (1986)).  The court must view the evidence in the light most favorable to the nonmoving party and
draw all reasonable inferences in its favor.  *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010).
"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from
the facts are jury functions, not those of a judge[.]"  *Anderson*, 477 U.S. at 255.

## BACKGROUND

A.     **Factual Background**

Defendant hired plaintiff as a sheriff's deputy at the Washington County Sheriff's Office
("WCSO") in 2018.  Decl. Melissa Canning Supp. Opp'n to Def. Mot. for Partial Summ. J. ("Canning
Decl."), ECF [53], ¶ 4.  Plaintiff worked for defendant until January 31, 2023, when defendant terminated
her employment, characterizing the termination as a "medical layoff."  *See* Decl. Jose Klein Supp. Opp'n to
Def. Mot. for Partial Summ. J. ("Klein Decl."), ECF [52], Ex. 43; Def. Mot. for Partial Summ. J. ("Def.
Mot."), ECF [41], at 16-17 n.6.

1.     *Plaintiff's Report of Winders's Dishonesty*

At approximately 8:55 p.m. on March 6, 2021, plaintiff was dispatched as the primary
officer to a suicide threat call, with Deputy Brett Winders ("Winders") dispatched as the back-up officer.
Klein Decl. Exs. 17 at 2, 24 at 2.  At approximately 8:59 p.m., Winders radioed that he was with the subject
and the subject's manager.  *Id.* at Ex. 24 at 2.  Plaintiff arrived at the scene at approximately 9:08 p.m., as
Winders and the subject were walking out to the parking lot.  *Id.* at Exs. 17 at 2, 24 at 2.  At Winders's
request, plaintiff drove the subject to the hospital.  *Id.*  During the car ride there, the subject did not make

any suicidal statements but told plaintiff that he had been kidnapped and raped at gunpoint two days prior. *Id.* After the subject was checked into the hospital, plaintiff radioed into dispatch and changed the call type from "Suicidal Threat" to "Sex Crime Adult." *Id.* at Exs. 17 at 2, 24 at 3. Within around one minute of radioing in the information, Winders sent plaintiff a direct message, expressing surprise about the change in the call type. *Id.* at Exs. 17 at 8 (showing that Winders sent Canning: ".....what"), 24 at 3. Plaintiff investigated the alleged sexual assault for the remainder of her shift and returned to the precinct to submit evidence at approximately 3:00 a.m. on March 7, 2021. *Id.* at Ex. 24 at 3. There, she encountered Winders again and explained that the subject he asked her to transport to the hospital had been raped at gunpoint two days prior, to which Winder again expressed surprise. *Id.* at Exs. 17 at 4, 24 at 3.

Later on March 7, 2021, plaintiff continued to investigate the alleged sexual assault and interviewed the subject's two managers who were present with the subject at the time of the suicide threat call. *Id.* at Ex. 24 at 3-4. While talking with one of the managers, plaintiff asked why law enforcement was not told about the alleged sexual assault but only about the risk of suicide. *Id.* at Ex. 24 at 4. The manager responded that they had told her partner, and plaintiff confirmed with both the manager and the subject that the subject had told Winders about the alleged sexual assault. *Id.* Later that day, plaintiff reported that Winders had lied about his knowledge of the subject's report of a sexual assault first to Sergeant Chris Bowman ("Bowman"), who was the Officer in Charge of the shift, and then to Sergeant John Snyder ("Snyder"), who was Winders and plaintiff's direct supervisor. *Id.* Plaintiff also reached out to Sergeant Robert Rookhuyzen ("Rookhuyzen"), who had been mentoring plaintiff regarding sex crime investigations, and explained that Winders had lied to her about what he had known regarding the report of sexual assault. *Id.* at Ex. 24 at 5.

On March 7 or 8, 2021, plaintiff asked Winders to write a supplemental report covering the conversation he had with the subject prior to plaintiff's arrival to the scene, and Winders again failed to include any reference to a report of sexual assault. *Id.* On March 22, 2021, Winders wrote a second supplemental report, in which Winder reported for the first time that the subject had reported a sexual assault to him when he arrived at the call. *Id.* at Ex. 24 at 6-7.

WCSO classifies personnel complaints into two categories. *Id.* at Ex. 16 at 2. "Class I Allegations" include allegations of misconduct regarding use of force, workplace harassment, discrimination, dishonesty, or violations of civil rights or criminal statutes. *Id.* "Class II Allegations" include allegations of misconduct regarding violations of WCSO policies, procedures or rules. *Id.* Despite plaintiff's allegation of Winders's dishonesty, which constitutes a Class I Allegation, Lieutenant Kelly Degman ("Degman") initially ordered the matter to be treated as a non-disciplinary Performance Observation ("PO"). *Id.* at Ex. 6 23:23-24:9; *see id.* at Ex. 16 at 2. After Degman and Commander David Marzilli ("Marzilli") reviewed the PO, Degman told Snyder that the matter would need to be changed into a Service Related Inquiry Memo ("SRIM") investigation. *Id.* at Ex. 15 at 1. During the SRIM investigation, despite the allegation of dishonesty, defendant classified the matter as a Class II personnel complaint addressing a failure to conduct a thorough investigation and failure to know applicable criminal laws. *See id.* at Ex. 16 at 1-2. Ultimately, Winders received an oral reprimand as a result of the SRIM investigation. *Id.* at Ex. 16 at 1.

In May 2021, plaintiff learned that Winders's SRIM investigation had concluded and had not included an investigation into or findings of untruthfulness. Canning Decl. Ex. 57 at 2. Plaintiff then reported to WCSO's Professional Standards Unit ("PSU") that she was concerned the SRIM investigation into Winders was incomplete. *Id.* Shortly after plaintiff made the report, PSU Sergeant Tony Bass told plaintiff that Winders's SRIM investigation was being elevated to an Internal Affairs ("IA") investigation into dishonesty. *Id.* When Bass interviewed plaintiff as part of that IA investigation, plaintiff provided the names of several personnel, including Rookhuyzen, who had relevant information regarding Winders's untruthfulness, but those witnesses were not contacted. Klein Decl. Ex. 24 at 7. During the IA investigation, Winders was not placed on modified duty or administrative leave. *Id.* at Exs. 24 at 8, 18 at 2 (indicating "No Leave" with respect to Winders's IA investigation). The IA investigation concluded as "unfounded." *Id.* at Ex. 17 at 9.

In the months after plaintiff reported Winders's dishonesty, plaintiff believed that "many sergeants and other leaders within the department viewed [her] as causing trouble." Canning Decl. ¶ 17.

Plaintiff "felt incredibly isolated and believed that [she] was experiencing a hostile work environment because of [her] whistleblowing about Winders." *Id.*

Between June 2021 and August 2021, plaintiff learned that Winders's IA investigation for untruthfulness came back as "unfounded." Klein Decl. Ex. 24 at 7; Canning Decl. Ex. 53 at 1. On around August 16, 2021, plaintiff met with Undersheriff John Koch ("Koch"), who had signed off on the IA finding, and he indicated a limited awareness of the facts of the IA investigation. Canning Decl. Ex. 53 at 1. Plaintiff described the details of the events and identified WCSO employees who knew relevant facts, and Koch promised to take "a second look" at the investigation. *Id.* (internal quotation marks omitted). Koch asked plaintiff "if supervisors had moved Winders out of [plaintiff's] district to avoid conflict[,]" and plaintiff responded that no one had ever told her that was possible. *Id.* Plaintiff explained that "the ordeal had caused so much stress and anxiety that [she] burned nearly all [her] accruals to not have to come in and work with Winders." Klein Decl. Ex. 24 at 8. Koch stated that if plaintiff requested, a supervisor would likely move Winders to a different district and that "supervisors 'should have' been on top of that." Canning Decl. Ex. 53 at 1. Koch also stated that WCSO administration should have contacted plaintiff to review the findings of the IA investigation and erred in not interviewing plaintiff regarding the initial report. *Id.*

In August 2021, plaintiff applied for an open position in the Crisis Negotiation Unit ("CNU"), a special team assignment. *Id.*; Klein Decl. Ex. 23 at 7. Plaintiff learned that Winders was eligible and had also applied for a position in the CNU. Canning Decl. Ex. 53 at 1. On around September 2, 2021, plaintiff met with Sergeant Cliff Lascink ("Lascink"), who was conducting CNU recruitment, and told him that she had serious concerns about one of the CNU applicants. *Id.* at Ex. 53 at 1-2. Plaintiff stated that she felt obligated to share this information regardless of whether she had applied for the position and that if she and Winders both made the team, she "would have to make a very difficult decision about accepting a position because [she] [cannot] work with a liar." *Id.* at Ex. 53 at 2. Plaintiff explained the details of Winders's IA investigation and the fact that Koch was giving the investigation a second look. *Id.* Lascink told plaintiff that he would confer with PSU about the status of the IA investigation, and plaintiff suggested that he check in with Koch. *Id.* Plaintiff later learned that Lascink had made negative comments

about her to a coworker, suggesting that "[h]e was overall displeased that [plaintiff had] initiated that meeting, even though [plaintiff] advised [she] felt an ethical obligation to provide that information." *Id.* at Ex. 57 at 4 (emphasis omitted).

On September 19, 2021, plaintiff reached out to the Washington County District Attorney's Office ("WCDA") and wrote that she believed that she was "in possession of information that could be seen as exculpatory during a criminal prosecution according to the Brady vs. Maryland case" regarding Winders's honesty. Klein Decl. Ex. 24 at 1. Plaintiff attached a summary of the events involving Winders. *Id.* On September 20, 2021, a senior deputy district attorney responded that WCDA's Discovery and Disclosure Advisory Committee ("DDAC"), which reviews issues relating to the conduct of law enforcement personnel that may be considered exculpatory in a criminal case, would review the information. Canning Decl. Ex. 53 at 3.

Winders was ultimately selected for the CNU position. *See* Klein Decl. Ex. 23 at 12. On September 24, 2021, plaintiff met with Lascink and a lieutenant regarding feedback on plaintiff's CNU application. Canning Decl. Ex. 57 at 6. Lascink began the meeting by emphasizing the importance of being able to trust and work with others on the CNU team and stated that regardless of whether plaintiff liked the outcome, Winders's IA investigation had concluded. *Id.* Plaintiff reiterated that she would have held that meeting with him regardless of whether she applied for or made the CNU team and that she felt that Winders's IA investigation was important information for him to know. *Id.* During this meeting, plaintiff got the impression that Lascink believed that she could not work well with others. *See id.*

On September 27, 2021, plaintiff met with Koch and Marzilli, and Koch clarified that he did not have the authority to change the patrol schedule and ensure that plaintiff and Winders did not share a district. *Id.* Marzilli stated that he wanted to make sure "everything [was] fair" for Winders and plaintiff, and plaintiff responded that "nothing ha[d] been fair for [her] since [she] was involved in the Winders IA." *Id.* at Ex. 57 at 9 (internal quotation marks omitted). Plaintiff specifically reported comments from coworkers about plaintiff being a "whistleblower"; alienation during shifts; accusations for being responsible for "the Winders thing"; denial of her CNU application and concern that she was "being

blacklisted from special teams"; her belief that Winders should not have been eligible for a special team assignment because of the sustained SRIM investigation; concerns about future retaliation in her upcoming detective application because Lascink was on the interview panel; and the fact that she had used leave for nearly half the previous rotation due to stress and anxiety. *Id.*

In October 2021, plaintiff applied as one of eight candidates to a detective position. *Id.* Plaintiff scored at or near the top on the search warrant exercise and presentation, which were objective measures, and scored poorly on the initial application and panel interview, during which the interviewers, including Lascink, gave their personal input. *Id.* Plaintiff ultimately placed seventh out of eight. *Id.*

In January 2022, plaintiff applied to a Field Training Officer ("FTO") position. *Id.* at Ex. 57 at 10. Despite previous comments that plaintiff would make "a good FTO," her application was rejected. *See id.* at Ex. 57 at 10, 12. Plaintiff learned from Rookhuyzen that a lieutenant who was involved in FTO appointment had negatively commented on plaintiff's work ethic. *Id.*

On January 3, 2022, WCDA placed Winders on the Brady list with the "Additional Discovery" designation, indicating that there were materials related to Winders that could be considered exculpatory and that potentially exculpatory evidence would be disclosed to defense counsel in advance of Winders testifying in a criminal case. Klein Decl. Exs. 25, 46. On February 2, 2022, Rookhuyzen told plaintiff about a sergeants' meeting that had taken place earlier that day, during which the sergeants were told that Winders "is only on the Brady list because [plaintiff] turned him into the [WCDA]." Canning Decl. Ex. 57 at 11 (emphasis omitted).

2.    *Salsa Bowl Incident*

On February 22, 2022, plaintiff went out to dinner with Rookhuyzen and his partner Anthony Bracamonte ("Bracamonte"), who also works at WCSO, while they were off duty. Klein Decl. Ex. 30 at 12, 14. During dinner, they discussed some of the stressors in plaintiff's personal and work life, including the ongoing gossip around the department about plaintiff regarding Winders's IA investigation. Canning Decl. Ex. 57 at 12.

At the end of the meal, plaintiff packed a to-go box of her leftovers, including a small

plastic serving bowl containing beans that had come with her meal.  Klein Decl. Ex. 30 at 12, 14.  Plaintiff later cleaned and returned the bowl to the restaurant, which is her apparent practice at restaurants where she is a regular customer.  *Id.* at Ex. 54 at 3, 5; *see id.* at Ex. 26.

On February 24, 2022, Rookhuyzen sent an email to Degman stating that, "out of an abundance of caution[,]" he believed he had an obligation to report plaintiff for her "theft" of the small plastic bowl, which he described as a "mortar salsa container."  *Id.* at Ex. 27 at 2.  In the email, Rookhuyzen stated that he had not seen plaintiff put the container in her to-go box but that Bracamonte had.  *Id.*

On February 25, 2022, WCSO referred the matter to the Beaverton Police Department for a criminal investigation.  *Id.* at Ex. 49 at 2.  That same day, defendant placed plaintiff on paid administrative leave while defendant investigated the claim that plaintiff had engaged in theft when she took a salsa bowl from a restaurant without the restaurant's permission (the "Salsa Bowl incident").  Decl. Al Roque Supp. Def. Mot. ("Roque Decl."), ECF [43], ¶ 4.  During paid administrative leave, plaintiff's duties were limited: her "commission as a deputy sheriff was suspended"; she "was instructed not to carry a concealed weapon or take any actions that would normally be expected of an actively commissioned deputy sheriff"; she was provided a WCSO-issued cell phone and required to contact WCSO twice per day, at 8:30 a.m. and 1:30 p.m.; she was required to be able to respond to WCSO upon request with one hour's notice; and her shift would be Monday through Friday, 8 a.m. to 4 p.m., with Saturdays and Sundays off.  Roque Decl. Ex. 3; Canning Decl. Ex. 59.  On February 26, 2022, defendant emailed that plaintiff would be "working a Modified Duty Assignment" until further notice.  Klein Decl. Ex. 28 at 1.

On March 1, 2022, Sheriff Pat Garrett emailed Washington County District Attorney Kevin Barton ("Barton") that WCSO had initiated a criminal investigation into plaintiff regarding an allegation of theft.  *See* Klein Decl. Ex. 11 30:1-12.  On March 31, 2022, WCDA issued a written decision declining to prosecute plaintiff for theft regarding the Salsa Bowl incident.  Roque Decl. ¶ 13 & Ex. 1 at 3; Klein Decl. Ex. 31.  The decision stated that the witnesses "did not report the incident for a couple of days," the value of the bowl was *de minimis*, the "restaurant was not interested in a criminal prosecution[,]" and "[m]ost importantly," there was insufficient evidence that plaintiff intended to permanently deprive the restaurant

of the bowl because there was evidence corroborating plaintiffs claim that she intended to return it.  Roque Decl. Ex. 1 at 3; Klein Decl. Ex. 31.

After WCDA declined to prosecute plaintiff, plaintiff remained on paid administrative leave through June 28, 2022, while defendant continued its internal investigation of the Salsa Bowl incident. *See* Klein Decl. Exs. 28, 32; Roque Decl. ¶ 14.  Plaintiff's paid administrative leave, spanning from February 25, 2022, to June 28, 2022, constituted eighty-six shifts that defendant coded as 688 hours of "Leave Misc Paid."  Klein Decl. Ex. 33 at 5-6.  During her paid administrative leave, plaintiff asserts that she completed active work assignments for defendant for an approximate total of seventy-nine hours.  *See* Canning Decl. ¶ 27.  Plaintiff also asserts that her twice daily calls amounted to a total of forty-three hours of work pursuant to the terms of the collective bargaining agreement ("CBA") between WCSO and Washington County Police Officers' Association ("WCPOA").  *See* Klein Decl. Ex. 34 art. 11.3 ("For purposes of compensating authorized off-duty communications . . . , work performed will be rounded up in fifteen (15) minute increments at the employee's overtime rate of pay.").  On May 26, 2022, plaintiff took a day of vacation leave.  *See* Canning Decl. Ex. 60 at 22; Decl. John Mansfield Supp. Def. Mot. ("Mansfield Decl."), ECF [42], Ex. 1 at 40.

On June 28, 2022, after the IA investigation into the Salsa Bowl incident concluded, plaintiff was reinstated to full duty and returned to work as a Deputy Sheriff, including with her regular seniority bid shift and regular work hours.  Klein Decl. Ex. 28 at 1.  On June 30, 2022, plaintiff met with Chief Deputy Al Roque, who gave her an oral reprimand and explained:

> "So, obviously the investigation is complete.  We do have sustained violations.  Um.  There are mitigating factors because you intended to bring the bowl back and we've established that, so, well well [*sic*] aware of that.  The one thing is though, the violations are sustained because of the discredit, and because of the appearance of it, and because of the act . . . . So those are the bases for sustaining the allegations.  Again, mitigating because you totally intended to bring it back and that was established.  So, the outcome is oral reprimand."

Roque Decl. ¶ 15.

### 3.    *Denial of Application for OFLA and FMLA Benefits*

On around July 26 or 27, 2022, plaintiff applied to UNUM, a third-party benefit-processing

company that handles defendant's FMLA and OFLA coverage, for FMLA and OFLA leave beginning on July 28, 2022. *See* Decl. UNUM Records Custodian ("Rodgers Decl."), ECF [44], Ex. 1 at 45 (referring to ECF numbering). On July 29, 2022, UNUM denied plaintiff's request for FMLA and OFLA use and leave on the grounds that plaintiff had not worked the minimum required hours. *Id.* Defendant's records reflected that plaintiff had worked 1,174.75 hours from July 28, 2021, to July 27, 2022; and an average of 9.6 hours a week from January 22, 2022, to July 22, 2022. Klein Decl. Ex. 35; *see* Rodgers Decl. at Ex. 1 at 71-72, 77. These numbers did not include any hours from plaintiff's period of paid administrative leave. Klein Decl. Ex. 35.

4.     *Arbitration of Plaintiff's OFLA and FMLA Grievance*

Between July 29, 2022, and October 13, 2022, plaintiff, represented by WCPOA, pursued the grievance procedure available under the CBA between WCPOA and WCSO regarding the denial of plaintiff's request for FMLA and OFLA leave. Def. Mot. 3. On October 13, 2022, WCPOA took the plaintiff's OFLA and FMLA grievance to arbitration. *Id.* After full briefing, the arbitrator issued an Award and Opinion rejecting plaintiff's OFLA and FMLA claims on June 26, 2023. Mansfield Decl. ¶ 2 & Ex. 1.

In the opinion, the arbitrator addressed the issue of whether defendant violated the CBA by denying FMLA and OFLA leave to plaintiff. *Id.* at Ex. 1 at 3. In deciding that defendant did not violate the CBA, the arbitrator noted that unlike with other CBA provisions that obligate defendant to comply with statutes, "nothing in the [CBA] expressly commits [defendant] ***contractually*** to comply with the FMLA or OFLA statutes." *Id.* at 31 (emphasis in original). The arbitrator reasoned that although Articles 18 and 19 of the CBA mention FMLA and OFLA, neither article sheds any light as to plaintiff's eligibility under the statutes. *Id.* at 32-33. The arbitrator then reviewed the relevant statutes, regulations, and case law and noted that none of the authorities squarely addressed the issue. *See id.* at 33-38. However, the arbitrator stressed that *Armour & Co. v. Wantock*, 323 U.S. 126 (1944), and *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), "emphasized the need to consider all the circumstances of the situation" and "illustrate[d] the need to examine whether employees are required to be close at hand and ready to jump into action as opposed to being free to engage in whatever personal pursuits they wish." *Id.* at 37.

In examining the terms and conditions of plaintiff's administrative leave, the arbitrator explained that: (1) "the reason for the leave [was] an IA investigation" and "the leave w[ould] continue 'while the investigation is ongoing'"; (2) plaintiff's "commission[] as deputy sheriff[] w[as] suspended" and plaintiff was told she was "not authorized to carry a concealed weapon or take any actions that would normally be expected of an actively commissioned deputy sheriff"; (3) plaintiff was "instructed to 'surrender all firearms, mag cards, keys, identification cards, County-owned cell phone (along with the password), County-owned laptop/computers/iPads (along with the password), and any other items requested by a supervisor'"; (4) although plaintiff was required to be able to respond within one hour from Monday to Friday, 8:00 a.m. to 4:00 p.m., she was "not confined to stay at home or at any other place"; (5) there was no restriction on what activities plaintiff could engage in; (6) plaintiff was "required to be available for meetings and interviews, [but] there [was] no evidence that [she was] ever called in for these events"; (7) plaintiff was "required to phone in twice a day"; and (8) plaintiff was "required to carry a PSU-issued cell phone." *Id.* at 38-39 (internal quotation marks omitted).

The arbitrator held that plaintiff was deprived of the authority and the means to do the work of a deputy sheriff and that the letter suggested that plaintiff would not be called in for duty until the completion of the IA investigation. *Id.* The arbitrator noted that "[t]he most significant factor is that [plaintiff was] free 24 hours a day and seven days a week to do whatever [she] wanted whenever [she] wanted, without restriction, so [her] time was spent primarily for [her] own benefit rather than for [defendant's] benefit." *Id.* at 39-40. Additionally, the arbitrator noted that although plaintiff's previous schedule of working four ten-hour shifts was changed to a schedule of working five eight-hour shifts, plaintiff remained "free to pursue [her] normal pursuits every day of the week, whether [she was] 'on shift' or 'off shift.'" *Id.* at 40. Although plaintiff had to use personal leave for vacations and had to receive permission to take vacation leave for her birthday, the arbitrator held that "[t]his [was] required of all WCSO employees" and that plaintiff was "able to engage in these personal pursuits on the same terms as before [she was] placed on administrative leave." *Id.* The arbitrator concluded "that the time [that plaintiff] spent on administrative leave—whether paid or unpaid, and whether 'on shift' or 'off shift'—would not count as

hours worked under the Fair Labor Standards Act" ("FLSA") and, therefore, "the time [she] spent on leave would not count as hours 'worked' under the [OFLA] or as 'hours of service' under the [FMLA]." *Id.*

> 5.    *Reports and Investigations Against Other Employees*

Deputy Frank Ward ("Ward") was accused of stealing latex gloves from WCSO but was not placed on modified duty or administrative leave. Klein Decl. Ex. 29 at 2. Ward's investigation "was over quickly with an SRIM, not an IA[,]" and during that investigation, WCSO never mentioned "pressing charges" for theft. *Id.* (internal quotation marks omitted).

Additionally, three other male, non-whistleblowing coworkers were subjects of IA investigations within six months of plaintiff's IA investigation. One was Winders, whose investigations involved allegations of (1) a failure to report or investigate a victim's allegation of rape at gunpoint and subsequent dishonesty about the failure to report, and (2) misuse of his WCSO credentials when Winders was stopped on suspicion of Driving Under the Influence of Intoxicants ("DUII"). *See id.* at Exs. 16-17, 37-39. Winders was not placed on modified duty or leave during his first investigation, and during his second investigation, he was initially placed on desk duty and then later placed on paid administrative leave only after he was found to be untruthful in his IA interview. *See id.* at Exs. 29, 37-39. Another was Rookhuyzen, whose investigation involved allegations of sexual harassment and improper use of police equipment. *See id.* at Exs. 40-41. During his investigation, Rookhuyzen was placed on desk duty for two and a half months. *See id.* at Exs. 41-42. The third was Sergeant Brandon Yon ("Yon"), whose investigation involved allegations of a DUII in a vehicle not certified for street use. *See id.* at Ex. 36. During his investigation, Yon was placed on desk duty at the sheriff's office for one month. Canning Decl. ¶ 29.

> 6.    *Plaintiff's Placement on Brady List*

On December 5, 2022, after reviewing the IA investigation into the Salsa Bowl incident, the DDAC recommended that "[n]o further action" be taken as to placing plaintiff on the Brady list. Klein Decl. Ex. 45. In February 2024, in response to a journalist's question about plaintiff's Brady status, WCDA indicated that plaintiff's Brady status was pending. *Id.* at Ex. 46 at 2. On April 30, 2024, WCDA confirmed that plaintiff had been placed on the Brady list with the "Additional Discovery" designation. *Id.* at Ex. 46

at 1.

On June 27, 2024, the DDAC again reviewed the IA investigation into the Salsa Bowl

incident and recommended that "[n]o further action" be taken as to placing plaintiff on the Brady list. *Id.*

at Ex. 47. On July 9, 2024, Barton overruled the committee's recommendation and placed plaintiff on the

Brady list with the "Additional Discovery" designation based on "Allegation #3 and theft activity." *Id.*

**B.     WCSO Policies**

WCSO has a General Conduct policy for reporting misconduct that states:

> "**37. Acting on Violations and Misconduct** Staff must report suspected or actual
> violations of WCSO orders, policies, or directives or misconduct by any WCSO staff to a
> supervisor or manager within 72 hours of learning of the misconduct; this includes
> unconfirmed rumors of staff misconduct. Supervisors must take appropriate action as soon
> as a potential or actual violation of rules, regulations, policies, or laws comes to their
> attention.
>
> **38. WCSO Staff Have a Duty to Intervene, Stop, and Report Specific Misconduct by
> Public Safety Officers or Criminal Justice System Associates** Staff who witness another
> public safety officer or criminal justice system associate who is engaged in specific
> misconduct must intervene and stop the misconduct in a manner that is safe. This applies
> to excessive force, sexual harassment, sexual misconduct, discrimination based on race,
> color, religion, gender, sexual orientation, national origin, disability or age, criminal
> conduct, or conduct that violates Oregon DPSST standards of moral fitness. Intervention
> may range from giving verbal commands, to moving to a safe place and calling for
> assistance, to using force based on the observer's training and the circumstances of the
> incident. Staff who witness such misconduct must also report it to a supervisor or higher
> ranking official in the chain of command within 72 hours of witnessing or learning of the
> misconduct. The agency will not retaliate against any deputy or reserve for reporting under
> this section."

Roque Decl. ¶ 26 (bolding in original).

WCSO also has a policy for handling personnel complaints, Policy 551-R03 ("Complaint

Policy"), which sets out the procedure that must be followed for allegations of misconduct against a WCSO

employee. *See id.* at Ex. 2 at 1-2. The Complaint Policy provides that "[a]ll complaints[] [and] allegations

of misconduct . . . shall be recorded and investigated. . . ." *Id.* at Ex. 2 at 1; Klein Decl. Ex. 14 at 1. The

Complaint Policy further details:

> "**6. The Division Commander Decides if a Supervisory Inquiry is Appropriate.** The
> division commander will decide whether the complaint can be assigned as a supervisory
> inquiry or whether an Internal Affairs Investigation should be considered by the Sheriff
> based on preliminary information. . . .

**7. Supervisors Immediately Notify the Division Commander when a Complaint of Criminal Conduct is Received.**
**8. If Appropriate, Supervisors Remove Employees from Duty and Advise the Division Commander.** . . .
**9. Supervisors May Immediately Suspend an Employee with Pay.** The supervisor will suspend an employee if, in the supervisor's opinion, it is in the best interest of the Sheriff's Office or community to immediately remove the employee from duty. The suspension decision may be based on the seriousness of the offense, peculiar circumstances, or other nature of the misconduct alleged or observed.

Supervisors have discretion to relieve the employee of badge, department issued weapons, ammunition, identification card, building access keys, key card, and commission card, as appropriate. . . .

The supervisor will order the employee to remain at his residence, or otherwise be immediately available by telephone between 0830 hours and 1630 hours, Monday through Friday, until otherwise directed by the division commander or his designee.

The supervisor will notify the chain of command if an employee is suspended. . . .
**10. When an Investigation Concludes, the Sheriff Sends a Letter to the Complainant.** Citizens who report a personnel complaint and provide their name and address, will receive a letter from the Sheriff at the conclusion of the investigation."

Roque Decl. Ex. 2 at 2 (emphases in original); Klein Decl. Ex. 14, at 2 (same).

**C.     Procedural Background**

Plaintiff initiated this action on February 13, 2023, ECF [1], and amended the complaint on July 3, 2024, ECF [21]. On January 27, 2025, defendant filed the instant Motion for Partial Summary Judgment, ECF [41]. Defendant moves for summary judgment on plaintiff's OFLA and FMLA interference claims. Defendant also asks the Court to preclude plaintiff from arguing that the discipline she received relating to the Salsa Bowl incident was retaliatory.

## DISCUSSION

"Courts analyze OFLA and FMLA claims together as much as possible because OFLA is construed 'to the extent possible in a manner that is consistent with any similar provisions' of the FMLA." *Hanson v. Oregon*, No. 3:21-cv-780-SI, 2023 WL 22196, at *16 (D. Or. Jan. 3, 2023) (citing Or. Rev. Stat. § 659A.186(2)); *see Sanders v. City of Newport*, 657 F.3d 772, 783 (9th Cir. 2011) ("Oregon courts have looked to federal law when interpreting OFLA."). Accordingly, it is appropriate to analyze plaintiff's FMLA and OFLA claims together.

The FMLA creates two interrelated, substantive rights for eligible employees: (1) the "right to use a certain amount of leave for protected reasons," and (2) the "right to return to his or her job or an

equivalent job after using protected leave." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001) (citing 29 U.S.C. §§ 2612(a), 2614(a)).  An employer cannot "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). Unlawful interference includes denying or discouraging the use of FMLA leave.  *See Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1133 (9th Cir. 2003) (citing 29 C.F.R. § 825.220(b)); *Schultz v. Wells Fargo Bank*, 970 F. Supp. 2d 1039, 1052 (D. Or. 2013).  Although the OFLA does not explicitly provide a cause of action for interference, "an OFLA claim rooted in facts constituting an interference claim under the FMLA also may be properly brought as an interference claim under the OFLA." *Stillwell v. Old Dominion Freight Line, Inc.*, No. 3:19-cv-1789-SI, 2021 WL 3056375, at *6 (D. Or. July 20, 2021) (citing *Rogers v. Or. Trail Elec. Consumers Co-op., Inc.*, No. 3:10-cv-1337-AC, 2012 WL 1635127, at *20, *24 n.6 (D. Or. May 8, 2012)).

Plaintiff argues that defendant interfered with her FMLA and OFLA rights by: (1) refusing to credit her for time worked while she was on paid administrative leave; and (2) discriminatorily deciding to place plaintiff on paid administrative leave while it investigated the Salsa Bowl incident and keep her on paid administrative leave for two months even after WCDA declined to prosecute and when plaintiff would have otherwise been eligible for leave.  To establish an FMLA interference claim, a plaintiff must show that: "(1) [s]he was eligible for the FMLA's protections, (2) h[er] employer was covered by the FMLA, (3) [s]he was entitled to leave under the FMLA, (4) [s]he provided sufficient notice of h[er] intent to take leave, and (5) h[er] employer denied h[er] FMLA benefits to which [s]he was entitled." *Sanders*, 657 F.3d at 778 (citation omitted).

Defendant disputes the first element and argues that plaintiff was not eligible for FMLA or OFLA protections because she did not work the minimum number of hours required under either statute. Plaintiff argues that the 688 hours she spent on shifts during paid administrative should count toward her eligibility; that she actually worked an estimated 122 additional hours completing active work assignments for defendant during paid administrative leave; and that defendant's retaliatory treatment of plaintiff in placing her on paid administrative leave constituted interference with her FMLA and OFLA eligibility.  The

Court addresses these arguments in turn.

## A.    Hours on Paid Administrative Leave Shifts

Defendant argues that plaintiff's time on administrative leave—whether paid or unpaid, and whether "on shift" or "off shift"—does not count as hours worked under the FLSA because plaintiff's time was spent primarily for her own benefit rather than defendant's benefit. Therefore, defendant argues that this time does not count as "hours of service" under FMLA or hours "worked" under OFLA. Plaintiff argues that during her shifts on paid administrative leave, plaintiff was "engaged to wait," and therefore, her shift time counted toward eligibility under both the FMLA and OFLA.

To be eligible for FMLA leave, an employee must: (1) have been employed by the employer for at least twelve months from the date the leave commences; and (2) have provided the employer with "at least 1,250 hours of service . . . during the previous 12-month period." 29 U.S.C. § 2611(2)(A); 29 C.F.R. § 825.110(d). To be eligible for OFLA leave, an employee must have worked for the employer "for an average of at least [twenty-five] hours per week during the 180 calendar days immediately preceding the date OFLA leave begins." Or. Admin. R. 839-009-0210(8)(b). It is undisputed that plaintiff was employed by defendant during the twelve months prior to plaintiff's requested leave date. The first issue is thus whether, as a general matter, plaintiff's 688 hours of paid administrative leave counts as "hours of service" under the FMLA or hours "worked" under the OFLA.

Under the FMLA, "whether an employee has worked the minimum 1,250 hours of service is determined according to the principles established under the [FLSA] for determining compensable hours of work." 29 C.F.R. § 825.110(c)(1). Under the OFLA, "[i]n determining [twenty-five] hours average per week, the employer must count actual hours worked using guidelines set out pursuant to the [FLSA]." Or. Admin. R. 839-009-210(8)(b)(B) (citing 29 C.F.R. § 785).

Section 7 of the FLSA does not define the term "hours of service" but provides in its definition of "regular rate" standards for determining the rate at which employees must be compensated for overtime work. 29 U.S.C. § 207. An employee's "regular rate" of compensation includes "all remuneration for employment paid to, or on behalf of, the employee," but, in relevant part, expressly excludes

"payments made for occasional periods when no work is performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, *or other similar cause;* reasonable payments for traveling expenses, or other expenses, incurred by an employee in the furtherance of his employer's interests and properly reimbursable by the employer; and other similar *payments to an employee which are not made as compensation for his hours of employment*[.]"

29 U.S.C. § 207(e)(2) (emphases added). The applicable regulations explain:

"[Section 207(e)(2)] deals with the type of absences which are infrequent or sporadic or unpredictable. It has no relation to regular 'absences' such as lunch periods nor to regularly scheduled days of rest . . . .
. . .
The term 'other similar cause' refers to payments made for periods of absence due to factors like holidays, vacations, sickness, and failure of the employer to provide work. Examples of 'similar causes' are absences due to jury service, reporting to a draft board, attending a funeral of a family member, inability to reach the workplace because of weather conditions. Only absences of a nonroutine character which are infrequent or sporadic or unpredictable are included in the 'other similar cause' category."

29 C.F.R. § 778.218(b), (d).

Under the FLSA, the test for determining if an employee's time constitutes working time is whether the time is spent predominantly for the employer's benefit or for the employee's. *Skidmore*, 323 U.S. at 137; *Armour & Co.*, 323 U.S. at 133. Time in which an employee is "engaged to wait" is considered compensable working time, whereas time spent "waiting to be engaged" is not. *Skidmore*, 323 U.S. at 137; *see Armour & Co.*, 323 U.S. at 134. In determining whether an employee was "engaged to wait" or "waiting to be engaged," the court must "scrutin[ize] and constru[e] the agreements between the particular parties, apprais[e] their practical construction of the working agreement by conduct, consider [] the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances." *Skidmore*, 323 U.S. at 137. "Such questions 'must be determined in accordance with common sense and the general concept of work or employment.'" 29 C.F.R. § 785.14 (citation omitted).

The regulations implementing the FLSA define "on duty" periods as periods in which "the employee is unable to use the time effectively for his own purposes. It belongs to and is controlled by the employer. In all of these cases waiting is an integral part of the job. The employee is engaged to wait." *Id.* § 785.15. The regulations define "off duty" periods as:

"Periods during which an employee is completely relieved from duty and which are long

17

enough to enable him to use the time effectively for his own purposes are not hours worked. He is not completely relieved from duty and cannot use the time effectively for his own purposes unless he is definitely told in advance that he may leave the job and that he will not have to commence work until a definitely specified hour has arrived.  Whether the time is long enough to enable him to use the time effectively for his own purposes depends upon all of the facts and circumstances of the case."

*Id.* § 785.16(a).  The regulations define "on-call time" as the following:

"An employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while 'on call.'  An employee who is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached is not working while on call."

*Id.* § 785.17 (citation omitted).  Oregon regulations provide similar definitions of "on duty" (or "engaged to wait"), "off duty" (or "waiting to be engaged"), and "on-call time."  *See* Or. Admin. R. 839-020-0041(1)-(3).

DOL's FMLA Frequently Asked Questions web page states:

**"(Q) Does the time I take off for vacation, sick leave or PTO count toward the 1,250 hours?**
The 1,250 hours include only those hours actually worked for the employer.  Paid leave and unpaid leave, including FMLA leave, are not included."

Mansfield Decl. Ex. 3, at 2 (bolding in original).

Finally, although *Brigham v. Eugene Water Board & Electric Company*, 357 F.3d 931 (9th Cir. 2004), does not directly address the issue of whether paid administrative leave constitutes hours worked, it provides some instructive principles.  In *Brigham*, the Ninth Circuit stated that the two predominant factors in determining whether an employee's on-call waiting time is compensable overtime are: "'(1) the degree to which the employee is free to engage in personal activities; and (2) the agreements between the parties.'"  357 F.3d at 936 (quoting *Berry v. County of Sonoma*, 30 F.3d 1174, 1180 (9th Cir. 1994)).

The court held that the first factor weighed narrowly in favor of the plaintiffs: although the plaintiffs routinely engaged in personal activities while they were on call, were only called out once or twice a month, and could switch shifts with each other in advance, the plaintiffs were required to live on premises, respond instantaneously to any alerts, and were "effectively tethered to their homes" during their

duty shifts. *Id.* at 937. Moreover, despite the low average number of call-outs and emergency alarms, the plaintiffs "were responsible for the safety of thousands of people and, accordingly, had to be absolutely prepared to respond at all times, . . . without regard to how often they were actually called out." *Id.* at 938.

As for the second factor, the court explained that "[a]n agreement between the parties which provides at least some type of compensation for on-call waiting time may suggest the parties characterize waiting time as work." *Id.* at 939 (quoting *Berry*, 30 F.3d at 1180-81). "Conversely, an agreement pursuant to which the plaintiffs are to be paid only for time spent actually working, and not merely waiting to work, may suggest the parties do not characterize waiting time as work." *Id.* (quoting *Berry*, 30 F.3d at 1180-81). The court held that under the circumstances, "the parties' agreement treating the otherwise formally uncompensated duty shift call time as equivalent to four hours' actual work [was] eminently reasonable." *Id.* at 942.

Here, during plaintiff's paid administrative leave, her "commission as a deputy sheriff [was] suspended[,]" she was "not authorized to carry a concealed weapon or take any actions that would normally be expected of an actively commissioned deputy sheriff[,]" and she was "ordered to surrender all firearms, mag cards, keys, identification cards, [defendant]-owned cell phone (along with the password), [defendant]-owned laptop/computer/iPads (along with the password), and any other items requested[.]" Roque Decl. Ex. 3. Plaintiff's shift was Monday through Friday from 8:00 a.m. to 4:00 p.m., and she was required to contact WCSO twice each weekday at 8:30 a.m. and 1:30 p.m. so that defendant could communicate "instructions [] regarding [any] meetings and interviews to be conducted." *Id.* During her shift hours, plaintiff was required to carry a defendant-issued phone and be able to respond to WCSO upon request within one hour. *Id.* Unless directed to respond by a command officer, plaintiff was required to contact WCSO to arrange any visits to WCSO buildings. *Id.* Finally, plaintiff was required to use personal leave for vacations, as was required of all WCSO employees, and plaintiff in fact requested and received permission to take vacation leave for her birthday. Def. Mot. 10; *see* Canning Decl. Ex. 60 at 22; Mansfield Decl. at Ex. 1 at 40.

Based on these terms and conditions, plaintiff was able to use much of her time during paid

administrative leave effectively for her own purposes. *See* 29 C.F.R. § 785.16(a). Although plaintiff needed to use personal leave for vacation, the conditions of plaintiff's paid administrative leave did not require plaintiff to be on defendant's premises—in fact, it prohibited her from defendant's premises without prior arrangement—nor did they place restrictions on what plaintiff could do with her waiting time. The FLSA regulations exclude from the "regular rate" payments made for occasional periods when no work is performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other "absences of a non-routine character which are infrequent or sporadic or unpredictable." 29 C.F.R. § 778.218(b), (d). Time on paid administrative leave during which plaintiff did not perform work appears to fall within this category because it is nonroutine and infrequent. Additionally, the DOL understands that "paid leave and unpaid leave, including FMLA leave, are not included" in calculating the 1,250 hours of service required for eligibility. Mansfield Decl. Ex. 3 at 2. Although the DOL specifies vacation, sick leave, and paid time off as the types of leave that are excluded from hours of service, paid administrative leave certainly qualifies as a type of "paid leave." *Id.*

The *Brigham* test, although not squarely applicable to this case, also supports the interpretation that the time during which plaintiff did not perform work—*i.e.*, waiting time—on paid administrative leave does not constitute hours worked. As for the first factor, plaintiff had a much higher degree of freedom to engage in personal activities during paid administrative leave than did the plaintiffs in *Brigham* during their duty shifts. The plaintiffs in *Brigham* were confined to the employer's premises and were responsible for responding immediately to any alerts during their shifts, even though they were free to engage in personal pursuits when not responding to alerts. 357 F.3d at 937. Despite the significant restrictions, the court found that this factor weighed only "narrowly" in favor of the plaintiffs. *Id.* at 938. Here, although plaintiff was required to call in twice a day and respond to WCSO within one hour's notice, her commission was suspended, and she was told not to take any actions that would normally be expected of an actively commissioned deputy sheriff. Although plaintiff could not visit WCSO buildings without prior arrangement, plaintiff was not otherwise restricted in terms of what she could do and where she could go. As such, during her waiting time while on paid administrative leave, plaintiff was largely able to use

her time effectively for her own purposes, suggesting that she was off duty during those periods. *See* 29 C.F.R. § 785.16(a). Accordingly, this factor weighs in favor of defendant.

As for the second factor, it is questionable whether the letter describing the terms and conditions of plaintiff's paid administrative leave would amount to an "agreement" between the parties, considering the facts that defendant unilaterally imposed paid administrative leave and plaintiff's signature constituted acknowledgment of receipt only. *See* Roque Decl. Ex. 3. Additionally, it is clear that defendant did not consider plaintiff's time on paid administrative leave as "hours worked" under the FLSA because it deemed plaintiff ineligible for FMLA and OFLA leave. In contrast, plaintiff believed that these hours would count toward FMLA and OFLA eligibility and was not informed that they did not until she sought and was denied FMLA and OFLA leave. Therefore, this factor appears neutral.

Taking all of the above principles into consideration, during her paid administrative leave, plaintiff was relieved of her normal duties as a sheriff's deputy and was largely able to use her time effectively for her own purposes. Plaintiff was not required to be on or so close to defendant's premises to be considered "on duty" or "on call." Plaintiff's waiting time during administrative leave was also not time during which she performed work for defendant. Accordingly, as a general matter, plaintiff's 688 hours on paid administrative leave do not constitute hours worked under the FLSA, and thus do not constitute either "hours of service" under the FMLA or hours "worked" under the OFLA.

## B.    Hours Completing Active Work Assignments

However, plaintiff also contends that she "actually worked" more than 1,250 hours in the previous twelve months because there were certain hours that she conducted active assignments for defendant's benefit (and was not merely waiting) while she was on paid administrative leave. The FLSA regulations provide that "[w]ork not requested but suffered or permitted is work time," including "work performed away from the premises or the job site, or even at home." 29 C.F.R. § 785.11, 785.12. "If the employer knows or has reason to believe that the work is being performed, he must count the time as hours worked." *Id.* § 785.12.

Under the FMLA, "[t]he determination [of hours worked] is not limited by methods of

recordkeeping, or by compensation agreements that do not accurately reflect all of the hours an employee has worked for or been in service to the employer." 29 C.F.R. § 825.110(c)(1).  Rather, "[a]ny accurate accounting of actual hours worked under FLSA's principles may be used." *Id.*  If "an employer does not maintain an accurate record of hours worked by an employee, . . . the employer has the burden of showing that the employee has not worked the requisite hours." *Id.* § 825.110(c)(3).  Otherwise, the employee is presumed to have worked 1,250 hours during the previous twelve-month period. *See id.* §§ 825.110(c)(3), 825.500(f)(1).  To overcome this presumption, the employer must clearly demonstrate that the employee did not work 1,250 hours during the previous twelve months.  29 C.F.R. § 825.110(c)(3).

Plaintiff applied for FMLA leave to begin on July 28, 2022.  Defendant's records reflected that plaintiff worked 1,174.75 hours from July 28, 2021, to July 27, 2022, which excluded any hours during plaintiff's paid administrative leave from February 25, 2022, to June 28, 2022.  However, plaintiff presents evidence that between February 25, 2022, and June 28, 2022, she worked approximately seventy-nine hours completing assigned work activities primarily for defendant's benefit.[1]  *See Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 717 (2d Cir. 2001) (holding that affidavits showing employee's pre-shift showering sufficient to overcome summary judgment as to FMLA eligibility); *Holladay v. Fairbanks N. Star Borough Sch. Dist.*, No. 4:15-cv-00011-SG, 2017 WL 2918955, at *10 (D. Alaska July 7, 2017) (denying the defendant employer's summary judgment motion on the basis of the plaintiff's "sworn assertion that she worked more than 1,250 hours," contradicted by employer's assertion that its records reflect fewer than 1,250 hours).  Evidence in the record also indicates that defendant knew or had reason to believe that the work was being performed: defendant required plaintiff to call in twice a day during her shifts, and

---

[1] Plaintiff also contends that the twice daily calls amounted to a total of forty-three hours of work pursuant to the terms of the collective bargaining agreement ("CBA") between WCSO and Washington County Police Officers' Association ("WCPOA").  *See* Klein Decl. Ex. 34 at art. 11.3 ("For purposes of compensating authorized off-duty communications . . . , work performed will be rounded up in fifteen (15) minute increments at the employee's overtime rate of pay.").  Plaintiff does not assert that she "actually worked" forty-three hours in participating in the twice-daily calls, only that that was the number of hours for which she would need to be compensated under the CBA.  However, the hours for which plaintiff had to be compensated under the CBA are not necessarily equivalent to the hours of service needed for FMLA eligibility.  *See* 29 C.F.R. § 825.110(c)(1).  Nonetheless, even excluding any call time, plaintiff's assertion that she worked approximately seventy-nine hours completing assigned work activities for defendant's benefit is sufficient to raise a genuine dispute of material fact as to her FMLA eligibility.

defendant requested plaintiff to complete certain assignments and communicated with plaintiff regarding certain tasks. *See* Roque Decl. Ex. 3; Canning Decl. ¶ 27. Defendant does not provide any evidence to clearly demonstrate that plaintiff did not work these asserted hours. A reasonable jury, if it credits plaintiff's account, could find that plaintiff actually worked 1,253.75 hours during the previous twelve months, which would satisfy the requisite minimum hours to receive FMLA protections. Accordingly, there is a genuine dispute as to material fact regarding whether plaintiff worked the minimum number of hours to be eligible for FMLA leave, and summary judgment on plaintiff's FMLA interference claim is not appropriate.

However, even with the additional hours, plaintiff does not demonstrate that she was eligible for OFLA leave. Defendant's records reflected that plaintiff worked an average of 9.6 hours per week in the previous 180 days. Even adding plaintiff's asserted seventy-nine hours, plaintiff would have worked an average of 12.7 hours per week in the previous 180 days, which is below the twenty-five hours per week required to receive OFLA protections. Accordingly, plaintiff does not raise a genuine dispute that she was eligible for OFLA leave, and summary judgment on plaintiff's OFLA interference claim is appropriate.

## C.    Other Arguments

Defendant further argues that even assuming that an employee should be credited for FMLA purposes as having worked hours that the employee was prevented from working due to wrongful employer action, plaintiff cannot show that her placement on or the length of her paid administrative leave was wrongful because Rookhuyzen's report was compelled by, and the IA investigation into the Salsa Bowl incident complied with, the law and WCSO policy. Defendant asserts that it had no control over the length of the first phase of plaintiff's investigation, which Beaverton Police Department conducted due to potential conflicts of interest, and that the second phase of the investigation, which began after WCDA declined to prosecute, concluded within the three months outlined by ORS § 181A.681(3)(c). Defendant also argues that it cannot be held liable for WCDA's decision to place plaintiff on the Brady list. Therefore, defendant argues that the Court should preclude plaintiff from arguing that the IA investigation into the Salsa Bowl incident was retaliatory.

Plaintiff argues that defendant's decision to place plaintiff on paid administrative leave and keep her away from the workplace far longer than was reasonably necessary and far longer than were plaintiff's three male, non-whistleblowing coworkers, whose IA investigations were much more complex, shows retaliatory intent.  Therefore, plaintiff argues that defendant's retaliatory and differential treatment of plaintiff constituted interference with her FMLA and OFLA eligibility.  As a result, even if the Court finds that none of plaintiff's hours on paid administrative leave count toward her FMLA and OFLA eligibility, plaintiff argues that her claims should still not be dismissed.

As for defendant's argument that it cannot be liable for WCDA's decision to place plaintiff on the Brady list, plaintiff does not bring a claim against defendant for that decision.  Instead, plaintiff argues that part of defendant's retaliation against her was improperly influencing WCDA to place her on the Brady list.  Whether defendant did so is not at issue in this motion.

As for defendant's argument that the Court should preclude plaintiff from arguing retaliation, plaintiff presents sufficient evidence to show that defendant wrongfully placed her on administrative leave.  Regardless of whether Rookhuyzen's report was mandated by law or WCSO policy, pursuant to WCSO's Complaint Policy, defendant had discretion in deciding whether and when to place an employee on paid administrative leave pending the outcome of an investigation.  *See* Roque Decl. Ex. 2; Klein Decl. Exs. 4-5, 29.  Plaintiff demonstrates that in multiple instances, defendant has exercised its discretion to not place on paid administrative leave male, non-whistleblowing employees who were subjects of investigations that involved similar or more serious allegations than plaintiff's.  For example, Ward's investigation similarly involved allegations of theft, but Ward was never placed on modified duty or administrative leave.  Moreover, his investigation concluded at the SRIM level, and defendant never referred the matter for a criminal investigation into the alleged theft.  Winders, Rookhuyzen, and Yon's IA investigations also involved allegations that would constitute Class I Allegations, yet Rookhuyzen and Yon were never placed on paid administrative leave.  Winders was not placed on paid administrative leave during his first investigation and was only placed on paid administrative leave during his second investigation after he was found to be untruthful in his IA interview.  Accordingly, the Court will not

preclude plaintiff from arguing that defendant's decision to place and keep her on paid administrative leave was retaliatory.

The issue is then whether the allegedly retaliatory nature of plaintiff's paid administrative leave precludes summary judgment on her OFLA interference claim. As noted above, the OFLA should be construed "to the extent possible in a manner that is consistent with any similar provisions" of the FMLA, Or. Rev. Stat. § 659A.186(2), and "an OFLA claim rooted in facts constituting an interference claim under the FMLA also may be properly brought as an interference claim under the OFLA[,]" *Stillwell*, 2021 WL 3056375, at *6 (D. Or. July 20, 2021) (citing *Rogers*, 2012 WL 1635127, at *20, *24 n.6). Whereas the FMLA provides that unlawful interference with an employee's FMLA rights includes "manipulation" by an employer "to avoid [its] responsibilities under FMLA," such as by "[c]hanging the essential functions of the job in order to preclude the taking of leave" or "[r]educing hours available to work in order to avoid employee eligibility[,]" 29 C.F.R. § 825.220(b)(2)-(3), neither the OFLA nor its applicable regulations contain an identical provision. The OFLA prohibits an employer from (1) denying family leave to an eligible employee or (2) "retaliat[ing] or in any way discriminat[ing]" against an employee because the employee has inquired into OFLA leave, submitted a request for OFLA leave, or invoked any provision of the OFLA. Or. Rev. Stat. § 659A.183; *see* Or. Admin. R. 839-009-0320.

However, plaintiff does not demonstrate that the allegedly retaliatory nature of her paid administrative leave violates either provision of the OFLA. First, as explained above, even with the addition of the disputed hours, plaintiff cannot show that she worked an average of twenty-five hours per week in the preceding 180 days to be eligible for OFLA protections. Because plaintiff was not an eligible employee under the OFLA, defendant did not deny OFLA leave to an eligible employee.

Second, although placing plaintiff on paid administrative leave in an allegedly retaliatory manner would constitute "retaliat[ing] or in any way discriminat[ing]" against an employee, the OFLA prohibits an employer from engaging in such retaliation or discrimination *because* an employee has invoked their OFLA rights. Or. Rev. Stat. § 659A.183(2). Plaintiff need not have explicitly requested OFLA leave; however, "to obtain OFLA protections, [plaintiff] need[ed] to have . . . provided 'sufficient information for

[defendant] to reasonably determine' that the OFLA applied to [her] request." *Johnson v. Jondy Chems., Inc.*, No. 3:16-CV-01734-MO, 2017 WL 1371271, at *5 (D. Or. Apr. 13, 2017) (footnote omitted) (quoting 29 C.F.R. § 825.303(b)).  Plaintiff applied for OFLA leave on July 26 or 27, 2022, but does not point to any evidence indicating that she inquired into or otherwise invoked her OFLA rights before February 25, 2022, the date that defendant placed her on paid administrative leave.  Therefore, at the time that defendant placed plaintiff on paid administrative leave, she had not yet applied for family medical leave, inquired into leave, or otherwise invoked the OFLA.  Therefore, it cannot be said that by placing plaintiff on paid administrative leave, defendant retaliated or discriminated against plaintiff *because* she inquired into OFLA leave or otherwise invoked the OFLA.  Accordingly, summary judgment as to plaintiff's OFLA claim is still appropriate, even despite the allegedly retaliatory nature of defendant's imposition of paid administrative leave.

## CONCLUSION

For the foregoing reasons, defendant's Motion for Partial Summary Judgment, ECF [41], is GRANTED in part and DENIED in part.  Plaintiff's third claim for relief for OFLA interference is DISMISSED.


IT IS SO ORDERED.


DATED this 4th day of April, 2025.

_Adrienne E Nelson_
Adrienne Nelson
United States District Judge